1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name   Amador _____ Henry _____

         (Last)        (First)       (Initial)

3  Prisoner Number __C-28545_____

4  Institutional Address P.O. Box 705/FD-64-U _____

5  Correctional Training Facility, Soledad, CA.93960-0705

6  

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  Henry Amador _____

  (Enter the full name of plaintiff in this action.)

9  

10             vs.

  Ben Curry et. al., _____

11  _____

12  _____

13  _____

14  (Enter the full name of respondent(s) or jailor in this action)

15  

  Case No. _____
  (To be provided by the clerk of court)

  **PETITION FOR A WRIT**
  **OF HABEAS CORPUS**

  **(PR)**

16  Read Comments Carefully Before Filling In

17  When and Where to File

18       You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23       If you are challenging your conviction or sentence and you were not convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS     - 1 -

1   <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3   jailer. Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced. These are not proper

5   respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1. What sentence are you challenging in this petition?

12         (a)   Name and location of court that imposed sentence (for example; Alameda

13               County Superior Court, Oakland):

14           <u>Los Angeles County</u>     <u>Superior Court</u>

15           Court               Location

16         (b)   Case number, if known  <u>A021884</u>

17         (c)   Date and terms of sentence  <u>March 21, 1980</u>

18         (d)   Are you now in custody serving this term? (Custody means being in jail, on

19             parole or probation, etc.)      Yes <u>X</u>   No    

20             Where?

21             Name of Institution: <u>Correctional Training Facility</u>

22             Address:  <u>P.O. Box 705/ FD-64-U/Soledad,CA.93960</u>

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26   <u>P.C. 187 / Second degree murder</u>

27

28

1    3. Did you have any of the following?

2         Arraignment:                              Yes _X_    No _____

3         Preliminary Hearing:                      Yes _X_    No _____

4         Motion to Suppress:                       Yes _____  No _X_

5    4. How did you plead?

6         Guilty _____   Not Guilty _____   Nolo Contendere _X_

7         Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9         Jury _____   Judge alone _X_   Judge alone on a transcript _____

10   6. Did you testify at your trial?              Yes _X_    No _____

11   7. Did you have an attorney at the following proceedings:

12        (a)   Arraignment                         Yes _X_    No _____

13        (b)   Preliminary hearing                 Yes _X_    No _____

14        (c)   Time of plea                        Yes _X_    No _____

15        (d)   Trial                               Yes _X_    No _____

16        (e)   Sentencing                          Yes _X_    No _____

17        (f)   Appeal                              Yes _X_    No _____

18        (g)   Other post-conviction proceeding    Yes _____  No _X_

19   8. Did you appeal your conviction?            Yes _X_    No _____

20        (a)   If you did, to what court(s) did you appeal?

21              Court of Appeal                     Yes _X_    No _____

22              Year: 1982        Result: Judgment Affirmed _____

23              Supreme Court of California         Yes _____  No _X_

24              Year: _____   Result: _____

25              Any other court                     Yes _____  No _____

26              Year: _____   Result: _____

27

28        (b)   If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

| | | petition? | Yes _____ | No _X_ |

1

2    (c)  Was there an opinion?     Yes _____   No _X_

3    (d)  Did you seek permission to file a late appeal under Rule 31(a)?

4                                              Yes _____   No _X_

5          If you did, give the name of the court and the result:

6 _____

7 _____

8 9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to

9 this conviction in any court, state or federal?       Yes _____   No _X_

10       [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition.  You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15 U.S.C. §§ 2244(b).]

16    (a)  If you sought relief in any proceeding other than an appeal, answer the following

17         questions for each proceeding.  Attach extra paper if you need more space.

18         I.   Name of Court: _____

19             Type of Proceeding: _____ _____

20             Grounds raised (Be brief but specific):

21             a._____

22             b._____

23             c._____

24             d._____

25             Result: _____ _____Date of Result:_____

26         II.   Name of Court: ___ _____

27             Type of Proceeding: _____ _____

28             Grounds raised (Be brief but specific):

1    a._____

2    b._____

3    c._____

4    d._____

5    Result: _____ Date of Result:_____

6    III.    Name of Court: _____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a._____

10    b._____

11    c._____

12    d._____

13    Result: _____ Date of Result:_____

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a._____

18    b._____

19    c._____

20    d._____

21    Result: _____ Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No _____

24    Name and location of court: _____

25    B. GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully. Give facts to

27    support each claim. For example, what legal right or privilege were you denied? What happened?

28    Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1 │ need more space. Answer the same questions for each claim.

2 │     [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3 │ petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4 │ 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5 │     Claim One: SEE ATTACHED PETITION

6 │

7 │ Supporting Facts: SEE ATTACHED PETITION

8 │

9 │

10 │

11 │ Claim Two: SEE ATTACHED PETITION

12 │

13 │ Supporting Facts: SEE ATTACHED PETITION

14 │

15 │

16 │

17 │ Claim Three:

18 │

19 │ Supporting Facts:

20 │

21 │

22 │

23 │     If any of these grounds was not previously presented to any other court, state briefly which

24 │ grounds were not presented and why:

25 │

26 │

27 │

28 │

PET. FOR WRIT OF HAB. CORPUS     - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4    See Attached Petition

5  _____

6  _____

7  Do you have an attorney for this petition?                    Yes_X__        No____

8  If you do, give the name and address of your attorney:

9  _____

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on ___3-11-08___            _Henry Amado_

14         Date                                Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

1                       UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6  HENRY AMADOR                           Case No. _____

7       PETITIONER

8    V.

9  BEN CURRY, Warden

10     RESPONDENT
                     /

11

12

13

14

15

16            PETITION FOR WRIT OF HABEAS CORPUS;

17            MEMORANDUM OF POINTS & AUTHORITIES;

18

19

20

21

22

23                                 Henry Amador C28545

24                                   P.O. Box 705/FD-64-U
                                  CTF North Facility

25                                   Soledad, CA.93960-0705

26                                   Petitioner In Pro Per

27

28

# TABLE OF CONTENTS

Petition For Writ Of Habeas Corpus                                          1

I. Statement of the Case                                                    2

II. Background                                                              2

A.  Amador's Criminal History & Commitment
    Offense                                                                2

B.  Social History                                                         3

C.  The Board of Parole Hearings Record                                    4

D.  Suoerior Court Decision                                                5

III. Parties                                                               6

IV. Bases For Petition                                                      7

1. THE BOARD FAILED TO PRESENT EVIDENCE THAT THE OFFENSE
   COMMITTED BY PETITIONER WAS A MORE CALLOUS DISREGARD
   FOR HUMAN SUFFERING THAN THAT SHOWN BY MOST SECOND
   DEGREE MURDER OFFENSES, AND THE BOARD'S USE OF THIS FA-
   CTOR TO FIND THAT PETITIONER COMMITTED HIS OFFENSE IN A
   MORE AGGRAVTED OR VIOLENT MANNER THAN THAT ORDINARILY
   SHOWN IN THE COMMISSION OF THE OFFENSE WAS ARBITRARY
   AND CAPRICIOUS                                                          7

2. THE BOARD IS ADDITIONALLY FINDING PETITIONER WAS UN-
   SUITABLE FOR PAROLE BY PLACING UNDO AND IMPROPER
   WEIGHT ON HIS COMMITMENT OFFENSE AND PRIOR CONDUCT
   TO PREDICT THAT HE IS CURRENTLY A DANGEROUS RISK
   AND A THREAT TO PUBLIC SAFETY AFTER NEARLY THREE
   DECADES OF INCARCERATION                                                7

3. THE BOARD PANEL FAILED TO PLACE ANY WEIGHT TO THE UN-
   DISPUTED EVIDENCE IN THE RECORD THAT AMADOR COMMITTED
   HIS OFFENSE AS THE RESULT OF SIGNIFICANT STRESS IN
   HIS LIFE                                                                7

4. IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE
   PROCESS GUARNTEED BY THE FOURTEENTH AMENDMENT TO
   THE UNITED STATES CONSTITUTION FOR THE BOARD TO
   FIND PETITIONER UNSUITABLE FOR PAROLE AFTER TEN
   PAROLE HEARINGS BASED ON HIS COMITMENT OFFENSE AND
   PRIOR CONDUCT.                                                          7

TABLE OF CONTENTS

(CONTINUED)

V.  Prayer For Relief                                    7,8

Verification

VI. Memorandum of Points and Authorities                 8

A.  The Statutory And Regulatory Scheme                  23

B.  Petitioner's Psycological Evaluations-1984-to-2004   23,25

Conclusion                                               31

TABLE OF EXHIBITS

1. Seperior Court Decision - 7/31/07

2. Hearing Transcript - 2/06/07

3. Notice of Appeal - 3/30/81

4. Probation Officers Report - 3/30/81

5. Appellate Decision - 5/24/82

6. Investigative crime Report, page 36 - 7/23/07

7. Psychological Evaluations - (1984) (1987) (1989) (1990) (1991)
   (1992) (1995) (1997) (1999) (2001) (2004)

1

## TABLE OF AUTHORITIES

2 Cases

3 In re Barker (2007) 151 Cal. App. 4th 352-354...................13,29

4 Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910,915..................26

5 Board of Pardons v. Allen 483 U.S. 369 (1987)...........,........26,27

6 In re Burns (2006) 136 Cal App. 4th 1318..........................12

7 In re Cooper (2007) 156 Cal. App. 4th 1049-1051...................13

8 In re Dannenberg (2007) 156 Cal. App. 4th 1392,1401.............13,29

9 In re Elkins (2006) 144 Cal. App. 4th 496-497...........9,10,20,21,22

10 Greenholtz v. Inmates of Nebraska Penal and Correctional
Complex. 442 U.S. 1, (1979)..................................26,27,29

11 Guidotti v. County of Yolo (1989) 214 Cal. App. 3d 1552,1561.......26

12 Hayward v. Marshall__ F3d__ 2008 WL 4316..........................13

13 Irons v. Carey 479 F.3d 665 (9th Cir. 2007).....................27,28

14 In re Lawrence (2007) 150 Cal. App. 4th 1517-1520......19,22,27,28,29

15 In re Lee (2006) 143 Cal App. 4th 598...........................28,29

16 In re Lowe (2005) 113 Cal. App. 4th 1411..........................11

17 Martin v. Marshall (2006) 448 F. Supp.2d 1041,1143,1145.........29,30

18 In re McClendon (2003) 113 Cal. App. 4th 1411.....................11

19 McQuillion v. Duncan (9th Cir. 2003) 334 F.3d 895,912.....25,26,27,28

20 In re Morrall (2002) 102 Cal. App. 4th 280........................11

21 O'Connor v. Donaldson (1995) 422 U.S. 563,575.....................30

22 Oregon Resource Council v. Lowe (9th Cir. 1997) 109 F.3d
23 1552,1561.........................................................26

24 In re Powell (1988) 45 Cal. 3dd 894,904...........................25

25 In re Ramirez, supra 94 Cal. App. 4th 549..........................9

26 Rosenkrantz, supra, 29 Cal. 4th 658............................14,25

27 Rosenkrantz v. Marshall (2006) 444 F.supp.2d 1063..................9

28 Sass v. Board of Prison Terms, 461 F.3d 1123,1129 (9th Cir.  2006).27

1

TABLE OF AUTHORITIES

2

(CONTINUED)

3

In re Scott (2004) 119 Cal. App. 4th 891......................... 9,22

4

In re Scott (2005) 133 Cal. App 4th 598......................... 19,21

5

In re Smith (2003) 109 Cal. App. 4th 494-495,499................... 29

6

In re Smith (2003) 114 Cal. App. 4th 349-351 ............9,11,20,22,27

7

In re Tripp __ Cal. App. 4th __ (2007) ............................28

8

Walker v. Alameda (2006) 444. supp. 2d 1063........................ 12

9

Willis v. Kane (2007) __ F. Supp. 2d __ N.D. Cal

10

2007 WL 1232060 ........................................................13

11

**Statutes**

12

Penal Code § 187 ................................................. 9

13

Penal Code § 189................................................. 2,9

14

Penal Code § 273 (d)..........................................2,16,17

15

Penal Code § 647 (f) ..............................................2

16

Penal Code § 849 B2 ...............................................2

17

Penal Code § 3041 (a)(b)........................................... 5

18

**Regulations**

19

20

15 CCR § 2402 ............................ 5,6,16,18,19,22,23,25,28

21

15 CCR § 2282 ....................................................14

22

**Constitutional Provisions**

23

Fourteenth Amendment ..........................................7,25

24

25

26

27

28

1  Henry Amador C-28545
   P.O. Box 705/FD-64-U
2  CTF North Facility
   Soledad,CA.93960-0705
3

4  In Pro Per

5

6              IN THE UNITED STATES DISTRICT COURT

7           FOR THE NORTHERN DISTRICT OF CALIFORNIA

8                  SAN FRANCISCO DIVISION

9

10  IN RE: HENRY AMADOR          CASE NO. _____

11       PETITIONER             PETITION FOR WRIT OF HABEAS
                                CORPUS AND MEMORANDUM OF
12  ON HABEAS CORPUS            POINTS AND AUTHORITIES IN
                                SUPPORT THEREOF.
13  _____/

14

15

16          PETITION FOR WRIT OF HABEAS CORPUS

17
    TO: THE HONORABLE UNITED STATES DISTRICT JUDGE OF THE UNITED
18  STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA.

19       Based on the facts, grounds, arguments, authorities and

20  exhibits, herein petitioner Henry Amador in Propria Persona  re-

21  spectfully seeks habeas corpus relief in an order

22  (a) Vacating Board of Parole Hearings action of February 6, 2007

23  that denied petitioner parole for the tenth time based upon the

24  commitment offense and prior conduct.

25  (b) Petitioner, by way of this writ does not contest or challe-

26  nge his conditions of confinement a the California Department of

27  Corrections & Rehabilitations (hereafter CDCR), here at the Cor-

28  rectional

                            1.

Training Facility, Soledad, California. Rather, petitioner, by way of this writ does contest and challenge the violations of rules, regula-tions, California Penal Codes, State and federal case laws, and denial of protection of due process, equal protection, and cruel and/or unus-ual punishment under both state and federal constitutions.

## I. Statement Of The Case

Preliminary formalities (HT 3). 1/ Exhibit #2, transcript of parole hearing conducted on February 6, 2007.

Henry Amador was received into the (CDCR) on April 3, 1981 from Los Angeles County for the offense of second degree murder in violation of penal code § 187, being sentenced to an indeterminate term of 15 years to life. The Board of Parole Hearings (hereafter Board or Board Panel) fixed petitioner's minimum eligible parole date at September 2, 1988. His case number is A021884.

## II. Bakground

### A. Amador's Criminal History & Commitment Offense

Prior to the murder, on December 15, 1976, Amador was arrested for "Feloney Wife Beating" under P.C. section 273 (d) which subsequently was dismissed in the furtherance of justice. And an arrest for P.C. 647 (f), public intoxication which was deemed detention only under section 849B2 of the penal code.(HT 45-46).

On Monday July 21, 1980, officers responded to 1506 East 63rd Street, Long Beach, California, after a call of a dead body. Officers were in-formed by Michael Jensen, that his brother-in-law, the defendant, had been staying with him and his wife for a period of time, that the def-

Reference to parole hearing transcripts will be indicated by HT followed by page number, i.e, (HT 0).

1 | endant's estranged wife, the victim Karen Amador, had been missing si-
2 | nce the previous Wednesday, that the defendant had been acting strange
3 | around the house and decided to plant a garden. He felt that defendant
4 | might have killed his wife and buried her body in the backyard and
5 | when he checked the situation out  he found the body. An autopsy per-
6 | formed on July 23, 1980, revealed that cause of death was massive brain
7 | damage due to multiple blunt force injury, that the scalp was not pres-
8 | ent, and that an extreamly large portion of the skull was missing and
9 | the brain was no longer present. Investigation revealed that the def-
10 | endant was seen with the victim on Wednesday, July 16, 1980, in front
11 | of her residence and apparently killed her in his van later that even-
12 | ing and then buried the body in the Jensen's backyard on Saturday,
13 | July 19, 1980. Officers took the defendant into custody approximately
14 | an hour later when he was walking down South Street. (Ex #4 at pp.5-6).

## B. Social History

Born in Los Angeles, California, petitioner is the second of three childern of the union of Ralph and Rachel (Diaz) Amador. The petitioer's parents' separated when he was approximately five years of age and he was raised by his mother.

His father, a construction worker died of a heart attack in 1977. And his mother died in 1980. The petitioner attended schools locally quitting Lynwood high school after the tenth grade since he did not like school and then Returned to night school and achieved his diploma in 1975. At the time of his arrest, the petitioner was living with his sister and brother-in-law for approximately three months.

In November of 1970, the petitioner married the former Karen Lyles, the victim, and he indicated they separated 25 to 30 times from one

3.

1 | week to a month until they were divorced in 1976. The couple remarried
2 | in October of 1978, and separated permanently in May of 1979. The pet-
3 | itioner related that separations were a result of almost every member
4 | of her family moving in one time or another and did indicate that he
5 | started drinking heavy after thier separation in 1976.

6 | Petitioner relates that he is in good health and never had any
7 | serious illnesses nor injuries. He did see a psychiatrist in Febuary
8 | of 1979 on one occasion as a result of emotional problems, but he felt
9 | he could not pay the $45 per hour and never went back. He related that
10 | he attended the "Grace Brethern Church" with regularity, that he is
11 | not a member of any social or fraternal organizations and has never
12 | served in the armed forces and his major leisure time activity since
13 | 1976 was drinking.

14 | From May, 1980, until his arrest in the present offense, the pet-
15 | itioner was employed as a machinist by the Metal Products Company of
16 | Cerritos. From 1976 until February, 1979, he was employed as a machin-
17 | ist by Morgan Hill Products of South Gate, earning $860 per month, but
18 | was fired when he had emotional problems that he could not cope with
19 | and work. From 1971 until 1976, he was employed as a machinist by "Bo-
20 | utell Aircraft", in Lynwood, California, earning $5 per hour, but left
21 | for a better job with Morgan Mill Products. From 1968 until 1971, he
22 | was employed as a compounder by "West Chemicals, Vernon California,
23 | but was fired as a result of domestic problems that affected his work.
24 | (Ex #4 at pp. 1-3).

25 | C. The Board of Parole Hearings Record

26 | On February 6, 2007, a panel of the Board of Parole Hearings
27 | considered the matter of petitioner's parole suitability for the tenth
28 |

4.

1  time. In making its determination the Board panel specificly relied on

2  penal code section 3041 (a) & (b) and California Code of Regulations,

3  Title 15, Division Two, Specifically, §2402 (Determination of suitab-

4  ility).

5      In the matter of Henry, CDC# C-28545, the panel has reviewed all

6  the information received from the public and relied on the following

7  circumstances in concluding that the prisoner is not suitable for par-

8  ole and would pose an unreasonable risk of danger to society or a thr-

9  eat to public safety if released from prison.

10  The first reason the panel finds that the commitment offense was carr-

11  ied out in a very cruel, very callous manner. (Cal. Code Regs., tit. 15,

12  §2402, subd. (c)(1).

13  The second reason the panel finds that the victim was abused, somewhat

14  defiled and mutilated during the offense. (Cal. Code Regs., tit. 15,

15  §2402, subd (c)(C).

16  The third reason the panel finds that the offense was carried out in a

17  manner that demonstrates a very callous disregard for human suffering.

18  (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D). (Ex #2 at pp.120-121).

19  D. Supreior Court Decision

20  On July 31, 2007, the Superior Court denied petitioner's habeas petit-

21  ion after concluding the following:

22  1. The record reflects that ther is some evidence the "the offense was
23     carried out in a manner which demonstrates an exceptional <u>callous</u>
       <u>disregard for human suffering</u>." (Cal. Code Regs. tit.15,§2<u>402.(c)</u>(1)
24     <u>(D)</u>.

25  2. This means that "the offense in question must have been committed
       in a <u>more aggraveted or violent manner</u> than that ordinarily shown
26     in the commission of that offense." (In re Scott (2004) 119 Cal.
       App. 4th 871,891.)

27  3. An offense is more aggravted or violent when it involves sever tra-
28     uma inflicted with deadly intensity; e.g., beating, clubbing, stran-
       ulation, suffocation, burning, multiple wounds inflicted with a

1   weapon not resulting in immediate death or action calculated to
    induce terror in the victim. (Id. at 892.) Here, petitioner beat
2   his wife multiple times with a hammer with such force that her brain
    and part of her skull were missing.

3
4.  The victim was particularly vulnerable due to her size and physical
4   disabilities. Because this crime involved sever trauma to the help-
    less victim, it shows an exceptionally callous disregard for human
5   suffering.

6   5. The Board found petitioner unsuitable for parole due to his unstable
    and tumultuous relationship with others, particularly his wife.
7   (Cal. Code Regs., tit. 15, §2402, subd. (c)(3).)

8   6. Petitioner and his wife had been separated over twenty-five times
    and divorced and remarried once. (HT 52). He was arrested once for
9   domestic violence in 1976 (HT 26-29) and admitted to another inci-
    dent in 1978. There were other allegations of domestic abuse, inc-
10  luding some made by members of petitioner's family (HT 65-66).

11  7. He continues to maintain that his wife provoked him into these att-
    acks by flirting with other men and allowing her family to stay at
12  their home. (HT 17,18,19,29,21,23,24,25,26,27,37,41). Additionally,
    petitioner admits that he was an alcoholic.

13
8.  Because petitioner has since remarried while in prison, the Board
14  was concerned that he needs additional psycological evaluation and
    further programming to ensure that he is able to understand and
15  cope with stress and anger in a non-violent manner, particulary in
    connection to his relationship with women.(HT 125-127). This is
16  some evidence to support the Board's finding that petitioner conti-
    nues to pose a risk of danger, and is therefore unsuitable for par-
17  ole.

18
                              III.
19
                            PARTIES
20

21  Petitioner, Henry Amador, CDC# C-28545 is a prisoner of the state of

22  California, incarcerated at the Correctional Training Facility, Soledad,

23  California.

24  Respondent, Ben Curry, is the Warden of the Correctional Training Fac-

25  ility, Soledad, California and is legal custodian of the petitioner.

26

27

28

IV.

BASES FOR PETITION

1. THE BOARD FAILED TO PRESENT EVIDENCE THAT THE OFFENSE
COMMITTED BY PETITIONER WAS A MORE CALLOUS DISREGARD
FOR HUMAN SUFFERING THAT WAS SHOWN BY MOST SECOND DE-
GREE MURDER OFFENSES, AND THE BOARD'S USE OF THIS FAC-
TOR TO FIND THAT PETITIONER COMMITTED HIS OFFENSE IN A
MORE AGGRAVATED OR VIOLENT MANNER THAN THAT ORDINARILY
SHOWN IN THE COMMISSION OF THE OFFENSE WAS ARBITRARY
AND CAPRICIOUS.

2. THE BOARD IS ADDITIONALLY FINDING PETITIONER WAS UNSU-
ITABLE FOR PAROLE BY PLACING UNDO AND IMPROPER WEIGHT
ON HIS COMMITMENT OFFENSE AND PRIOR CONDUCT TO PREDICT
THAT HE IS CURRENTLY A DANGEROUS RISK AND A THREAT TO
PUBLIC SAFETY AFTER NEARLY THREE DECADES OF INCARCERATION.

3. THE BOARD PANEL FAILED TO PLACE ANY WEIGHT TO THE UN-
DISPUTED EVIDENCE IN THE RECORD THAT AMADOR COMMITTED
HIS OFFENSE AS THE RESULT OF SIGNIFICANT STRESS IN HIS
LIFE.

4. IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARNTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED ST-
ATES CONSTITUTION FOR THE BOARD TO FIND PETITIONER UNSU-
ITABLE FOR PAROLE AFTER TEN PAROLE HEARINGS BASED ON HIS
COMMITMENT OFFENSE AND PRIOR CONDUCT.

V.

PRAYER FOR RELIEF

Henry Amador states that he has no other plain or speedy remedy save

habeas corpus: therefore, he prays this honorable court;

　　1. Issue an order to show cause;

　　2. appoint counsel to represent petitioner in any and all pro-
　　ceedings in this matter;

　　3. conduct an evidentiary hearing;

　　4. order respondents to provide petitioner with reasonable dis-
　　covery;

7

1    5. declare the rights of the petitioner;

2    6. grant any other further relief the court deems proper and just.

3

4

5    Dated:  _3 - 11 - 08_                    _Henry Amador_
6                                                    Henry Amador

7

8

9                              VERIFICATION

10

11    I am the petitioner in this action. All facts in the above documents, not otherwise supported by citations to the record, exhibits, or

12

13    other documents, are true of my own personal knowledge. I declare under

14    penalty of perjury that the foregoing is true an correct and that this

15    declaration was executed on this date  _3 - 11 - 08_          at the

16    Correctional Training Facility near Soledad, California.

17

18

19

20                                        _Henry Amado_
21                                        Respectfully submitted
                                          In Propria Persona
22

23

24

25

26

27

28

1

VI.

2

MEMORANDUM OF POINTS AND AUTHORITIES

3

4

5

6

7

1. THE BOARD FAILED TO PRESENT EVIDENCE THAT THE OFFENSE COMMITTED BY PETITIONER WAS A MORE CALLOUS DISREGARD FOR HUMAN SUFFERING THAT WAS SHOWN BY MOST SECOND DE- GREE MURDER OFFENSES, AND THE BOARD'S USE OF THIS FAC- TOR TO FIND PETITIONER COMMITTED HIS OFFENSE IN A MORE AGGRAVATED OR VIOLENT MANNER THAN THAT ORDINARILY SHOWN IN THE COMMISSION OF THE OFFENSE WAS ARBITRARY AND CAP- RICIOUS.

8

9

Petitioner contends that the Superior Court erred in its analysis of the factors underlying the Board's decision to deny parole.

10

11

12

13

14

15

16

17

18

19

20

The court finds that the crime was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering on the grounds that the offense in question must have been committed in a more aggravated or violent manner than ordinarily shown in the commiss- ion of that offense. The manner in which Amador committed his offense does not demonstrate an exceptionally callous disregard for human suff- ing when compared to most second degree murders. To the contrary, second degree murder requires express or implied malice--i.e., the perpetrator must kill another with the specific intent to do so; or he or she must cause  another person's death by intentionally performing an act, know- ing it is dangerous to life and with consicious disregard for life.

21

22

23

24

25

26

27

( Pen. Code, §§ 187-189; CALJIC No. 8.11.) For this reason, it can re- asonably be said that all second degree murders by definition involve some callous--i.e., lack of emotion or sympathy, emotional insensitiv- ity, indifference to the feelings and suffering of others. (In re Smith, (2003) 114 Cal. App. 4th 349; In re Scott (2004) 119 Cal. App. 4th 891; In re Elkins (2006) 144 Cal. App. 4th 496-497; Rosenkrantz v. Marshall (2006) 444 F. Supp. 2d 1063, 8. In Ramirez, suprs 94 Cal. App. 4th 549,

28

1    as in this case, the Board denied a parole release date on the basis of
2    a finding that the nature of the inmate's offense displayed a "callous
3    disregard for human suffering." (Id. at pp. 558, 568.) Setting aside
4    that determination, the court agreed that "the gravity of the commit-
5    ment offense or offenses alone may be a sufficient basis for denying a
6    parole application, so long as the Board does not fail to consider all
7    other relevant factors," (Id. at p. 569), but attached an important
8    caveat. As the court explained, [a]ll violent crime demonstrates the
9    potential for posing a grave risk to public safety, yet parole is mand-
10   atory for violent felons serving determinate sentences.

11        [T]he Legislature left a Consideration of the public safety as
12   the fundamental criterion in assessing suitability. When evaluating wh-
13   ether a commitment offense alone can support such a finding, the Supr-
14   eme Court has supplied some further guidance, focused largely on the
15   nature of that offense. In Rosenkrantz, it explained "a denial of paro-
16   le based upon the nature of the offense alone might rise to the level
17   of a due process violation--for example where no circumstances of the
18   offense could reasonably be considered more aggravated or violent than
19   the minimum necessary to sustain a conviction for that offense.

20        Comparing Amador's offense for second degree murder to other
21   second degree murders, and/or first degree murders for whom  the courts
22   have properly granted relief or the Board of Parole Hearings have gr-
23   anted parole even after concluding that the inmates offense was an ex-
24   tremely vicious crime.  In re Elkins (2006) 144 Cal. App. 4th 483. The
25   Board did in fact conclude that Elkins who killed his friend with a
26   baseball bat because he wanted money that his offense was an extreamly
27   vicious crime but that he would not pose an unreasonable risk of danger
28   to society or public safety if released from prison after 26 years.

--In In re Morrall (2002) 102 Cal. App. 4th 280, a defendant embroiled in an acrimonious divorce was a poisonous brew of "self-fostered anger." He was "angry at the prospect of being compelled to divided the community property with his wife. He was angry at the prospect of having continuing child and spousal support obligations. He was angry that his wife would have custody and thus some control when he could see the children. He was angry that his wife would stand up for her interests in the dissolution proceedings rather than yield to his demands." In the months before he murdered his wife, he threatened her a number of times, hoping to get his way in the dissolution proceedings. He told his wife's parents "that he would have his wife killed and would burn both houses before he ever gave her a dime." Consumed by incalculable rage, he took a loaded gun to her house. The court described wife's final moments as follows: "At first, the victim would not open her door. When she did, he shot her seven times, including a contact wound to the neck. In doing so, he consummated the life-endangering anger he had been harboring, and also depriving his young childern of a mother and imposed upon them the stigma of having a murder for a father."

--In In re Ernest Smith (2003) 114 Cal App. 4th 349-351. a defendant ask  his wife to accompany him job hunting. When she refused, he began to shake uncontrollably because he could no longer tolerate the pressure from his disintegrating marriage and his wife's parents hostility. When [he] asked [her] if she was seeing another man, [she] replied in the affirmative and stated she did not want anything further to do with [him], [Smith] began pounding his head with his fist and stated he could not take anymore of this anxiety. [He] took a .22 caliber handgun from a dresser drawer and shot his wife once in the head. He shot [her] twice more as she was falling to the floor. Later that morning, Smith went to a church, asked people to pray for him, and asked them to call the police.

--In In re McClendon (2003) 113 Cal. App. 4th 315, the defendant planned a "calculated attack" in the middle of the night against his estranged wife. He arrived at her home wearing rubber gloves and carring a handgun and wrench, which he used to attack his wife and another victim.

--In In re Lowe (2005) 113 Cal. App. 4th 1411, the defendant had a "special relationship of trust and confidence" with the victim. He purchased a gun shortly before the murder, entered the victim's bedroom while the victim slept "and shot him five times in the head and chest, execution style."

-- In In re Burns (2006) 136 Cal. App. 4th 1318, the defendant and murder victim were longtime friends who had been dating. When the victim moved away to college, she told the defendant she wanted to stop seeing him. The court described her last hours alive as follows: "[A]fter luring Katina to an isolated spot and shooting her, [defendant] did not summon help or stay to help her.Instead he walked away, climbed the stairway of his dormitory building from which Katina might have been visible, and entered his dorm room where he laid down on his bed and may have joined his roommate who was watching Monday Night Football. Meanwhile Katina, who had been shot between 7:00 and 8:00 p.m., was not found until 9:45 p.m. When found, she was lying on her back and moaning. Her body had scratches indicating that she may have tried to obtain help. Katina was not pronunced dead until after midnight. Thus, [defendant] had approximately one to two hours in which he could have reconsidered his disregard for Katina's suffering and life, but he did not do so."

--In Walker v. Alameda (2006) U.S. Dist. Lexis 21673, the defendant planned a "calculated attack" against his wife. The autopsy revealed the cause of death was multiple blunt injuries to the head and neck caused by a blunt object. The victim was taken to the hospital by ambulance, underwent surgery, and placed in critical care unit in a coma. While in jail, the defendant solicited another prisoner to murder a potential witness against him.

In Rosenkrantz v. Marshall, (2006) 444. supp. 2d 1063, the defendant brutally murdered his victim after a full week of carful preparation, rehersal and execution. The defendant killed the victim by firing "10 shots at close range from an assault weapon and "firing] at least three or four shots into the victim's head as he lay on the pavement.

--In In re Lawrence (2007) 150 Cal. App. 4th 1517-1520, the defendant became enraged at a man who promised to divorce his wife and marry her. When the man failed to keep his promise the defendant immediately drove over to the victim's place of business to confront her about her husband. The defendant anticipating a confrontation spopped off at her sister's home to pick up a handgun and a potato peeler to stab the victim after shooting her in the hand, arm, leg, and neck. The defendant characterized the murder as a "cat fight" after shooting and then stabbing the victim.

After learning the authotities were looking for her the defendant left the country for 11 years. She decided to return and turn herself in. A jury found the defendant guilty of first degree murder.

--In In re Barker (2007), 151 Cal. App. 4th 352-354, the defendant together with his codefendant met over citizen's (CB) raido. Soon after they met, they talked about killing the codefendant's parents and his grandfather. The two talked of living and traveling together with the money they would get after the parents were dead. After discussing their plan, Barker's codefendant walked up behind his father and shot him in the head three times. He then shot his mother two times. The defendant then picked up the .22 rifle and shoot the grandfather twice in the head. Afterwards, the two ransacked the house to make it look like a burgalary.

--In In re Cooper (2007), 153 Cal. App. 4th 1049-1059, the defendant married his wife and victim Joan Cooper in 1986. Six months into the marriage an argument started over the defendant's inability to preform sexually. The defendants wife Joan called him a queer and told him that his mother knew that he was a queer. The victim continued to yell at him for an additional 10 minutes. The defendant then rushed behind his victim carrying a sledgehammer and with a swinging downward BLOW TO THE BACK OF HER NECK AND HEAD knocked her down with the sledgehammer. An autopsy established that the victim died of spinal shock from blunt trauma injuries to the back of the neck. She also had bruise in the pubic region consistent with being kicked or hit there.

--In In re Dannenberg (2007), 156 Cal. App. 4th 1392, the defendant "reacted with extreme and sustained violence, " stricking "multiple blows to his wife's head with a pipe wrench." While she was helpless from her injuries, he delivered the coup de grace by placing her head "into a bathtube full of water,... or at least left it there without assisting her until she was dead.

--In Willis v. Kane (2007)__F.Supp. 2d__, the defendant killed his 19 -month old daughter after hitting her several times on the head and then failed to obtain medical attention. After the baby was dead, he disposed of her boby by first hiding her in a closet and then putting her in a dumpster. He then reported to the police that she had been kidnapped.

--In Hayard v. Marshall __ F.3d. __2008 WL 43716, the defendant along with other members of the Vagos motorcycle gang confronted the victim and stabbed him 12-times because he believed the victim may have rape his girlfriend.

13.

When the relevant evidence showed no more callous disregard for human
suffering than that shown by most second degree murder offenses, the
Board's use of this factor to conclude that petitioner committed his
offense in an especially crule and callous manner for the purpose of
determining petitioner's suitability for parole was arbitrary and cap-
ricious. (Rosenkrantz, supra, 29 cal. 4th at p. 658 italics addeded.)
Examples of aggravated conduct reflecting an "exceptionally callous
disregard for human suffering," are set forth in Board regulations re-
relating to the matrix used to set base terms for life prisoner's
(§2282, subd, (b) n 11; namely "torture" as where the "[v]ictim was
subject to prolonged infliction of physical pain through the use of
non-deadly force prior to act resulting in death, " and "severe trauma
as where "[d]eath resulted from sever trauma inflicted with deadly in-
tensity; e.g., beating, clubbing, stabbing, strangulation, suffocation,
burning, multiple wounds inflicted with a weapon not resulting in imm-
ediate death or actions calculated to induce terror in the victim.

No such facts or anything remotely similar are present in this
case as the record reflects that the victim died instantaneously. There
is no evidence in the record that Amador "tormented, terroized his wife
before killing her, or that he gratuitously increased or unnecessarily
prolonged his wife's pain and suffering... Was the crime callous? Yes,
in fact the orignal trial court that tried the case  called this a very
brutal beating. The court said, the womans head was practically pulver-
ized by the use of a heavy hammer. And there was some evidence of pre-
meditation (thoe the court never mentions what that evidence is). But I
thought that, listing to the evidence and the mechanics of how the cr-
ime went down, apparently they started off the evening friendly, and
it developed into just an out-and-out anger-induced but not enough to

1  to bring it to voluntary. (Exhibit #3 at p.3)

2  The probation report states: with respect to the present offense, the
3  defendant admits the act but offers in mitigation that he was driven to
4  this act by his wife's behavior. The autopsy report indicates there we-
5  re missing portions of the victims head and indicates that she was st-
6  ruck numerous times with the hammer. The defendant could not remember
7  the amount. It is not felt that defendant's actions proved premedita-
8  tion. Nevertheless, the defendant's willfull taking of human life must
9  result in a commitment to the Department of Corrections.

10  There are no circumstances in aggravation. Circumstances in mitigation:
11  The defendant has an insignificant prior record. (Ex. #4 at pp.8-9).
12  The trial court ·found defendant guilty of second degree murder, indic-
13  ating that it was a "classic" second degree murder in which defendant
14  in which defendant had acted in a "frenzy" without premeditation ˌand
15  that the killing was not voluntary manslaughter because defendant's
16  "frenzy" was not a "reasonable reaction but rather was "overkill."
17  (Ex #5 at pp. 4-5).

18  Evidence of the victim's fear did the defense no harm whatsoever for
19  defendant, in fact was convicted of second degree murder rather than
20  first degree murder as charged 3/ as the defendant himself points out
21  in his brief, "[t]he evidence of the victim's state of mind failed in
22  [it's] purpose... for it is clear that the court never accepted the
23  prosecution theory of a kidnapping and believed only that the killing
24  occured in an unplanned "frenzy." (Ex #5 at pp. 7-8).

25

26  3/
          The challenged evidence of course, had no impact upon the court's
27  rejecting the defense voluntary manslaughter theory. The court in ess-
    ense aggreed with the defense that the killing occured in the heat of
28  passion but found that defendant's frenzy was not a reasonable reaction

1       If the decision's consideration of specified factors is not supp-
2   orted by some evidence in the record and thus is devoid of a factual
3   basis, a court should grant the prisoner's petition for writ of habeas
4   corpus and should order the board to vacate its decision denying parole
5   and thereafter to proceed in accordance with due process of law.

6

7       **2. THE BOARD IS ADDITIONALLY FINDING PETITIONER WAS UNSU-**
    **ITABLE FOR PAROLE BY PLACING UNDO AND IMPROPER WEIGHT**
8   **ON HIS COMMITMENT OFFENSE AND PRIOR CONDUCT TO PREDICT**
    **THAT HE IS CURRENTLY A DANGEROUS RISK AND A THREAT TO**
9   **PUBLIC SAFETY AFTER NEARLY THREE DECADES OF INCARCERATION.**

10

11      The Board's determination that petitioner is not yet sutiable for
12  parole was based on its finding that he would pose an unreasonable risk
13  of danger to society or a threat to public safety if released from pri-
14  son is based entierly on the nature of his commitment offense and the
15  manner in which it was carried out. (HT 120-121). Additionally the Bo-
16  ard found petitioner unsuitable for parole due to his history of unsta-
17  ble and tumultous relationships with others, particularly his wife.
18  (Cal. Code Regs., tit. 15. §2402, subd. (c)(3).) The record reflects
19  the petitioner was arresred for "Feloney Wife Beating" under P.C. sec-
20  tion 273 (d) 4-yrs prior to the commitment offense on December 15, 1976.
21  (HT 45-46). Additionally the court in its analysis of the factors in
22  this case rely on allegations of petitioner's family that are not con-
23  tained in the record. Allegations are just allegations and cannot be re-
24  lied upon to make a determination when they have no support in the re-
25  cord. Then the court misconstrue what the record states. The court says

26

27  to provocation. Indeed, as the court pointed out in denying the motion
    for new trial, the court believed that defendant and Karen "started
28  off that evening friendly."

16

1    petitioner continues to maintain that his wife provoked him into these
2    attacks (as thoe there were several of them) by flirting with other men
3    and allowing her family to stay in their home. It is true that Amador
4    was arrested for Feloney Wife Beating  under P.C. section 273 (d) be-
5    cause he did beat his wife on December 15, 1976, because he was jealous
6    of another man. This statement arises from a question the panel asked
7    Amador about arguments he had with his wife during the course of their
8    marriage. (HT 26-40). Starting at page 26 of the hearing transcript,
9    Commissioner ENG. ask Amador to give the panel a better idea of how of-
10   ten he and his wife had arguments that lead to you hitting her. As the-
11   se events happen over 31 years ago I told the panel I did not remember
12   all of the details because I was heavily intoxicated and passed out
13   when the police came to arrest me. In fact, I told the panel that I
14   went into a jealous rage because my wife was flirting with another man.
15   But the panel already knows that. I had to rely on statements made by
16   the victim herself as she told this to a witness. (Ex #6 at p.36). I
17   had to wait 22 years to find this out for myself because the Board had
18   held this information in my confidential file. (HT-36-37). Basicly the
19   petitioner is answering the panels question as to how often he and his
20   wife would get into arguments and what the arguments were about. Here
21   the court left out so many of the details.

22       At pages 26 through 40 of the transcripts, the petitioner answers
23   the panels questions with regard to why he and his wife had so many
24   arguments through their marriage. The court left out all the other de-
25   tails and centered in on the fact that that Amador beat his wife only
26   because she provoked him by flirting with other men. The court ignored
27   other facts like the abuse the victim imposed on their child Henry Jr.
28   (HT 28-30). The court also ignored the stress Amador was under at the

17

1  time of the offense due to the enormous financial burdens he was left
2  with resulting from the first divorce coupled together with the hard-
3  ship of instantly becoming a single father without any warning. The
4  panel asked about why there were so many separations (25 to 30) during
5  the course of the marriage. Petitioner explained to the panel that many
6  seperations resulted because the victim insisted that her family memb-
7  ers should move in with him and his wife and in fact the family memb-
8  ers were in the couples home most of the time during the course of the
9  marriage until they had all passed away in 1976 resulting in the first
10  divorce (HT 26-40): (Ex #4 at p.2, 6, 8).

11      Here, the court has actually reweighed the Boards finding. The
12  Board's finding states as follows: Regarding a previous record, this
13  inmate does not have any prior convictions. However, we do note that he
14  does have a history of unstable and tumultous relations with others.
15  Specifically with the victim, Karen Amador, his estranged wife. And
16  this is evidence by his prior arrest for demestic violence. ( "Feloney
17  Wife Beating" (HT 122).

18      The court adds additional language to the Board's finding. The
19  court states: The Board found petitioner unsuitable for parole due to
20  his history of unstable and tumultuous relationships with others, par-
21  ticularly his wife. (Cal. Code Regs., tit. 15, §2402, subd. (c)(3).)
22  Petitioner and his wife had been separated over twenty-five times and
23  divorced and remarried once He was arrested once for domestic violence
24  in 1976 and  admitted to another incident in 1978. There were other al-
25  legations of domestic abuse, including some made by members of petiti-
26  oner's family. He continues to maintain that his wife provoked him into
27  these attacks by flirting with other men and allowing her family to
28  stay at their home. Additionally, petitioner admits that he was an

18.

1   alcoholic. The court has taken the Board's findings from (HT 122) and
2   adds its own language from its own assessment of what it thought the
3   panel meant to say thoe the Board never stated why they noted that the
4   petitioner has a history of unstable and tumultous relations with his
5   wife. (HT 26-40).

6       The court erred in its holding that the Board could continue to
7   hang its hat on the commitment offense and its nature, something that
8   can never change and could keep an inmate confined forever if it con-
9   tinues to be the dominate factor in Justifying continued confinement.

10       Even though Title 15 CCR., section 2402 (a) demands that the Bo-
11   ard set a release date unless the prisoner currently presents an unrea-
12   sonable risk of danger for the public. There is absolutely nothing in
13   the Board's decision indicating the basis for that belief.

14       The standard set forth in In re Rosenkrantz, 29 Cal. 4th at 658,
15   683, that when the Board finds parole unsuitable based solely of the
16   facts of the commitment offense, it must cite some evidence of factors
17   beyond the minimum elements of that offense. In re Lawrence 150 Cal.
18   App. 4th 1533; In re Scott 133 Cal. App. 4th 598; In re Weider 145 Cal.
19   App. 4th 587. However, the Board's caracterization of petitioner's ac-
20   tion premeditation is incorrect because the trial court found the off-
21   ense was murder in the second degree.

22       Accordingly, the Board's determination that the circumstances of
23   the commitment offense were egregious and beyond what is ordinarily re-
24   quired for a conviction of second degree murder is not supported by
25   "some evidence."

26   As indicated above, the California regulations require the Board to
27   find some evidence that the prisoner poses a present danger to society.
28   A continued reliance over time on unchanging factor, such as the comm-

itment offense and prior conduct does not provide evidence of present danger to society and thus may rise to the level of a due process violation. Reliance on unchanging factors transforms an offense for which California law-and the sentencing judge provided parole eligibility into an offense carrying life imprisonment without the possibility of parole.

Not only did the superior court reweigh the evidence in favor of the Board's decision to deny parole to the petitioner after having his tenth parole hearing since becoming eligible for parole since September 2, 1988. The court never considered Amador's prior conduct happened 31 years ago. Since it happened 4 years prior to the commitment offense it has no connection to the offense itself. In re Ernest Smith 114 Cal. App. 4th 356-357 The Board set Smith's base term for the murder at 20 years because it was aggravated by the fact that he inflicted serious bodily injury, he had a special relationship to Garner, she was particularly vulnerable, he had engaged in a "ongoing pattern of physical and mental abuse, and he had an opportunity to stop the crime but instead continued.

Moreover, the court must consider that some point after an inmate has served his minimum sentence the probative value of his commitment offense and his prior conduct as an indicator of "unreasonable risk of danger to society" recedes below the "some evidence" required by due process to support a denial of parole. In re Elkins, 144 Cal. App. 4th 496, the court in vacating the governors reversal of Elkins parole date relies on Scott II summarization of the law: "The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct[citation], but the proposition must be properly understood. The commitment offense is one of

1    only two factors indicative unsuitability a prisoner cannot change (the
2    other being his 'previous Record of violance'). Reliance on such an
3    immutable factor 'without regard to or consideration of subsequent cir-
4    cumstances' may be unfair [citation], and 'runs contrary to the rehab-
5    ilitative goals esposed by the prison system and could result in a due
6    process violation.' [Citation.] The commitment offense can negate suit-
7    ability only if the circumstances of the crime reliably established by
8    evidence in the record rationaly indicate that the offender will pres-
9    ent an unreasonable public safety risk if released from prison. Yet,
10   the predictive value of the commitment offense may be very questionable
11   after a long period of time. [Citation.] Thus, denial if release solely
12   on the basis of the gravity of the commitment offense warrants especia-
13   lly close scrutiny." (Scott II, supra, 133 Cal. App. 4th at pp.594-595,
14   fns. omitted.) Given the lapse of 2[6] years and the exemplary rehab-
15   ilitative gains made by Elkins over that time, continued reliance on
16   these aggravating facts of the crime no longer amount to some evidence
17   supporting denial of parole.(Elkins, supra, 144 Cal. App. 4th at p.498)

19       3. THE BOARD PANEL FAILED TO PLACE ANY WEIGHT TO THE UN-
            DISPUTED EVIDENCE IN THE RECORD THAT AMADOR COMMITTED
20          HIS OFFENSE AS THE RESULT OF SIGNIFICANT STRESS IN HIS
            LIFE.

22       In denying petitioner's habeas petition the court adopted the
23   Board's reasoning that because petitioner has since remarried while in
24   prison, the Board was concern that he needs an additional psychological
25   evaluation and further programming to ensure that he is able to under-
26   stand and cope with "Stress And Anger" in a non-violent manner, part-
27   icularly in connection to his relationship with women. This is some

1  evidence to support the Board's finding that petitioner continues to
2  pose a risk of danger, and therefore unsuitable for parole. (Ex #1 p.2)

3      It is true that at the time of the crime that Amador was under
4  a great deal of stress and that he was an alcoholic who had no control
5  over his addiction to alcohol. This factor should have been considered
6  by the hearing panel but was not a consideration in his favor. Subdiv-
7  ision (d) (4) of section 2402, which list the circumstances tending to
8  indicate suitability for release, (In re Scott 119 Cal. App. 4th 890);
9  In re Smith (2003), 114 Cal. App. 4th 356; In re Weider 145 Cal. App.
10  4th 570,577, 578,586,589,590;In re Elkins 144 Cal. App. 4th 492-493;
11  In re Lawrence 150 Cal. App. 4th 1512,1521,1526,1544,1545,1546).

12      The panel did ask Amador a question relating to his stress but
13  never considered the entire record. (Ex #2 at pp. 46-47) The panel ask
14  Do you think it's okay to hit a woman? Amador's reply was that he was
15  under a lot of pressure. On page 61 of Ex#2 he told the panel that he
16  consumed alcohol to relieve the stress in his life. Other than that the
17  panel ignored all the evidence in the record with regard to the factor
18  in the (Cal. Code Regs., tit 15, §2402, subd (d)(4).) Apparently, the
19  superior did the same. Petitioner submitted all the relevant documents
20  to the court to consider in his habeas petition. Obviously, these ex-
21  hibts were overlooked. Instead, the court's decision on the Board's
22  concern that petitioner has since remarried while in prison and the
23  Board's concern that after 27 years of incarceration without any viol-
24  ence he now needs additional psychological evaluation and further pro-
25  gramming to insure that he is able to cope with "Stress and Anger" in
26  a non-violent manner, particularly in connection to his relationships
27  with women. The court proposes that this evidence to support the Boar-
28  d's finding that petitioner continues to poses a risk of danger, and

1  is therefore unsuitable for parole.

2  A. THE STATUTORY AND REGULATORY SCHEME

3  The factors required to be considered by the Board regulations
4  are for the most part specifed in section 2402 of title 15 of the
5  California Code of Regulations.

6  "Subdividion (a)(b) of the California Code of Regulations, provides th-
7  at [a]ll relevant, reliable information available to the panel shall be
8  considered in determining suitability for parole.  Such information sh-
9  all include the circumstances of the prisoner's [:] social history; pa-
10  st criminal history, including involvement in other criminal misconduct
11  which is reliably documented; the base and other commitment offenses,
12  including behavior before, during and after the crime; past and present
13  attitude toward the crime; any condition of treatment or control, in-
14  cluding the use of any condition under which bears on the prisoner's
15  suitability for release.

16

17  B. PETITIONER'S  PSYCHOLOGICAL EVALUATIONS-1984-TO-2004

18  On March 14, 1984, Dr. Ranald Bruce prepared a report for the
19  Board. He states in relevant part: He was married at the age of 18 in
1970 and worked as a skilled machinist. His wife was partially disabled
and partially unable but also partially disinclined towards deep invol-
20  ment with their first child, a boy. Mr. Amador compensated with an ex-
aggerated commitment to care for his son. After divorce he was appare-
21  ntly unable to completely separate from his wife or resolve his loss,
as they were remarried in 1979.

22

23  There is a long history of their volatile and mutually destructive re-
lationship, marked by Mr. Amador's violence toward his wife which cul-
minated in the instant offense. He also became a sever alcoholic app-
24  arently from the combined stress of single parenting and his own unmet
needs and inability to resolve the loss of the relationship with his
25  wife. This need for release through alcohol was heightend by Mr. Amador's
emotional overcontrol, and excessively intellectualized and contricted
26  character. He was so attached to his son that when his wife apparently
threatened this involvement he demanded custody of the child just prior
27  to her murder.

28

1    Conclusion: The inmate's psychopathology was directly related to
his criminal behavior which was directly related to **stress and alcohol-**
2 **ism.** During incarceration the inmate has improved. His violence poten-
tial is estimated to be less than the average inmate. His prognosis is
3 in the community or a less controled setting is good and he would be ex-
pected to hold present gains. He shows a great deal of remorse and well-
4 developed conscience and is well prepared for the future.

5
     On August 11, 1987, Dr. Charles D. Willis states in relevant part:
6 He is depressed some of the time, but he sleeps and eats good. He has
suicidal thoughts in the past and some intention, but not now. In 1980,
7 he was drinking alot and turned the gas on to try and destroy himself,
but this was unsuccessful.

8
My conclusions about this man are that this was a crime of passion and
9 that during his time in prison, he has improved in terms of behavior.
In a less controlled situation, he would probably be stable. I am of
10 the opionion that his violence potential would probably be less than
average and that my suggestion is that he can be removed from the cal-
11 endar, since I do not feel that pschiatric opinion will significantly
influence decision to release him.

12
                                                    \
13    On June 28, 1989, Dr. M. Tavoularis states in relevant part: Mr.
Amador showed no evidence of psychosis. He was neither delusional nor
14 hallucinated. He appeared to be quite introspective. He was able to re-
late to me the murder of his ex-wife, his fear at the time and partic-
15 ularly his fear of what would happen to his son. He remains in touch
with his now 18 year old son who has been raised by his brother and att-
16 emps to discuss the murder with his son. Mr. Amador believes that at
the time of the killing, he was not only draining himself by working
17 two jobs and trying to take care of his son and pay for a babysitter
but he was also drinking heavily and believes that had he not been dr-
18 inking heavily, he would have handled himself better. He states that
when his wife told him she planned to try to get custody of thier son
19 after he was already feeling financially drained by her, he lost con-
trol in a fit of passion and killed her. He states that he has experie-
20 nced significant remorse but has had to wall off much of his feeling in
this regard in order to survive without severe depression in a prison
21 setting. He states that his fiancee's family fears him as a wife kill-
er whereas he has learned well the importance of discussing problems
22 and leaving open doors for relationships. He appears to recognize the
importance of remaining abstinent from drugs.

23
Mr. Amador's crime appears to be a crime of passion that took place
24 while he was under the influence of alcohol. His potential for violen-
ce appears to be significantly less than other persons in his situation.
25 He is well prepared to earn a living and has reestablished himself with
a new love relationship and his potential for living successfuly and
26 free of illegal activities outside the prison seems excellent. He app-
earsto appreciate both the need to remain chemically free and his con-
27 tinuing need for A.A. to help him achieve that goal.

28

1    On October 1,1990, Dr. R.A. Orling states in relevant part:
According to Amador, after the first divorce he began to drink heavily
2  and was feeling "stressed" over raising their child as a single parent.
He was feeling a great financial burden. His wife threaten to regain
3  the custody of their son. When asked about his thoughts and feelings at
the time of the crime, S stated that he had a sence of fear, and that
4  in the county jail five days later he felt a sence of relief because he
had released much hate toward her. (PSYCHOLOGICAL TESTING REPORT p.2)

5  Health And Drugs at p. 2: Concerning alcohol and drugs, S stated that
he started drinking at age 14 but confined his drinking to social eng-
6  agements. At age 28, in 1976 at about the time of his divorce, he began
drinking "a quart of wiskey every day." S rationalized that this was
7  because he was "depressed." Also, S indicated that he experimented wi-
th marijuana and barbiturates at various times in his life. When asked
8  about this depression. S stated that it occurred because of his failure
as a husband and a father. He was quite lonely, attempting to raise a
9  san and had no time to socialize. He mentioned working 12 hours a day,
his son clinging to him for support end encouragement and any spare
10  time that S had, in a stressful and depressing environment. This, he
said, increased his consumption of alcohol.
11

12    Not only is the record replete with evidence that Amador was un-

13  der significant stress at the time of his life crime. The record shows

14  that the Board failed to consider Amador's stress as a factor in deter-

15  ming his suitability for parole . (Ex #2 pp.120-127); (In re Scott 119

16  Cal. App. 890).

17

18    4. IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
        GUARENTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED ST-
19      ATES CONSTITUTION FOR THE BOARD TO FIND PETITIONER UNSU-
        ITABLE FOR PAROLE AFTER TEN PAROLE HEARINGS BASED ON HIS
20      COMMITMENT OFFENSE AND PRIOR CONDUCT.

21

22    Although the Board of Parole Hearings discretion in parole matt-

23  ers has been described as "broad," it is not absolute (In re Powell

24  (1988) 45 Cal.3d 894,904), as its discretion is "cabined" by the crit-

25  eria, in petitioner's case, listed in the California Code of Regulat-

26  ions, title 15, §2402 (McQuillion v. Duncan (9th Cir. 2003) 306 F.3d

27  895,912). Petitioner has not only a "liberty interest" in parole In re

28  Rosenkrantz (2002) 29 Cal 4th 616,651), but an "expection that [he]

1   will be granted parole unless the Board finds in the exercise of its

2   discretion that [the prisoner is] unsuitable for parole in light of the

3   the circumstances specified by statute and by regulations" (Ibid. at

4   654, emphasis added). Petitioner's "liberty interest" in, and "expect-

5   ation" of parole, does not attach upon being found suitable for parole,

6   but upon entrence of prison gates (Biggs v. Terhune (9th Cir. 2003) 334

7   F.3d 910,915). A decision of unsuitability for parole must be supported

8   by "some evidence" having "some indicia of reliability" (Ibid., citati-

9   on). There must also be a rational connection between the evidence and

10  the decision made; if not, the decision is arbitrary and and an abuse

11  of discretion, violating the due process clause (Guidotti v. County of

12  Yolo (1989) 214 Cal. App. 3d 1552, 1561; Oregon Resource Council v.

13  Lowe (9th Cir. 1997) 109 F.3d 521, 526).

14          Starting in 2002, when the Ninth Circuit once-and-for-all held

15  that indeterminately sentenced prisoners in California have a "protec-

16  ted liberty interest" in parole "that is protected by the procedural

17  safegaurds of the Due Process Clause (McQuillion v. Duncan, 306 F. 895,

18  903 (9th Cir. 2002), there was a paradigm shift in interpreting Calif-

19  ornia's parole statutes for those indeterminately sentenced prisoners.

20          In 2003, the Ninth Circuit held, argued as dicta, based on

21  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (here-

22  after Greenholtz), 442 U.S. 1, (1979) and Board of Pardons v. Allen,

23  483 U.S. 369 (1987), opined: "The parole Board's decision is one of

24  'equity' and requires a carful balancing and assessment of factors con-

25  sidered" (Biggs v. Terhune, 334 F.3d 910,916 (9th Cir. 2003), conclud-

26  ing: "A continued reliance in the future on an unchanging factor, the

27  circumstances of the offense and conduct prior to imprisonment, runs

28  contrary to the rehabilitative goals espoused by the prison system and

could result in a due process violation" (Id., at 917).

        In 2006, the Ninth Circuit, although affirming that Biggs repres-
ents the law of this circuit (Sass v. Board of Prison Terms, 461 F.3d
1123, 1129 (9th Cir. 2006), appeared to back off from Biggs, leaving
some confusion among the courts in this circuit. The law being a living
organism, however, mutating as abuse by the Executive become obvious
and adjustments for those abuses become necessary, the Ninth Circuit
has not only reiterated its holding in Biggs (see Irons v. Carey, 479
F.3d 658, 665 (9th Cir. 2007) ["We hope that the Board will come to re-
cognize that in some cases, indefinite detention based solely on an in-
mate's commitment offense, regardless of the extent of his rehabilita-
tion, will at some point violate due process, given the liberty inter-
est that flows \from the relevant California statutes. Biggs, 334 F.3d
at 917"]), but the Irons Court noted: "We note that in all cases which
we have held that a parole board's decision to deem a prisoner unsuit-
able for parole solely on the basis of his commitment offense comports
with due process, the decision was made before the inmate had served
the minimum number of years required by his sentence" (Id), as was the
case in Biggs and Sass, suggesting the due process violation is estab-
lished after the prisoner has served his or her minimum term.

        Recently, in a detailed analysis of California and federal law,
the Second Appellate District recently held under both the California
and United States Constitutions, life prisoners in California have a
"liberty interest" in parole and judicial review is the "some evidence"
standard (In re Lawrence 150 Cal. App. 4th 1533-1534, citing inter alia,
Greenholtz, 442 U.S. 1 supra; Board of Pardons v. Allen, 482 U.S. 369,
supra; Superintendent v. Hill, 472 U.S. 445 (1985); McQuillion v. Dun-
can, 306 F.3d 895, supra; Biggs v. Terhune, 334 F.3d 910, supra; Sass

1  v. Board of Prison Terms, 461 F.3d 1123, supra; Irons v. Carey, 479 F.

2  3d 658 supra; In re Rosenkrantz, 29 Cal. 4th 1061 (2005)). The Lawrence

3  court held,

4      "Combining the California and federal standards of review,
        as they have been articulated thus far by the California
5      Supreme Court and the Ninth Circuit, respectively, the com-
        mitment crime can lack the power to supply 'some evidence'
6      supporting a denial of parole because of the interplay be-
        tween two factors--the nature of that crime and the passage
7      of time since its commission. That is, the fact ther is 'some
        evidence' the crime was committed a certain way at at a cer-
8      tian time does not mean that crime necessarily represents
        'some evidence' the prisoner's release on parole will pose
9      an unreasonable risk of danger to public safety at the pres-
        ent time. Whether it posesses the necessary predictive value
10     depends both on the nature of the crime and how long ago it
        happened."
11

12  Relative to "some evidence" it is not just "some evidence" to support

13  the Governor's finding, but "some evidence" sufficient to satisfy the

14  the statute's ultimate test is, "some evidence" the release of Lawrence

15  would subject society to an 'unreasonable risk' of danger to public sa-

16  fety" (In re Lee, 143 Cal App. 4th 1400,1408 (2006), emphasis in orig-

17  inal, petition for review denied, depublication denied). In reviewing

18  a suitability determination, the Executive "must remain focused not on

19  the circumstances that may be aggravating in the abstract but, rather,

20  on facts indicating that release currently poses 'an unreasonable risk

21  of danger to society' (§2402, subd. (a): accord. pen code, §3041, subd.

22  (b))" In re Elkins, 144 Cal. App. 4th 475,499 (2006), "Whether the in-

23  mate will be able to live in society without committing additional an-

24  tisocial acts" (In re Lawrence 150 Cal. App. 4th 1544).

25      Although the comitment offense can be initially used to deny pa-

26  role (Biggs v. Terhune, 334 F.3d at 916, supra), as recently opined in

27  In re Tripp, ___ Cal. App. 4th ___ (2007) DJDAR 5877, at 5881 c.2 [DJDAR

28  4/30/07]):

"the viciousness of the commitment offense must be balanced against the passage of time and any evidence of an inmate's rehabilitation. Among the indicators of parole suitability are: '(7) Age. The prisoner's present age reduces the probability of recidivism. [¶] £8. Understanding and plans for the future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9). Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Regs., §2402, subd. (d).)

Thus, weighing the commitment offense, against the passage of time, rehabilitation, parole plans, and postconviction behavior, "[u]nless there is an unreasonable risk the parole applicant will re-offend and thus pose a risk to public safety if she or he is to be released on parole" (In re Lawrence 150 Cal. App. 4th 1541; See also In re Barker, 151 Cal. App. 4th 369. ["To deny parole, the reason must relate to a defendant's continued risk to public safety"] quoting In re Lee, 143 Cal. App. 4th

The offense and past history cannot be viewed in a vacuum as though current, but is to be placed into perspective relative to time, (In re Ernest Smith (2003), 114 Cal. App. 4th 350-351,354,357,358,366); (In re Mark Smith (2003), 109 Cal. App. 4th 494-495,499); (Martin v. v. Marshall 431 F.Supp. 2d 1041). "entailing primarily what a man is and what he may become rather than simply what he has done" (Greenholtz, supra, 442 U.S., at 10). As the Supreme Court opined in Greenholtz: "the purpose of parole" is "the long-range objective of rehabilitation" (Id., at 13). In considering parole, therefore, not only is "the gravity of the offense in a particular case[,]" but the behavioral record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release" (Id., at 15). Thus, a prisoner's "behavior in prison is often molded by his hope and expectation of securing parole at the earliest time permitted by law" (Id., at 20). (In re Dannenberg (2007) 156 Cal. App. 4th 1401).

29.

1    Another recent case relative to case at bench, in that petitioner
2  was convicted of second degree murder and sentenced to 15 years to life,
3  now having served a quarter century, 15 years past his minimum eligible
4  parole date and a decade past his minimum term in calendar years, is
5  the appellate court case of in re weider, 145 cal. App. 4th 570, at 582-
6  583 (2006), in which the court noted:

7        "[I]t should be self evident that after an inmate has served
         the equivalent of 25 years, whether his actions were more
8        than minimally necessary for second degree conviction... is
         no longer the appropriate question. [The Board's] position,
9        that inmates who were only convicted of second degree may
         forever be denied parole based on some modicum of evidence
10       that their acts rose to the level of first, without ackkow-
         ledging the fact that they have already served the time for
11       a first, should be seen as so ridiculous that simply to state
         it is to refute it."
12

13    Petitioner, with postconviction custody credits, 4 months per
14  year for 104 months or 8 years and 8 months plus the 26 years and 5 mo-
15  nths he has already served equals 34 years and 1 month plus preconvic-
16  tion preconviction credits (Willis v. Kane, __ F. Supp. 2d __ (N.D. Cal.
17  2007), 2007 WL 1232060, *10), has exceeded even the maximum 33 years
18  for first degree murder, transmuting his sentence into life without the
19  possibility of parole. Because we live in a society in which "[m]ere
20  public intolerence or animosity cannot constitutionally justify the
21  deprivation of a person's physical liberty" (O'Connor v. Donaldson, 422
22  U.S. 563, 575 (1975), we cannot let decisions based on political safety
23  rather than public safety stand.

24    Even if petitioner's term was to be fixed at maximum for 2nd de-
25  gree murder, 21 years, having a three year parole, when excess custody
26  credits are applied to parole, he is to be discharged (Martin v. Marsh-
27  all, 448 F. Supp. 2d 1143, 1145 (N.D. Cal. 2006).

28

## CONCLUSION

Based on the forgoing, it is clear that petitioner is both eligible and suitable for parole and the Board's unfounded determination that the petitioner is currently a threat to public safety after nearly three decades of incarceration never having committed a single act of violence his entire time in prison has deprived Mr. Amador's constitutional and statutory rights. Accordingly, it is respectfully requested that this court issue a writ of habeas corpus, or order to show cause, to inquire into the legality of petitioner's incarceration, and briefing and evidentiary hearing, if necessary, issue an order to release and direct such relief as is appropriate under the circumsttances.

Dated: _3-11-08_                           Respectfully submitted,


                                           _Henry Amador_
                                           Henry Amador
                                           Petitioner In Pro Per

31.

1    ## DECLARATION OF SERVICE BY MAIL

2    (28 U.S.C. section 1746)

3       I, Henry Amador_____, declare: That I am a resident

4    of the Correctional Training Facility in Soledad, California; I

5    am over the age of eighteen (18) years; I am / am not a party to

6    the attached action; My address is P.O. Box 705, FD-64-U___, CTF -

     North Facility, Soledad, CA  93960-0705; I served the attached

7    document entitled: WRIT OF HABEAS CORPUS

8

9

10   on the persons/parties specified below by placing a true copy of

11   said document into a sealed envelope with the appropriate postage

     affixed thereto and surrendering said envelope(s) to the staff of

12   the Correctional Training Facility entrusted with the logging and

13   mailing of inmate legal mail addressed as follows:

14

     OFFICE OF ATTORNEY GENERAL
15   455 GOLDEN GATE AVENUE,SUITE 11000
     San Francisco, CA. 94102-7004

16

17

18

19

20

21

22      There is First Class mail delivery service by the United

23   States Post Office between the place of mailing and the addresses

     indicated above.  I declare under the penalty of perjury under the
24
     laws of the United States that the foregoing is true and correct,

25   and I executed this service this _11th_ day of _March_____,

26   _2008_, at the Correctional Training Facility in Soledad, CA.

27

28                          _Henry Amador_____
                            Declarant

# EXHIBIT
# 1

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES**<br><br>COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | Reserved for Clerk's File Stamp<br><br>**CONFORMED COPY**<br><br>AUG 0 6 2007<br><br>**LOS ANGELES**<br>**SUPERIOR COURT** |
| PLAINTIFF/PETITIONER:<br><br>HENRY AMADOR | Joseph M. Pulido |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004780 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time        ☒ Order re: Writ of Habeas Corpus
☐ Order to Show Cause         ☐ Order
☐ Order for Informal Response    ☐ Order re:
☐ Order for Supplemental Pleading   ☐ Copy of Petition for Writ of Habeas Corpus for the
                                                      Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

August 6, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
      Joseph M. Pulido

Henry Amador
C-28545
Correctional Training Facility, North
P.O. Box 705
Soledad, California 93960-0705

Department of Justice of the State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, California 92101

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | JULY 31, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004780
In re,
HENRY AMADOR,
    Petitioner,
    On Habeas Corpus

Counsel for Respondent:

Nature of Proceedings:  ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on May 18, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4[th] 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on April 3, 1981 after a conviction for second-degree murder. He was sentenced to fifteen years to life. His minimum parole eligibility date was September 2, 1988. The record reflects that on June 21, 1980, the body of petitioner's estranged wife was found buried in the backyard of his sister's home where he was staying. She had been missing for several days. When petitioner asked to plant a garden, his brother-in-law notified the police. According to petitioner, when his wife threatened to take custody of their son, he became enraged. He beat her multiple times with a hammer. She died as a result of multiple blunt force traumas to the head. When her body was found, her brain and part of her skull were missing. Petitioner had been physically abusive to his paraplegic wife in the past.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on February 6, 2007. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The record reflects that there is some evidence that, "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).) This means that "the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of that offense." (*In re Scott* (2004) 119 Cal.App.4[th] 871, 891.) An offense is more aggravated or violent when it involves severe trauma, "as where death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (*Id.* at 892.) Here, petitioner beat his wife multiple times with a hammer with such force that her brain and part of her skull were missing. The victim was particularly vulnerable due to her size and physical disabilities. Because this crime involved severe trauma to the helpless victim, it shows an exceptionally callous disregard for human suffering.

1

| Minutes Entered |
|---|
| 07-31-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
DEPT 100

| Date: | JULY 31, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td colspan="2" align="center">(Parties and Counsel checked if present)</td></tr>
<tr><td>BH004780<br>In re,<br>HENRY AMADOR,<br>    Petitioner,<br>On Habeas Corpus</td><td><br><br><br>Counsel for Respondent:</td></tr>
</table>

The Board found petitioner unsuitable for parole due to his history of unstable and tumultuous relationships with others, particularly his wife. (Cal. Code Regs., tit. 15, §2402, subd. (c)(3).) Petitioner and his wife had been separated over twenty-five times and divorced and remarried once. He was arrested once for domestic violence in 1976 and admitted to another incident in 1978. There were other allegations of domestic abuse, including some made by members of petitioner's family. He continues to maintain that his wife provoked him into these attacks by flirting with other men and allowing her family to stay at their home. Additionally, petitioner admits that he was an alcoholic. Because petitioner has since remarried while in prison, the Board was concerned that he needs an additional psychological evaluation and further programming to ensure that he is able to understand and cope with stress and anger in a non-violent manner, particularly in connection to his relationships with women. This is some evidence to support the Board's finding that petitioner continues to pose a risk of danger, and is therefore unsuitable for parole.

Accordingly, the petition is denied.

The clerk is to give notice.

The court order is signed and filed this date.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Henry Amador
C-28545
Correctional Training Facility, North
P.O. Box 705
Soledad, California 93960-0705

Department of Justice of the State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, California 92101

Minutes Entered
07-31-07
County Clerk

# EXHIBIT
# 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )    CDC Number:  C-28545
Term Parole Consideration )
Hearing of:               )
                          )
HENRY AMADOR              )    INMATE COPY
                          )
_____ )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 6, 2007

9:51 A.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
NOREEN BLONIEN, Deputy Commissioner

OTHERS PRESENT:

HENRY AMADOR, Inmate
MARY ANN TARDIFF, Attorney for Inmate
ALEXIS DELAGARZA, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No    See Review of Hearing
_____Yes   Transcript Memorandum

Debra Bradfute, Capitol Electronic Reporting

# I N D E X

|  | Page |
|---|---|
| Proceedings...................................... | 3 |
| Case Factors.................................... | 15 |
| Pre-Commitment Factors.......................... | 45 |
| Post-Commitment Factors......................... | 55 |
| Parole Plans.................................... | 78 |
| Closing Statements.............................. | 99 |
| Recess.......................................... | 119 |
| Decision........................................ | 120 |
| Adjournment..................................... | 127 |
| Transcript Certification........................ | 129 |

--oOo--

1          **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER BLONIEN:**  We are on record.

3          **PRESIDING COMMISSIONER ENG:**  All right.  This is

4     a Subsequent Parole Consideration Hearing for Henry

5     Amador, A-M-A-D-O-R, CDC number, C-28545.  Today's date

6     is February 6th, 2007 and the time is 9:51.  We're

7     located at CTF, Soledad.

8          The inmate was received on April 3rd, 1981 from

9     Los Angeles County.  The life term began also on April

10    3rd, 1981 and the minimum eligible parole date is

11    September 2nd, 1988.  The controlling offense for which

12    the inmate has been committed is murder two, case number

13    A021884, count one, Penal Code 187.  The inmate received

14    a total term of 15 years to life.

15         This hearing is being tape-recorded so for the

16    purpose of voice identification, each of us will be

17    required to state our first and last names, spelling out

18    our last names.  So when it comes to your turn, sir,

19    after you spell your last name, please provide us with

20    your CDC number.  So I'll begin, we'll move to my left.

21    My name is Janice Eng, E-N-G, Commissioner.

22         **DEPUTY COMMISSIONER BLONIEN:**  I'm Noreen Blonien,

23    B-L-O-N-I-E-N, Deputy Commissioner.

24         **ATTORNEY TARDIFF:**  Mary Ann Tardiff, T-A-R-D-I-

25    double-F, Attorney for Mr. Amador.

4

| | |
|---|---|
| 1 | **INMATE AMADOR:**  Henry Amador, A-M-A-D-O-R.  I do |
| 2 | have the flu, you know. |
| 3 | **DEPUTY COMMISSIONER BLONIEN:**  You have the flu? |
| 4 | **INMATE AMADOR:**  Yeah, my voice, I don't -- Does |
| 5 | my voice sound hoarse to you? |
| 6 | **DEPUTY COMMISSIONER BLONIEN:**  No.  But I guess |
| 7 | the main thing is how do you feel? |
| 8 | **INMATE AMADOR:**  No, I'm okay. |
| 9 | **DEPUTY COMMISSIONER BLONIEN:**  You're okay? |
| 10 | **INMATE AMADOR:**  No, I'm just saying in case my |
| 11 | voice sounds kind of strange. |
| 12 | **DEPUTY COMMISSIONER BLONIEN:**  Well, it does, it's |
| 13 | okay. |
| 14 | **INMATE AMADOR:**  Okay.  My CDC number is C-28545. |
| 15 | **PRESIDING COMMISSIONER ENG:**  Okay.  And we also |
| 16 | have two correctional officers present for security |
| 17 | reasons and they will not be participating in the |
| 18 | hearing.  Sir, are you running a fever? |
| 19 | **INMATE AMADOR:**  No, no I'm not. |
| 20 | **PRESIDING COMMISSIONER ENG:**  So it's just your |
| 21 | throat? |
| 22 | **INMATE AMADOR:**  Just my throat, yes. |
| 23 | **PRESIDING COMMISSIONER ENG:**  Okay.  So let us |
| 24 | know if you need to take a break or anything, or if you |
| 25 | need to -- |

1          **DEPUTY COMMISSIONER BLONIEN:**  Have a glass of

2    water or --

3          **INMATE AMADOR:**  Yes, maybe water.

4          **PRESIDING COMMISSIONER ENG:**  Can you bring a

5    glass of water.  Okay.  Sir, before we go any further, I

6    was going to ask you to read that ADA statement in front

7    of you.  Will be you be able to see it?

8          **INMATE AMADOR:**  Yes.

9          **PRESIDING COMMISSIONER ENG:**  Or will it be

10   difficult for you to --

11         **INMATE AMADOR:**  No, I can read.

12         **PRESIDING COMMISSIONER ENG:**  Okay.

13         **INMATE AMADOR:**  I normally wear glasses but this

14   is big enough print.

15         **PRESIDING COMMISSIONER ENG:**  Okay, okay.

16         **INMATE AMADOR:**  It says,

17               "The Americans with Disabilities Act is a

18         law to help people with disabilities.

19         Disabilities are problems that make it harder for

20         some people to see, hear, breathe, talk, walk,

21         learn, think, work or take care of themselves

22         than it is for others.

23               "Nobody can be kept out of public places or

24         activities because of a disability."

25         Thank you very much.

6

1            "If you have a disability, you have a right

2        to ask for help to get ready for your BPT

3        Hearing, get to the hearing, talk, read forms and

4        papers and understand the hearing process.

5            "BPT will look at what you ask for and make

6        sure that you have a disability that is covered

7        by the ADA and that you have asked for the right

8        kind of help.  If you do not get help or if you

9        don't think you got the kind of help you need,

10        ask for a BPT 1074 Grievance Form.  You can also

11        get help to fill it out."

12        **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

13    The record also reflects that you did sign a BPT Form

14    1073 back on September 14th of 2006.  And, sir, that

15    form is the Reasonable Accommodation Notice and Request

16    in accordance with the Provisions of the Americans with

17    Disabilities Act.  And it indicates, you checked off

18    that you do not have any disabilities as defined under

19    the ADA.  Is that correct?

20        **INMATE AMADOR:**  That's correct.

21        **PRESIDING COMMISSIONER ENG:**  Okay.  So this

22    information is still current and correct?

23        **INMATE AMADOR:**  Yes, it is.

24        **PRESIDING COMMISSIONER ENG:**  Okay.  I still have

25    to go through some standard questions with you regarding

1   ADA.  So, do you have any problems walking up and down

2   stairs or for distances of 100 yards or more?

3           **INMATE AMADOR:**  No, I don't.

4           **PRESIDING COMMISSIONER ENG:**  Okay.  You stated

5   that you didn't have your glasses with you, so.

6           **INMATE AMADOR:**  Yes.

7           **PRESIDING COMMISSIONER ENG:**  Do you need glasses

8   just to read or do you need them for distance too?

9           **INMATE AMADOR:**  Just reading, reading, yes.

10          **PRESIDING COMMISSIONER ENG:**  Okay.  And will you

11  be able to get through the hearing today without those

12  reading glasses?

13          **INMATE AMADOR:**  I believe so.

14          **PRESIDING COMMISSIONER ENG:**  Okay.  So, if you

15  have any problems, if you're looking at any documents

16  and you have some problems, please let us know then

17  maybe we can get you a magnifying glass or something.

18          **INMATE AMADOR:**  Okay.

19          **PRESIDING COMMISSIONER ENG:**  Okay.  So do you

20  have any hearing impairments?

21          **INMATE AMADOR:**  No.

22          **PRESIDING COMMISSIONER ENG:**  Okay.  Have you ever

23  been included in the Triple CMS or the EOP programs?

24          **INMATE AMADOR:**  No.

25          **PRESIDING COMMISSIONER ENG:**  And you know what

8

1   those are?

2           **INMATE AMADOR:**  No, I don't.

3           **PRESIDING COMMISSIONER ENG:**  Okay.  Do you know

4   anything about the mental health programs?  So the

5   Triple CMS and the EOP comes under the mental health

6   programs, so.

7           **INMATE AMADOR:**  No, I'm not, I don't.

8           **PRESIDING COMMISSIONER ENG:**  You don't understand

9   that or?

10          **INMATE AMADOR:**  Well, I've never been in the

11  program.

12          **PRESIDING COMMISSIONER ENG:**  You've never been in

13  it, so you --

14          **INMATE AMADOR:**  Yes, Ma'am.

15          **PRESIDING COMMISSIONER ENG:**  Okay.  So have you

16  been on, ever taken psychotropic medication either in

17  prison or on the streets?

18          **INMATE AMADOR:**  No, I haven't.

19          **PRESIDING COMMISSIONER ENG:**  Okay.  And while you

20  were growing up, do you recall, were you ever enrolled

21  in Special Education classes?

22          **INMATE AMADOR:**  No.

23          **PRESIDING COMMISSIONER ENG:**  Okay.  So do you

24  suffer from any disability that would prevent you from

25  participating in today's hearing?

*Capitol Electronic Reporting*

1    **INMATE AMADOR:**  No, I don't.

2    **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel, are

3    there any other ADA issues that you believe need further

4    discussion?

5    **ATTORNEY TARDIFF:**  No.

6    **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

7    This hearing is being conducted pursuant to the Penal

8    Code and the Rules and Regulations of the Board of

9    Parole Hearings governing Parole Consideration Hearings

10   for life inmates.  So, the purpose of today's hearing is

11   to once again consider your suitability for parole.  And

12   in doing so, we'll consider the number and the nature of

13   the crimes for which you were committed, your prior

14   criminal and social history, your behavior and

15   programming since your commitment, and your plans if

16   released.  We've had the opportunity to review your

17   Central File and you'll also be given the opportunity to

18   correct or to clarify the record.

19       We will consider your progress since your

20   commitment, your counselor's reports and your mental

21   health evaluations.  So we will focus on your progress

22   and any new reports since your last hearing.  So any

23   changes in parole plans should be brought to our

24   attention at the time that we discuss those.

25   **INMATE AMADOR:**  Okay.

1      **PRESIDING COMMISSIONER ENG:** We will reach a
2  decision today and inform you whether or not we find you
3  suitable for parole and the reasons for our decision.
4  So if you are found suitable for parole, the length of
5  your confinement will be fully explained to you at that
6  time.

7      Before we recess for deliberations, your Attorney
8  and you, yourself, will have an opportunity to parole,
9  to make a final statement regarding your parole
10  suitability. Just keep in mind that in your final
11  statement, if you choose to make one, that it should
12  really focus on why you feel you are suitable for
13  parole. We'll then recess, clear the room and
14  deliberate and once we have completed our deliberations,
15  we'll resume the hearing and announce our decision.

16      **INMATE AMADOR:** Yes, Ma'am.

17      **PRESIDING COMMISSIONER ENG:** California Code of
18  Regulations states that regardless of time served, a
19  life inmate shall be found unsuitable for and denied
20  parole if in the judgment of the Panel the inmate would
21  pose an unreasonable risk of danger to society if
22  released from prison.

23      You have certain rights. Those rights include
24  the right to a timely notice of this hearing, the right
25  to review your Central File, and the right to present

1   relevant documents.  So Counsel, so far have your

2   client's rights been met?

3        **ATTORNEY TARDIFF:**  Yes.

4        **PRESIDING COMMISSIONER ENG:**  You have an

5   additional right to be heard by an impartial Panel.

6   You've been introduced to this Panel, do you have any

7   objection?

8        **INMATE AMADOR:**  No, I don't.

9        **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel, any

10   objections to the Panel?

11        **ATTORNEY TARDIFF:**  No.

12        **PRESIDING COMMISSIONER ENG:**  So you, you will

13   receive a copy of the written tentative decision today.

14   And that decision will become final within 120 days.  A

15   copy of the decision and a copy of the transcript will

16   be sent to you.

17        On May 1st, 2004, the regulations regarding your

18   right to appeal a decision made at this Hearing were

19   repealed.  And basically the new policy states that you

20   basically have to go to court now.  If you have any

21   questions about that policy, you can discuss it with

22   your legal Counsel, or you can review the policy at the

23   prison Law Library.

24        You're not required to admit to or discuss your

25   offense.  However, this Panel does accept as true the

12

1  findings of the court.  Do you understand what that

2  means?

3       **INMATE AMADOR:**  Yes, I do.

4       **PRESIDING COMMISSIONER ENG:**  Okay.  Commissioner,

5  is there any confidential material in the file?  And if

6  so, will we be using it today?

7       **DEPUTY COMMISSIONER BLONIEN:**  There is

8  confidential information in the file that we may use

9  today.

10      **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

11  I'm going to pass the hearing checklist, today's the

12  sixth, over to your legal Counsel to, we're going check

13  off to make sure that we're dealing with the same set of

14  documents for your hearing.  Okay.  And that's labeled

15  Exhibit One.

16      **ATTORNEY TARDIFF:**  Yes, I have all these

17  documents.  And also the psych reports, it's not checked

18  off and that's an issue we need to discuss.

19      **PRESIDING COMMISSIONER ENG:**  Exactly, okay.  So,

20  Counsel, are there any additional documents?

21      **ATTORNEY TARDIFF:**  No.

22      **PRESIDING COMMISSIONER ENG:**  Okay.  Okay, now,

23  any preliminary objections?

24      **ATTORNEY TARDIFF:**  No.

25      **PRESIDING COMMISSIONER ENG:**  Okay.  And will your

1   client be speaking with the Panel?

2       **ATTORNEY TARDIFF:**  Yes, he will.

3       **PRESIDING COMMISSIONER ENG:**  On all matters?

4       **ATTORNEY TARDIFF:**  Yes.

5       **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, I'll

6   have to swear you in.  Please raise your right hand.  Do

7   you solemnly swear or affirm that the testimony you give

8   at this hearing will be the truth, the whole truth, and

9   nothing but the truth?

10      **INMATE AMADOR:**  Yes, I do.

11      **PRESIDING COMMISSIONER ENG:**  Okay.  Before we go

12  any further, Counsel, I'm going to ask you and your

13  client and your position on the fact that we do not have

14  the new psychological report as ordered by the January

15  4th, 2005 Panel.

16      **ATTORNEY TARDIFF:**  That's correct, that report,

17  he has not been interviewed yet for it.  But he wishes

18  to move forward with this hearing.  He feels that the

19  issues asked by the prior Panel in terms of a new psych

20  eval have been sufficiently addressed in prior psych

21  evals.  And he would like to waive that need for that

22  psych eval to move forward on the hearing.

23      **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, you

24  understand what your Counsel just said?

25      **INMATE AMADOR:**  Yes, I do.

1      **PRESIDING COMMISSIONER ENG:**  Okay.  I just want

2  to be sure that you're well aware that you wanted to

3  move forward and, without having a current psychological

4  evaluation.

5      **INMATE AMADOR:**  That's correct.

6      **PRESIDING COMMISSIONER ENG:**  That's correct?

7      **INMATE AMADOR:**  Yes, Ma'am.

8      **PRESIDING COMMISSIONER ENG:**  Okay.

9      **DEPUTY COMMISSIONER BLONIEN:**  And you read the

10  last hearing?

11      **INMATE AMADOR:**  Yes.

12      **DEPUTY COMMISSIONER BLONIEN:**  And you read the

13  questions that that Panel raised?

14      **INMATE AMADOR:**  Yes, I did.

15      **DEPUTY COMMISSIONER BLONIEN:**  And you do

16  remember, I was on that Panel?

17      **INMATE AMADOR:**  Yes, I do remember.  They're all

18  right here, and when I looked at the psych reports,

19  every single one of them has been addressed.

20      **DEPUTY COMMISSIONER BLONIEN:**  And you are in, I

21  just saw in your packet, I don't know if you got it,

22  that the psych report was ordered on 1/23/07, which is

23  very late.  But it has been ordered and you haven't been

24  called to an interview or anything?

25      **INMATE AMADOR:**  No.  I 602'd it because I

1    contacted them in October, they never responded.  So I

2    602'd it, they still didn't respond.  I sent them a

3    second 602 and they finally responded and put a due date

4    way after the hearing.  So I did try.

5        **DEPUTY COMMISSIONER BLONIEN:**  So you understand

6    you have the absolute right to have this psych report?

7        **INMATE AMADOR:**  Yes, I tried to get it.

8        **DEPUTY COMMISSIONER BLONIEN:**  And you're waiving

9    that right?

10        **INMATE AMADOR:**  Yes.  I feel like all these

11    issues have been, at least what I got right here in

12    front of me, have been thoroughly covered in the last

13    psych report.

14        **DEPUTY COMMISSIONER BLONIEN:**  That's all I have.

15        **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  Then

16    we'll move forward.  All right.  The first order of

17    business is that I'm going to go ahead and read into the

18    record the crime facts.  And I'm going to take that from

19    the probation officer's report in the back of the

20    packet.  And it begins on page five, line six.

21                "On Monday, July 21st, 1980, officers

22            responded to 1506 East 63rd Street, Long Beach,

23            California, after a call of a dead body.

24            Officers were informed by Michael Jensen that his

25            brother-in-law, the defendant, had been staying

*Capitol Electronic Reporting*

1   with him and his wife for a period of time.  That

2   the defendant's estranged wife, the victim, Karen

3   Amador, had been missing since the previous

4   Wednesday.  That the defendant had been acting

5   strange around the house and decided to plant a

6   garden.

7       "He felt that the defendant might have

8   killed his wife and buried her body in the back

9   yard.  And when he checked the situation out, he

10   found the body.  An autopsy performed on July

11   23rd, 1980, revealed that cause of death was

12   massive brain damage due to multiple blunt force

13   injury.  That the scalp was not present and that

14   an extremely large portion of the skull was

15   missing and the brain was no longer present.

16       "Investigation revealed that the defendant

17   was seen with the victim on Wednesday, July 16th,

18   1980, in front of her residence, and apparently

19   killed her in his van later that evening.  And

20   then buried the body in the Jensen's back yard on

21   Saturday, July 19th, 1980.

22       "Officers took the defendant into custody

23   approximately an hour later when he was walking

24   down S, South Street."

25   I'm sorry.  Sir, is that an accurate description

1  of what happened back in 1980, July 16th?

2      **INMATE AMADOR:**  Well, except for one fact right

3  here.  The body wasn't buried on the 19th, it was buried

4  the same night, on the 16th.

5      **PRESIDING COMMISSIONER ENG:**  Okay.  So, okay.

6  You ended up, you were with your estranged wife at the

7  time?

8      **INMATE AMADOR:**  Yes.

9      **PRESIDING COMMISSIONER ENG:**  Okay.  And were you

10  arguing in the van?

11      **INMATE AMADOR:**  Yes, we were.

12      **PRESIDING COMMISSIONER ENG:**  Had this been an

13  ongoing argument?

14      **INMATE AMADOR:**  Yeah.  Probably ever since we got

15  married, you know, we didn't get along, you know.  I'm

16  not even sure why we stayed married that many years.

17  But my wife, she was paraplegic and I wrote about this

18  in here.  And I wrote something about our history in

19  here, where it talks about her being very demanding, you

20  know.

21      And she always had to have her family around her

22  because, she lived in Children's Hospital for probably

23  eight years as a child.  And so I wasn't ready for this.

24  Like I said in the report, I met her when I was 16 years

25  old.  She was around 19.  And I wasn't prepared for it.

1  I was prepared for taking care of her as far as her

2  handicap, but the emotional needs that she had, I wasn't

3  prepared for that.  So her family practically lived with

4  us ever since we got married.

5      **PRESIDING COMMISSIONER ENG:**  When did you get

6  married?  How old were you?

7      **INMATE AMADOR:**  I think I was 17, my mother had

8  to sign a, what do you call that, a permission type.

9      **PRESIDING COMMISSIONER ENG:**  When did you realize

10 that this was going to be a bit much?  Did you realize

11 that before you actually got married?

12     **INMATE AMADOR:**  No, no, because her family didn't

13 originally move in with us.  But they moved in with us

14 later.  I realized she didn't cut the apron strings

15 probably about, and she was very co-dependent, probably

16 about a year or two after we were married.

17     **PRESIDING COMMISSIONER ENG:**  So you always had

18 her, parts of her family around you at all times?

19     **INMATE AMADOR:**  Yes, at all times.

20     **PRESIDING COMMISSIONER ENG:**  Okay.  And did you

21 resent that?

22     **INMATE AMADOR:**  Yes, I did.

23     **PRESIDING COMMISSIONER ENG:**  But at the same

24 time, did they help out in caring for her?

25     **INMATE AMADOR:**  Well that's what we fought over

1   because my wife needed a lot of treatment. Like she

2   needed therapy and I'm trying to work and then I have to

3   take off work to take her. I said, well, if they're

4   going to be here, at least can they help and take you to

5   the -- And she didn't think that it was their

6   responsibility, and I thought it was their

7   responsibility. If they were going to always be there

8   all the time, you know, they can help out. Because we

9   only had a one-income family. And so they wouldn't, so

10  I had to take her to her therapy, take her home.

11       **PRESIDING COMMISSIONER ENG:** So how many people

12  were living there?

13       **INMATE AMADOR:** Well, they didn't live there.

14  They were just there all the time, constantly there.

15  They didn't live in the house. Now, she wanted them to

16  live there when her older sister died, leaving behind

17  two children and her mother. And her other sister had

18  died prior to that, but she left behind two adult

19  children.

20       So they didn't, my wife wanted all three of them

21  to move in with us, in a one-bedroom apartment, and I

22  told her we couldn't accommodate them, you know. Some

23  of the family would have to step up and take

24  responsibility, and my wife wasn't going to have it. I

25  guess she felt like her mother took care of her all her

20

1   life and it was her responsibility to in turn take care

2   of her mother, which I agreed to.  But I said, you know,

3   either your mother or the two children, but the other

4   family members have to take responsibility for some of

5   it.

6       **PRESIDING COMMISSIONER ENG:**  You had a son

7   together?

8       **INMATE AMADOR:**  Yes, we did.

9       **PRESIDING COMMISSIONER ENG:**  And when you had

10  your son, was that the first marriage, or the, didn't

11  you, you were divorced after about, what, six years?

12      **INMATE AMADOR:**  Yes.

13      **PRESIDING COMMISSIONER ENG:**  And then you

14  remarried?

15      **INMATE AMADOR:**  Right.

16      **PRESIDING COMMISSIONER ENG:**  So when did you have

17  your son, during the first or the second marriage?

18      **INMATE AMADOR:**  Well it's the same marriage, the

19  same woman.

20      **PRESIDING COMMISSIONER ENG:**  Well the, yeah, but

21  was it the first time or the second time?

22      **INMATE AMADOR:**  Yeah, first time, yes.

23      **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  Now

24  let me ask you something.  Those first six years, would

25  you consider it to be rather, let's use an easier,

1  topsy-turvy in the marriage?

2          INMATE AMADOR:  I'm not sure.

3          PRESIDING COMMISSIONER ENG:  Were there a lot of

4  arguments?  Was it a very difficult adjustment for you

5  during the first six years of the marriage?

6          INMATE AMADOR:  I think I thought I could handle

7  it.

8          PRESIDING COMMISSIONER ENG:  But that's when her

9  family was around all the time too?

10          INMATE AMADOR:  Yes, yes.  They didn't leave

11  until after her mother, her sister and her mother died.

12  Then, but she had already divorced me because of it.

13          PRESIDING COMMISSIONER ENG:  In '76.

14          INMATE AMADOR:  Right, in '76.

15          PRESIDING COMMISSIONER ENG:  Okay, so, had you,

16  during those first six years that you were married, the

17  first six, was there a lot of arguing?

18          INMATE AMADOR:  Yes, there was.  It was over the

19  family issues.

20          PRESIDING COMMISSIONER ENG:  It was always over

21  the family?

22          INMATE AMADOR:  Yeah.  Always being at our own

23  place.

24          PRESIDING COMMISSIONER ENG:  So what would you

25  do?

22

1          **INMATE AMADOR:**   Well, we would argue mostly
2     about, because I'm an alcoholic.  And we both come from
3     alcoholic backgrounds.  And it just got worse because,
4     you know, I didn't stand a chance being with other
5     alcoholics that always constantly drank all the time.
6          **PRESIDING COMMISSIONER ENG:**   Okay, why, how did
7     you, how do you define being an alcoholic back then?
8          **INMATE AMADOR:**   Being addicted and always having
9     to drink on a regular basis.
10         **PRESIDING COMMISSIONER ENG:**   So what were you
11    drinking back then?
12         **INMATE AMADOR:**   Beer.
13         **PRESIDING COMMISSIONER ENG:**   And when you say on
14    a regular basis, how much were you drinking and how
15    often?
16         **INMATE AMADOR:**   Probably mainly on weekends,
17    maybe probably a couple of six-packs on weekends.  And
18    two or three during the week, work week.
19         **PRESIDING COMMISSIONER ENG:**   Two or three beers?
20         **INMATE AMADOR:**   Yes, yeah.
21         **PRESIDING COMMISSIONER ENG:**   How often?
22         **INMATE AMADOR:**   On a daily basis.
23         **PRESIDING COMMISSIONER ENG:**   On a daily basis,
24    two or three beers and then on the weekends you'd do a
25    few six-packs?

23

1         **INMATE AMADOR:**  Yes.

2         **PRESIDING COMMISSIONER ENG:**  Okay.  Over how many

3    hours?

4         **INMATE AMADOR:**  You know, that's something I

5    didn't really monitor ever.

6         **PRESIDING COMMISSIONER ENG:**  Okay.  Well, it's a

7    difference if you're doing, downing two six-packs within

8    like two hours.  Or over an eight-hour period of time,

9    or, you know, 14-hour period of time versus like over an

10   hour or two.  So that's why I'm just trying to get an

11   idea.

12        **INMATE AMADOR:**  Well, you know, I accept

13   responsibility for my own drinking.  But it's easy when

14   somebody's there to, you know.  Mainly we fought over

15   the fact that she didn't think it was any of their

16   responsibility to help out with her health issues, you

17   know.

18        **PRESIDING COMMISSIONER ENG:**  Well, I'm getting

19   back to your drinking, okay.  So you drank just beer all

20   the time?

21        **INMATE AMADOR:**  No, I eventually went on to hard

22   liquor.

23        **PRESIDING COMMISSIONER ENG:**  Okay.  Well, what

24   was your wife drinking?

25        **INMATE AMADOR:**  Same thing, beer.

1       **PRESIDING COMMISSIONER ENG:**  So you would drink

2   together?

3       **INMATE AMADOR:**  Yes, and the family too.

4       **PRESIDING COMMISSIONER ENG:**  Okay.  During those

5   years, did you realize you had a drinking problem, or it

6   never occurred to you?

7       **INMATE AMADOR:**  Well, yeah, I think I was in

8   denial.  I mean, I didn't, I felt like I was having fun,

9   it was a way to relieve stress.

10      **PRESIDING COMMISSIONER ENG:**  How about drugs?

11      **INMATE AMADOR:**  No.

12      **PRESIDING COMMISSIONER ENG:**  So you did, you had

13  an -- Is this an ongoing argument, always about the

14  family?

15      **INMATE AMADOR:**  Mostly about --

16      **PRESIDING COMMISSIONER ENG:**  And whether they're

17  not, they're helping?

18      **INMATE AMADOR:**  Finances and their lack of

19  participation.  And it climaxed with the fact, like I

20  said, she wanted them to not only be there all the time,

21  she eventually wanted to move them in.

22      **PRESIDING COMMISSIONER ENG:**  When was this?

23      **INMATE AMADOR:**  In was 1976, when we moved there.

24      **PRESIDING COMMISSIONER ENG:**  That's when it, she

25  wanted them to move in.

1                **INMATE AMADOR:**  Right.

2                **PRESIDING COMMISSIONER ENG:**  And your response

3     was?

4                **INMATE AMADOR:**  That we can accommodate either

5     her mother or her two children.  Her mother wound up

6     committing suicide because she was being bounced around

7     from house to house.

8                **PRESIDING COMMISSIONER ENG:**  Her mother?

9                **INMATE AMADOR:**  Yes, while the family decided who

10    was going to take responsibility for who.  Temporarily

11    they bounced around.  And I included that in this, the

12    history report that I wrote.  So she committed suicide

13    and we wound up divorcing over that.  And probably the

14    biggest thing we argued about is she --

15               **PRESIDING COMMISSIONER ENG:**  Why did she blame

16    you?

17               **INMATE AMADOR:**  Yes, she did.  Blamed me and her

18    sister, the one whose house she committed suicide in.

19               **PRESIDING COMMISSIONER ENG:**  So your wife had two

20    sisters.

21               **INMATE AMADOR:**  No, she had three sisters.

22               **PRESIDING COMMISSIONER ENG:**  That died.

23               **INMATE AMADOR:**  Two that died.

24               **PRESIDING COMMISSIONER ENG:**  Two that died.  Were

25    they older sisters that died?

1        **INMATE AMADOR:**  They were older sisters.

2        **PRESIDING COMMISSIONER ENG:**  All right.

3        **INMATE AMADOR:**  And they died of alcoholism.  And

4    then her mother --

5        **PRESIDING COMMISSIONER ENG:**  And then her mother

6    committed suicide.

7        **INMATE AMADOR:**  Yeah, alcoholic.  She took some

8    pills or something while she was drinking.

9        **PRESIDING COMMISSIONER ENG:**  Father, where was

10   her father?

11       **INMATE AMADOR:**  Well, her mother had been

12   divorced for years.  He lives in Colorado.  He's

13   remarried.

14       **PRESIDING COMMISSIONER ENG:**  Okay.  Your

15   arguments, your arguments with your wife, Karen, did

16   they ever escalate to a point where the two of you, or

17   you would hit her?

18       **INMATE AMADOR:**  Yes.

19       **PRESIDING COMMISSIONER ENG:**  Okay.  Did it

20   usually escalate to that point?

21       **INMATE AMADOR:**  No, it didn't.

22       **PRESIDING COMMISSIONER ENG:**  Can you give this

23   Panel a better idea as how often your arguments would

24   get to that point?  Was it --

25       **INMATE AMADOR:**  Well, there was two specific

27

1  times which is 1976 and in 1978.  And it, you know, I

2  went into a jealous rage.  My wife was flirting with

3  somebody at a party in 1976.  And I don't remember all

4  the details other than what I read in the police report.

5  See, I'd been.

6          PRESIDING COMMISSIONER ENG:  Were you arrested?

7          INMATE AMADOR:  Yes, I was arrested.

8          PRESIDING COMMISSIONER ENG:  She called the

9  police on you?

10         INMATE AMADOR:  I don't know who called.

11         PRESIDING COMMISSIONER ENG:  Or somebody else?

12         INMATE AMADOR:  I passed out, they knocked on the

13  door.  I don't know who called the police.  All I know

14  is she was gone and I was there alone and they arrested

15  me.

16         PRESIDING COMMISSIONER ENG:  Okay.  You hit her?

17         INMATE AMADOR:  Yes, I did.

18         PRESIDING COMMISSIONER ENG:  But you don't

19  recall?  Or you do recall?

20         INMATE AMADOR:  I recall, yes.  I hit her

21  (inaudible) know what, but I know I, I did lash out on

22  her, yes.  And the second time was in 1978 for the same

23  thing, because she -- We had gotten remarried, but she

24  told me she was, she had been unfaithful, and again,

25  over jealousy.

28

1    **PRESIDING COMMISSIONER ENG:**  How hard did you hit
2    her, did you knock her out?

3    **INMATE AMADOR:**  I don't know because that's when
4    I passed out.

5    **PRESIDING COMMISSIONER ENG:**  Well, did you hit
6    her in the face?

7    **INMATE AMADOR:**  I believe I did, yes.

8    **PRESIDING COMMISSIONER ENG:**  And that was the two
9    times that you recall.  Were there other times that you
10   may have shoved her or, not punched her, but physically
11   touched her in an aggressive manner, besides these two
12   times that you hit her?

13   **INMATE AMADOR:**  I got aggressive with her when
14   she abused my son, yes.

15   **PRESIDING COMMISSIONER ENG:**  How did she abuse
16   your son?

17   **INMATE AMADOR:**  Well, because she was in a
18   wheelchair, he was about maybe five years old, he would
19   run from her when she would call him and she would get
20   frustrated.  So, since she couldn't catch him, she would
21   throw things at him.  Specifically, she threw a plate
22   and hit him in the head.  We had to go get stitches for
23   that.  And then one time she cornered him in a corner,
24   and she got an electrical extension cord and she started
25   beating him with that.

1       **PRESIDING COMMISSIONER ENG:**  Were the authorities

2   ever called to your house because of these alleged,

3   alleged incidents?

4       **INMATE AMADOR:**  No, no they weren't, no.

5       **PRESIDING COMMISSIONER ENG:**  So it was never

6   reported to anybody?

7       **INMATE AMADOR:**  No.

8       **PRESIDING COMMISSIONER ENG:**  Were you witness to

9   these incidences?

10      **INMATE AMADOR:**  No.  She did this to my son while

11  I was at work.

12      **PRESIDING COMMISSIONER ENG:**  A five-year old?

13      **INMATE AMADOR:**  Well, he's 37 now.

14      **PRESIDING COMMISSIONER ENG:**  Is it, yeah but at

15  the time, at the time you said he was only about five

16  years old.  So how did you find out about these types of

17  details?

18      **INMATE AMADOR:**  Because he had told me at that

19  time.

20      **PRESIDING COMMISSIONER ENG:**  Who had told you?

21      **INMATE AMADOR:**  My son.

22      **PRESIDING COMMISSIONER ENG:**  A little five-year

23  old?

24      **INMATE AMADOR:**  Yes.

25      **PRESIDING COMMISSIONER ENG:**  Okay.

1      **INMATE AMADOR:**  As a matter of fact he, he's got

2    a very good memory.  He remembers where we lived back

3    then because he recently came to visit me and he went to

4    go see the old house.

5      **PRESIDING COMMISSIONER ENG:**  Well, let me ask you

6    something.  Did you ever see your wife do, react to her

7    young son in that way?

8      **INMATE AMADOR:**  Well, I didn't see those two

9    incidents I was talking about, but I have seen her grab

10   him, you know like, if he (inaudible).

11     **PRESIDING COMMISSIONER ENG:**  If he was being bad?

12     **INMATE AMADOR:**  Yes.  Well, I don't know exactly

13   what he was doing.  But yeah, he was defying her.

14     **PRESIDING COMMISSIONER ENG:**  But did you ever see

15   her restrain him with cords or anything?

16     **INMATE AMADOR:**  No, no.  Those two incidents are

17   the ones he reported to me.

18     **PRESIDING COMMISSIONER ENG:**  But you didn't, I'm

19   asking what you saw, what you actually witnessed.  Did

20   you see?

21     **INMATE AMADOR:**  Pulling, like that.

22     **PRESIDING COMMISSIONER ENG:**  That's it?

23     **INMATE AMADOR:**  That's it, that's what I saw.

24     **PRESIDING COMMISSIONER ENG:**  Pulling his cheek?

25     **INMATE AMADOR:**  Yeah.

1    **PRESIDING COMMISSIONER ENG:**  Okay, okay.  So on

2    the night that this happened, okay, were you on your way

3    to a second divorce?

4    **INMATE AMADOR:**  Well, we were separated, okay.

5    Now according to her attorney, he had served divorce

6    papers but I never received anything.

7    **PRESIDING COMMISSIONER ENG:**  Okay.

8    **INMATE AMADOR:**  He swears up and down but, and so

9    does the, what do you call them, what do you call them?

10   The DA, District Attorney, yeah, swears up and down, but

11   they never had the documents.

12   **PRESIDING COMMISSIONER ENG:**  But you were

13   separated?

14   **INMATE AMADOR:**  We were separated.

15   **PRESIDING COMMISSIONER ENG:**  You were not living

16   under the same roof?

17   **INMATE AMADOR:**  Correct.

18   **PRESIDING COMMISSIONER ENG:**  And had you had

19   discussions about divorcing again?

20   **INMATE AMADOR:**  Well, we didn't discuss it, she

21   just moved out and moved in her own apartment.  She just

22   left.

23   **PRESIDING COMMISSIONER ENG:**  Is that after an

24   altercation between the two of you?

25   **INMATE AMADOR:**  Yeah, yeah.  That was the second

```
 1   altercation in 1978.  Yes.

 2         PRESIDING COMMISSIONER ENG:  The second time?

 3   Okay.  Were the police called for that one?

 4         INMATE AMADOR:  No, they weren't.

 5         PRESIDING COMMISSIONER ENG:  Okay, all right.  So

 6   after the second time your wife moved out?

 7         INMATE AMADOR:  Yes.

 8         PRESIDING COMMISSIONER ENG:  Okay, so.

 9         INMATE AMADOR:  And let me add that we were

10   remarried in '78.  And then that happened, and then she

11   moved out.

12         PRESIDING COMMISSIONER ENG:  So you hadn't been

13   remarried very long when this occurred?

14         INMATE AMADOR:  No.

15         PRESIDING COMMISSIONER ENG:  Okay.  All right.

16   So at the time of the life, the life crime in July of

17   1980, had you been separated all that time, you know,

18   like two years?  Or at least a year and a half.

19         INMATE AMADOR:  We'd been separated but we got

20   together periodically.

21         PRESIDING COMMISSIONER ENG:  But she was living

22   in a separate place?

23         INMATE AMADOR:  Right, right.

24         PRESIDING COMMISSIONER ENG:  And she moved out?

25         INMATE AMADOR:  Right.
```

1          **PRESIDING COMMISSIONER ENG:**  In that '78, after

2    that incident that you hit her?

3          **INMATE AMADOR:**  Yes, she did.

4          **PRESIDING COMMISSIONER ENG:**  Okay.  Up until the

5    time that she lost her life at your hands?

6          **INMATE AMADOR:**  Right.

7          **PRESIDING COMMISSIONER ENG:**  Okay.  So she was

8    living in a separate place.  So how did you come to --

9    When you did get together, during the time that she

10   moved out up through July 16th of 1980, when you did get

11   together with her, what was that about?  Were you dating

12   again or something, or were you just.

13         **INMATE AMADOR:**  I think it, it was mostly a way

14   for us to, I guess have sex, you know.

15         **PRESIDING COMMISSIONER ENG:**  Is that really what

16   it was all, that the time that you would get together

17   and see each other was really just for sex?

18         **INMATE AMADOR:**  Well we did go out, not just --

19   And sometimes I would spend the night at her place and

20   she would spend the night at my place.

21         **PRESIDING COMMISSIONER ENG:**  Did you ever discuss

22   moving back in together?

23         **INMATE AMADOR:**  She did move back in with me for

24   a while.  But I had a girlfriend at the time and she

25   kind of like, gave me an ultimatum.  And I didn't really

1    want to come to any conclusion, so I asked them both to

2    leave, and they did both leave.

3        **PRESIDING COMMISSIONER ENG:** So how long did you

4    have a girlfriend while you were still married?

5        **INMATE AMADOR:** It was pretty recent after she

6    moved out.

7        **PRESIDING COMMISSIONER ENG:** So for that whole

8    period of time, you had another girlfriend? Was she

9    living with you or no?

10       **INMATE AMADOR:** Yes, she was living with me.

11       **PRESIDING COMMISSIONER ENG:** You had another

12   girlfriend living with you, but yet you weren't divorced

13   from your wife and you were still seeing each other?

14       **INMATE AMADOR:** Yes.

15       **PRESIDING COMMISSIONER ENG:** And did both of them

16   know this was going on?

17       **INMATE AMADOR:** Yes, they did.

18       **PRESIDING COMMISSIONER ENG:** So, the night.

19       **INMATE AMADOR:** In other words, when I would

20   leave my place, you know, I would take my son down to

21   her place. That was the understanding, at least to my

22   girlfriend that, you know, that I'm going to take my son

23   to go see his mother. That's as far as the

24   understanding that she had.

25       **PRESIDING COMMISSIONER ENG:** Did you have custody

1   of your son?

2          **INMATE AMADOR:**  Yes, I did, twice.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  So she wasn't

4   sure that you, she didn't, well I shouldn't say -- What

5   did she think, that you were just going to drop off your

6   son so he could visit with his mother?

7          **INMATE AMADOR:**  No, she knew we were going to

8   stay, but.

9          **PRESIDING COMMISSIONER ENG:**  Did she know you

10  were sleeping with her?

11         **INMATE AMADOR:**  I never discussed it, I don't

12  know.

13         **PRESIDING COMMISSIONER ENG:**  Okay, okay.  Okay.

14  So when you got together -- I'm trying to understand

15  what led up to the incident in the van.  And I thought I

16  read somewhere that you had been out to dinner or

17  something.

18         **INMATE AMADOR:**  Yes.

19         **PRESIDING COMMISSIONER ENG:**  Is that true?

20         **INMATE AMADOR:**  That's true.

21         **PRESIDING COMMISSIONER ENG:**  Earlier?

22         **INMATE AMADOR:**  Yes.

23         **PRESIDING COMMISSIONER ENG:**  Okay.  And all the,

24  during all this time, let's say, you know, six months

25  prior, that you would see her on a regular basis.  Is

1    that correct?  Or no?

2        **INMATE AMADOR:**  I wouldn't say a regular basis,

3    an irregular basis, yeah.  We would see --

4        **PRESIDING COMMISSIONER ENG:**  How often would you

5    see her?

6        **INMATE AMADOR:**  There was no set, just

7    periodically, you know.

8        **PRESIDING COMMISSIONER ENG:**  But it was always

9    with your son?

10       **INMATE AMADOR:**  Usually, yeah.  Sometimes I would

11   take him down there and just drop him off.

12       **PRESIDING COMMISSIONER ENG:**  Okay.

13       **INMATE AMADOR:**  Okay.  But I didn't always.

14       **PRESIDING COMMISSIONER ENG:**  So what led you to

15   get together on July 16th, 1980?

16       **INMATE AMADOR:**  Well, it was one of the times

17   that we did get together.  We did go out to eat, and we

18   did wind up in an argument on custody of my son.  And

19   she wanted me to give her alimony, and I told her I

20   wasn't working at the time, which I wasn't.  I got fired

21   from my job for drinking too much.

22       And you know, I told her that, and this is my own

23   opinion, I was capable of taking care of him.  The

24   reason the court didn't give her, now I didn't find this

25   out until recently, until I obtained the confidential

1    information, but the reason why they didn't give her
2    custody was because she didn't have a driver's license
3    and she wasn't able to transport him.  And it was
4    basically the same thing, she wasn't able to take care
5    of him, you know, in the way that he should be taken
6    care of.

7         And with the family that she was always with,
8    because they were still at her place, the remainder of
9    them, and it wasn't a good environment for him.  Well,
10   I'm not the best parent, but I'm trying to do the best I
11   could, but I'm not going to abuse him, you know.  Even
12   though I did abuse my wife, or at least I lashed out at
13   her.  I didn't come home fighting drunk and just attack
14   her, or something like that, by going out of my mind.

15        When I had a complication with my wife, it was a
16   response to a provocation of some sort.  Like jealousy
17   or, you know, or the way that she'd treat my son.

18        **PRESIDING COMMISSIONER ENG:**  That night when you
19   were out to dinner, were both of you drinking?

20        **INMATE AMADOR:**  We were drinking, yes.

21        **PRESIDING COMMISSIONER ENG:**  Had you had a lot?

22        **INMATE AMADOR:**  Like I said, I didn't (inaudible)
23   monitor her.  I can only say what I was drinking, you
24   know.  I don't watch the other person, what they're
25   drinking or eating or.

1    **PRESIDING COMMISSIONER ENG:**  Well, you said

2    normally on the weeknights you would drink maybe two or

3    three beers a night.  So were you drinking beer or hard

4    alcohol that night?

5    **INMATE AMADOR:**  Well, this is, from 1976 up until

6    1980, my drinking had increased.  So yes, I was drinking

7    a lot more.  Because I was under a lot of stress.  My

8    wife had left a lot of credit card charges and a lot of

9    telephone charges that I was trying to get paid off.

10   See, and I discussed it in here too, that, you know,

11   there was a lot of financial stress and the stress of

12   trying to be a single father.  Giving him the best life

13   I could.

14       A lot of it had to do with the fact that, you

15   know, it, she told people that because I did smack her

16   around when I went into a jealous rage, that that's why

17   she had left.  But in reality, she had left because of

18   the fact that her mother committed suicide.  And as far

19   as she was concerned, it was my fault.

20   **PRESIDING COMMISSIONER ENG:**  Why did you remarry?

21   **INMATE AMADOR:**  In 1978?

22   **PRESIDING COMMISSIONER ENG:**  Yeah.

23   **INMATE AMADOR:**  Well, like anybody else, you

24   know, I want a mother for my son.  It's very difficult,

25   unless you're in a man's shoes, you know, to try and,

1  you know, raise him.  Even with my current wife, you
2  know, it's very difficult for her to raise my daughter
3  without me.  My daughter needs me.  And he needed his
4  mother, in spite of the fact that she was abusive
5  towards him, you know.

6  **PRESIDING COMMISSIONER ENG:**  Well, this is what I
7  don't understand.  You knew, you stated that you felt
8  that your, that Karen, your deceased wife, was abusive
9  to your son.

10  **INMATE AMADOR:**  Yes.

11  **PRESIDING COMMISSIONER ENG:**  You didn't want her
12  to have custody, you had custody of your son.

13  **INMATE AMADOR:**  Well, I didn't want her to have
14  custody, in other words for him to be there without me.

15  **PRESIDING COMMISSIONER ENG:**  Well sir, when
16  you're working, where do you think your son is?  At
17  that, you know, when he was young, he was going to be
18  home with his mother.

19  **INMATE AMADOR:**  Well, in other words, when I get
20  home, you know, (inaudible), at least I'm there to
21  monitor whatever goes on.  I understand today that, you
22  know, I should have called the authorities.  But you
23  know, I was so twisted back then, you know.  I mean,
24  alcoholism, you know, just makes you.

25  **PRESIDING COMMISSIONER ENG:**  Okay.  So you

1  separated after, soon after you remarried you were

2  separated.

3       **INMATE AMADOR:**  Right, right.

4       **PRESIDING COMMISSIONER ENG:**  And you had another

5  girlfriend.

6       **INMATE AMADOR:**  Right.

7       **PRESIDING COMMISSIONER ENG:**  So, I want to ask,

8  why didn't you go forward with the divorce at that time?

9       **INMATE AMADOR:**  As far as I, she was the one

10  initiating the divorce.  As far as I knew, she was going

11  forward.  But I had not been notified.

12      **PRESIDING COMMISSIONER ENG:**  But I'm asking, did

13  you think about moving forward, not waiting for her to

14  file?  Did you think about filing for divorce?

15      **INMATE AMADOR:**  No, I didn't think about filing.

16      **PRESIDING COMMISSIONER ENG:**  Did you intend to

17  stay married?

18      **INMATE AMADOR:**  Well, I didn't know what our

19  future -- Like I said, she moved out, I knew we were

20  separated.  And I knew she needed time and space, you

21  know.

22      **PRESIDING COMMISSIONER ENG:**  So, let's go back to

23  that night of July 16th.  You had dinner.  What were you

24  arguing about in the van?

25      **INMATE AMADOR:**  About child custody.

1        **PRESIDING COMMISSIONER ENG:**  It was all about

2   child custody?

3        **INMATE AMADOR:**  Yes.

4        **PRESIDING COMMISSIONER ENG:**  When you think back,

5   what triggered anger in you?

6        **INMATE AMADOR:**  I didn't know how to control my

7   rage, you know.

8        **PRESIDING COMMISSIONER ENG:**  Why did you, why did

9   you become enraged?

10        **INMATE AMADOR:**  Because she, the way she

11   presented it to me, in a threatening way, that she was

12   going to take my son away from me.  And I told her that

13   she wasn't going to do that and -- In other words, not

14   only was she abusive to him, but her family, you know,

15   emotionally, that's not an environment for him to grow

16   up in.

17        And my wife is very, very persistent in having

18   her own way.  So I just grabbed what was next to me,

19   according to the report it was a hammer, and I just went

20   into a rage.  Just like I did with the jealous rage, you

21   know, because my wife, I reacted to my wife's

22   provocation.  I guess she knew what buttons to push.

23        **PRESIDING COMMISSIONER ENG:**  So you beat her

24   quite a bit that night in the van?

25        **INMATE AMADOR:**  Yes, yes.

42

1    **PRESIDING COMMISSIONER ENG:**  What was going

2    through your head?  I mean how, did you go, right after

3    that, did you go to your brother-in-law's house and

4    decide to bury her?  Or what went through your head?

5    Did you consider calling the police, did you -- What

6    happened?

7        **INMATE AMADOR:**  I believe I considered that.

8        **PRESIDING COMMISSIONER ENG:**  Did you know she was

9    dead?

10       **INMATE AMADOR:**  Yes.  It was dark, but I knew it

11   because, I knew there was damage there, you know.

12   Enough to where a person would be deceased.

13       **PRESIDING COMMISSIONER ENG:**  Did you check to see

14   if there was a pulse?  Or you didn't bother?

15       **INMATE AMADOR:**  Well it's not that I didn't

16   bother, I, because I knew that she was dead, you know.

17   I mean, I don't know how I knew that.  I'm not a medical

18   examiner, I've never taken a pulse or nothing like that.

19   But I just knew that she'd been hit hard enough.

20       **PRESIDING COMMISSIONER ENG:**  How many times did

21   you hit her?

22       **INMATE AMADOR:**  I don't, I'm only guessing, maybe

23   three or four, I don't know.

24       **PRESIDING COMMISSIONER ENG:**  Was she screaming?

25       **INMATE AMADOR:**  No.  I think she died instantly.

1  **PRESIDING COMMISSIONER ENG:**  So, how did you end

2  up driving over and digging a hole?

3  **INMATE AMADOR:**  It's the only thought that came

4  in, you know, my mind, because I knew it ruined my, even

5  my chances of having custody.  And I wanted to be with

6  my son as long as I could.  I mean, I knew I was coming

7  to prison, you know.  I mean, I know right from wrong.

8  But like I said, when you, when rage takes over,

9  like you don't see that initially, you know.  Once it's

10  dissipated, you just know you're in trouble.  So I tried

11  to delay the inevitable, you know, I cleaned up after

12  myself.  I took her belongings back to her apartment and

13  I took her wheelchair and I dropped it off in the

14  hospital.  And I took the dog, you know, I let the dog

15  go because I didn't want the dog to draw any attention,

16  you know, to the fact that, you know, she hadn't been

17  home in a while.

18  **PRESIDING COMMISSIONER ENG:**  How'd you explain it

19  to your son?

20  **INMATE AMADOR:**  I haven't really had an

21  opportunity, not a good opportunity, because he doesn't

22  really want to discuss it.  He was telling me that he

23  went to the funeral.  I just seen him about eight months

24  ago, he just got married.  I think he's choosing to just

25  put it behind him, I don't know why.  But he said they

1  tried to force him to cry at the funeral and he couldn't

2  cry.  I don't know why.  But he's kind of an introvert.

3  He's, you know -- I apologized to him, you know.

4  **PRESIDING COMMISSIONER ENG:**  Was he close to his

5  mother?

6  **INMATE AMADOR:**  Not real close, no.

7  **PRESIDING COMMISSIONER ENG:**  What do you think

8  now when you think back about that period?

9  **INMATE AMADOR:**  Well, I think the way I

10  (inaudible), that I needed help for my rage.  Because in

11  spite of what she may have triggered in me, you know, it

12  was still my responsibility, you know, to conduct myself

13  in a more appropriate way.

14  **PRESIDING COMMISSIONER ENG:**  Did you think that

15  you didn't have any other choice?

16  **INMATE AMADOR:**  I didn't think at all.

17  **PRESIDING COMMISSIONER ENG:**  I'll probably come

18  back and ask you more questions a little later on.

19  **INMATE AMADOR:**  Okay.

20  **PRESIDING COMMISSIONER ENG:**  But at this point,

21  we'll go ahead and move on.  And before we go any

22  further, we had someone enter the room.  I believe it's

23  the representative from the District Attorney's Office

24  of Los Angeles County.  And if you would please state

25  your first and last names.

1       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  My name is

2  Alexis Delagarza, D-E-L-A-G-A-R-Z-A, Deputy District

3  Attorney, Los Angeles County.  And I apologize I'm late,

4  but my office was told that I should be here at 10:30,

5  and that's why I was not here before now.

6       **PRESIDING COMMISSIONER ENG:**  Well, we're in the

7  midst, in the middle of Mr. Henry Amador's parole.

8       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I

9  understand, thank you.

10       **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Amador,

11  let's, I'm going to take this from, let's see if it's

12  here, the, actually I'm going to take it from the

13  February 2000 Board report in terms of your background,

14  your prior arrest record, etcetera.  And it states here

15  that in terms of a juvenile record, that you don't have

16  any juvenile arrest record.  Is that correct?

17       **INMATE AMADOR:**  That's correct.

18       **PRESIDING COMMISSIONER ENG:**  Okay.  And it also

19  states, in terms of adult arrest or convictions, that

20  the life offense is the only one.  Is that correct?

21       **INMATE AMADOR:**  That's correct.

22       **PRESIDING COMMISSIONER ENG:**  So you've never been

23  arrested or had any altercations with the police before?

24       **INMATE AMADOR:**  I've had an arrest, but not a

25  conviction.

1      **PRESIDING COMMISSIONER ENG:**  Okay.

2      **INMATE AMADOR:**  That was in 1976, it was spousal

3   abuse.

4      **PRESIDING COMMISSIONER ENG:**  Right.  I just saw

5   that.  Because if I take a look at the CI and I, it does

6   state on December 15th, 1976 that you were arrested for

7   injury to a wife, disposition was action pending.  And

8   then it does state that in '77, July 15th, that it was

9   dismissed for the furtherance of justice.  So, and you

10  openly talked about those two incidences of the domestic

11  violence.  Sir, would you consider yourself an abuser?

12     **INMATE AMADOR:**  Well, I have to ask in what sense

13  do you mean by that?  Because I think there's different

14  types of an abuser.

15     **PRESIDING COMMISSIONER ENG:**  Okay.

16     **INMATE AMADOR:**  In other words, like I said, did

17  I come home and just beat my wife for any reason?  No.

18  You know, I tried to take care of my wife.  But when the

19  demands got too heavy, you know, I reacted.  And I did

20  lash out at her.

21     **PRESIDING COMMISSIONER ENG:**  Well, let me ask you

22  this.  Do you think it's okay to hit a woman?

23     **INMATE AMADOR:**  No.

24     **PRESIDING COMMISSIONER ENG:**  Under any

25  circumstances?

1    **INMATE AMADOR:**  Under any circumstances.

2    **PRESIDING COMMISSIONER ENG:**  So then, why did

3    you?

4    **INMATE AMADOR:**  Because back then, I was under a

5    lot of pressure and I didn't know how to deal with that

6    pressure.

7    **PRESIDING COMMISSIONER ENG:**  You and your, you

8    and the deceased had a lot of arguments.

9    **INMATE AMADOR:**  Yes, we did.

10   **PRESIDING COMMISSIONER ENG:**  Okay.  Well, let's

11   move on.  In terms of your personal background, and

12   again, it's (inaudible).  You were very young when you

13   met and started a relationship with Karen.  You stated,

14   I believe, that you were 16.  I'm trying to see if I can

15   get a better feel for your background that -- You were

16   born in Los Angeles, your birth date is September 17th,

17   1951.  Correct?

18   **INMATE AMADOR:**  Correct.

19   **PRESIDING COMMISSIONER ENG:**  So you were, I have

20   written down here you were 28 at the, that's how old you

21   are, were, at the time of the life offense.

22   **INMATE AMADOR:**  Yes.

23   **PRESIDING COMMISSIONER ENG:**  And you're currently

24   55?

25   **INMATE AMADOR:**  Yes.

48

1          **PRESIDING COMMISSIONER ENG:**  Okay.  So you were

2     born in LA and you were the second of three children.

3     Okay.  So you have an older, what, brother, sister?

4          **INMATE AMADOR:**  Well I have, actually there's

5     more children, but they're from a different marriage.

6          **PRESIDING COMMISSIONER ENG:**  Okay.

7          **INMATE AMADOR:**  But they're step, two step-

8     sisters.

9          **PRESIDING COMMISSIONER ENG:**  Okay.

10         **INMATE AMADOR:**  And then I have an older sister

11    and a younger brother, and then the two younger step-

12    sisters.

13         **PRESIDING COMMISSIONER ENG:**  Are you in touch

14    with any of them?

15         **INMATE AMADOR:**  Yes.

16         **PRESIDING COMMISSIONER ENG:**  All of them?

17         **INMATE AMADOR:**  No.

18         **PRESIDING COMMISSIONER ENG:**  Okay.

19         **INMATE AMADOR:**  Just my step-sister and my older

20    sister.

21         **PRESIDING COMMISSIONER ENG:**  So, just your, okay.

22    And your younger brother, what happened?

23         **INMATE AMADOR:**  Well, he's got a lot of health

24    issues right now.  Our entire family's health, my dad

25    had a heart condition.  Our parents only lived to be 50

1    years old.  He just, I don't know, my sister went blind

2    and they had to take her eye out.  They both have very

3    bad health issues, they just aren't.

4        **PRESIDING COMMISSIONER ENG:**  Because it does

5    state here that your parents separated when you were

6    young, when you were five.

7        **INMATE AMADOR:**  Right.

8        **PRESIDING COMMISSIONER ENG:**  And your mother took

9    care of you.

10       **INMATE AMADOR:**  Yes.

11       **PRESIDING COMMISSIONER ENG:**  She raised you.  So

12   she raised all three children?

13       **INMATE AMADOR:**  Yes, she raised five children,

14   yeah.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  Well, at that

16   time it was three.

17       **INMATE AMADOR:**  Yeah.

18       **PRESIDING COMMISSIONER ENG:**  So then your father

19   was a construction worker and you, yeah, he died of a

20   heart attack in 1977.  Okay.  And then your mother died,

21   well, your mother died three years later.  Is that true?

22       **INMATE AMADOR:**  No.  Actually they died before

23   this happened, I don't know where that.

24       **PRESIDING COMMISSIONER ENG:**  Well yeah, that was

25   before this happened.  Because the crime was 1980.

1          **INMATE AMADOR:**  Yeah, yeah.

2          **PRESIDING COMMISSIONER ENG:**  So if your father

3    died in '77, your mother died in 1980.  Was that just

4    before?

5          **INMATE AMADOR:**  Nineteen seventy-nine, I believe.

6          **PRESIDING COMMISSIONER ENG:**  She died in 1979?

7          **INMATE AMADOR:**  She was 49 years old and he was

8    50, I recall.

9          **PRESIDING COMMISSIONER ENG:**  Did your mother

10   remarry?

11         **INMATE AMADOR:**  Yes.

12         **PRESIDING COMMISSIONER ENG:**  So that's how you

13   ended up with the step- --

14         **INMATE AMADOR:**  Yes.

15         **PRESIDING COMMISSIONER ENG:**  -- sisters,

16   etcetera.  Okay.  Well, you were raised with all, all

17   together?

18         **INMATE AMADOR:**  Yes.

19         **PRESIDING COMMISSIONER ENG:**  By your mother?

20         **INMATE AMADOR:**  Right.

21         **PRESIDING COMMISSIONER ENG:**  Okay.  So you

22   dropped out of school?

23         **INMATE AMADOR:**  Yes.

24         **PRESIDING COMMISSIONER ENG:**  Okay.

25         **INMATE AMADOR:**  Well, that's when I met Karen.  I

1   actually got kicked out of school.

2        **PRESIDING COMMISSIONER ENG:**  You got kicked out?

3        **INMATE AMADOR:**  Yeah.

4        **PRESIDING COMMISSIONER ENG:**  Okay.

5        **INMATE AMADOR:**  I went back later in 1975 to get

6   my high school diploma.

7        **PRESIDING COMMISSIONER ENG:**  You got it.  Okay,

8   in 1975.  You were going to night school.

9        **INMATE AMADOR:**  Yeah.

10       **PRESIDING COMMISSIONER ENG:**  Yeah, okay.  So at

11  the time of this life crime, you were living with your

12  sister and brother-in-law for about three months?

13       **INMATE AMADOR:**  Yeah.

14       **PRESIDING COMMISSIONER ENG:**  This is your older

15  sister?

16       **INMATE AMADOR:**  Yes.

17       **PRESIDING COMMISSIONER ENG:**  Okay.  So it was

18  your brother-in-law, this is where you buried Karen's

19  body.

20       **INMATE AMADOR:**  Yes.

21       **PRESIDING COMMISSIONER ENG:**  I've got to ask this

22  question.  Why your sister's yard would you bury a body?

23       **INMATE AMADOR:**  Well, like I said, I mean, I

24  consider myself to be a pervert, you know, a criminal.

25  A criminal doesn't think, you know.  Anybody that stoops

1    that low and doesn't care about anything else.  So once

2    you've already, you know, did the ultimate thing, you

3    know, it's not like you're going to all of sudden become

4    considerate.

5        **PRESIDING COMMISSIONER ENG:**  Okay.  And it states

6    here, like you, like we discussed earlier, that November

7    1970 you married Karen, the victim.  And it states here

8    that you separated 25 to 30 times.

9        **INMATE AMADOR:**  Yeah, it was during the course of

10   the first marriage.

11       **PRESIDING COMMISSIONER ENG:**  From one week to a

12   month, until you finally divorced in '76.  Rather a

13   tumultuous time in a marriage.  You were very young,

14   too.

15       **INMATE AMADOR:**  Yeah.

16       **PRESIDING COMMISSIONER ENG:**  Then you remarried

17   in '78 and separated permanently in May of 1979.  And

18   this, I'm taking this from the probation officer's

19   report, it states that, the separations were a result of

20   almost every member of the family moving in at one time

21   or another.  And he did indicate that he started

22   drinking heavily after the separation in '76.  Okay.

23   And that you do have one son.  When was your son born?

24       **INMATE AMADOR:**  He was born in 1970.

25       **PRESIDING COMMISSIONER ENG:**  Nineteen-seventy.

1    **INMATE AMADOR:**  Yeah.

2    **PRESIDING COMMISSIONER ENG:**  So when you got

3    married, your, had she already given birth?

4    **INMATE AMADOR:**  Well, we were just living

5    together.

6    **PRESIDING COMMISSIONER ENG:**  Right.

7    **INMATE AMADOR:**  Until I think I turned about 17.

8    That was when we got married.

9    **PRESIDING COMMISSIONER ENG:**  States here, let's

10   see, you got married November of 1970.  When was your

11   son born?

12   **INMATE AMADOR:**  I think '70, '71.

13   **PRESIDING COMMISSIONER ENG:**  Okay.

14   **INMATE AMADOR:**  Right, shortly after we got

15   married.

16   **PRESIDING COMMISSIONER ENG:**  So she was already

17   pregnant when you guys got married?

18   **INMATE AMADOR:**  No.

19   **PRESIDING COMMISSIONER ENG:**  No?

20   **INMATE AMADOR:**  She wasn't, no.

21   **PRESIDING COMMISSIONER ENG:**  Okay, okay.

22   **INMATE AMADOR:**  I don't know, like I said, the

23   exact, you know.

24   **PRESIDING COMMISSIONER ENG:**  Okay, yeah.  All

25   right.  So you did have a son, you don't have any, you

1  didn't have any other children?

2      **INMATE AMADOR:**  I have a daughter now from a

3  different marriage.

4      **PRESIDING COMMISSIONER ENG:**  Okay.  So, when did

5  you remarry?

6      **INMATE AMADOR:**  Are you talking about, to who?

7      **PRESIDING COMMISSIONER ENG:**  Now, now.  Who's

8  your current wife?

9      **INMATE AMADOR:**  Naomi, 1989.

10     **PRESIDING COMMISSIONER ENG:**  Okay.  Nineteen

11 eighty-nine.  So while you were here.  How did you meet

12 Naomi?

13     **INMATE AMADOR:**  I met her through some friends of

14 mine who were with my M2 sponsor.  And my wife, well,

15 not at that time but, they introduced me to her and she

16 started visiting me.

17     **PRESIDING COMMISSIONER ENG:**  And you had a

18 daughter.

19     **INMATE AMADOR:**  Yes, I have a daughter.

20     **PRESIDING COMMISSIONER ENG:**  And when was she

21 born?

22     **INMATE AMADOR:**  She was born in 1994.

23     **PRESIDING COMMISSIONER ENG:**  Okay.  And where is

24 she now?

25     **INMATE AMADOR:**  She's with her mother.

1  **PRESIDING COMMISSIONER ENG:**  Where are both of

2  them?  Where do they live?

3  **INMATE AMADOR:**  They live in Ukiah.

4  **PRESIDING COMMISSIONER ENG:**  Okay, okay.  You get

5  to visit with them often?

6  **INMATE AMADOR:**  It used to be pretty regular

7  because they lived in Oakley.  Ukiah is quite a distance

8  away so they come about, mostly we keep in contact by

9  phone and letters.

10  **PRESIDING COMMISSIONER ENG:**  How old is your

11  daughter?

12  **INMATE AMADOR:**  She's 12.

13  **PRESIDING COMMISSIONER ENG:**  She's 12?

14  **INMATE AMADOR:**  Yes.

15  **PRESIDING COMMISSIONER ENG:**  How would you feel

16  if a man nit her?

17  **INMATE AMADOR:**  Well, ordinarily I probably would

18  retaliate, which is what I did basically in this case.

19  But you know, I've learned a lot since then, you know.

20  **PRESIDING COMMISSIONER ENG:**  Okay.

21  **INMATE AMADOR:**  I learned that you can't take

22  matters into your own hands.

23  **PRESIDING COMMISSIONER ENG:**  Well, we'll find out

24  how much you've learned, because Commissioner Blonien is

25  now going to go over the different things that you've

1    been going through since you were convicted.

2            **INMATE AMADOR:** Okay.

3            **DEPUTY COMMISSIONER BLONIEN:** So Mr. Amador, this

4    is your ninth hearing. Your last appearance before the

5    Board was January 4th of 2005 and the decision was for a

6    two-year denial. The Panel asked you to get self-help,

7    continue, stay disciplinary-free and earn positive

8    chronos. And your custody level is still Medium-A, your

9    classification score is 19.

10           So, in order to go over what you've been doing in

11   the institution since your last hearing, I've gone

12   through your C-File. I've read your counselor's report

13   by Counselor Studebaker dated January of 2007. I've

14   read the psych report dated 4/15/04 by Dr. Amber

15   Gleason. And somehow you had a psych report done

16   1/20/04 by Dr. R. Talbot. I don't know how that ever

17   happened, but, and they're a little conflicting. So I

18   went over and read both of those and we'll put those

19   into the record.

20           I'll note you did an Olson Review of your file on

21   9/27/06. Since you've been incarcerated, you've only

22   had one 115, and that was back in the late 80s. In

23   terms of vocations and education, you came into the

24   institution with a high school diploma. Correct?

25           **INMATE AMADOR:** Correct.

1    **DEPUTY COMMISSIONER BLONIEN:**  And you've picked

2   up numerous vocations in appliance repair, ventilation

3   and air conditioning.  And you've been working at PIA

4   for how many years?

5        **INMATE AMADOR:**  Since 1996.

6        **DEPUTY COMMISSIONER BLONIEN:**  So over ten years

7   you've been at PIA.  And you're a good worker, otherwise

8   they wouldn't have kept you for ten years.  Because it's

9   not easy to stay in a job anymore, because there's lots

10  of inmates and not so many jobs and they like to rotate.

11  But in your case, you have all satisfactory reports from

12  your supervisor.  You're in garment assembly and you

13  work on the serge sewing machine?

14       **INMATE AMADOR:**  Yes.

15       **DEPUTY COMMISSIONER BLONIEN:**  And you have job

16  quotas.  Right?

17       **INMATE AMADOR:**  Yes.

18       **DEPUTY COMMISSIONER BLONIEN:**  I think it's pretty

19  stressful when I go out and look at you guys making all

20  of these different things.  Things are moving fast.

21       **INMATE AMADOR:**  I know it, it moves fast enough

22  because I, initially I didn't want to get in there.  I

23  was (inaudible) for about a year.  I thought, what a

24  boring job, just sitting at a machine.  But it's not

25  boring.

1      **DEPUTY COMMISSIONER BLONIEN:** It's difficult. Do

2  you get a sore neck?

3      **INMATE AMADOR:** Not neck so much as back, my

4  back, the way you're sitting.

5      **DEPUTY COMMISSIONER BLONIEN:** When we did your

6  last hearing, you'd had some problems with your heart.

7  You look like you're taking pretty good care of

8  yourself.

9      **INMATE AMADOR:** Well, I just had a physical. You

10  know, I take life-time medication. I haven't had any

11  problems since (inaudible).

12      **DEPUTY COMMISSIONER BLONIEN:** And you, do you

13  have high blood pressure and you take medication?

14      **INMATE AMADOR:** Not high blood pressure, just

15  cholesterol, cholesterol.

16      **DEPUTY COMMISSIONER BLONIEN:** You have a letter,

17  and although it's dated '04 it remains current, from

18  Prison Industry discussing that you have valuable job

19  experience that you've gained by working at Prison

20  Industry. And that they can verify your job skills can

21  transfer into the community. And that should assist you

22  in getting a job that we'll talk about when we talk

23  about your parole plans. You've been a member of AA

24  fairly regularly since 1981, I think.

25      **INMATE AMADOR:** By the way, that letter, 2004, it

59

1   has been updated.  I thought I, see, I thought I was

2   coming at ten o'clock so I didn't have a chance to get

3   all -- But that was 602'd.

4       **DEPUTY COMMISSIONER BLONIEN:**  And I see your job

5   specs are the same and I'm very familiar with the letter

6   and how they do it.  And that if you weren't a good

7   worker you wouldn't be working there because there's

8   people lined up.  What's your pay number?

9       **INMATE AMADOR:**  Seventy-five cents an hour.

10      **DEPUTY COMMISSIONER BLONIEN:**  But you're not a

11  lead person?

12      **INMATE AMADOR:**  Yes, I am.

13      **DEPUTY COMMISSIONER BLONIEN:**  You are a lead

14  person.  That in itself is stressful because you have no

15  authority, but you have to lead.

16      **INMATE AMADOR:**  Then you do understand the job.

17      **DEPUTY COMMISSIONER BLONIEN:**  I do understand.

18  So in the last hearing we talked about your

19  participation in AA and we talked about whether you knew

20  the steps or not.  And you demonstrated to me that you

21  knew the steps and that you worked the steps.  And that

22  alcohol was such a major part of your life since you

23  were a very young person, I think you started drinking

24  when you were 13 or 14.  And a big part of your bad

25  decision-making in terms of beating your wife and

60

1  actually killing your wife.

2      Tell me what your plan is to make sure that you

3  never take alcohol in the community.  There's nothing in

4  your record that says that you've had any alcohol while

5  in the institution.  But while the institution is a

6  stressful place, the community is too.  So what do you

7  plan?

8      **INMATE AMADOR:**  Well, if you know anything about

9  Alcoholics Anonymous, it was formed in 1935 by a Dr.

10  Wilson.  And since then, since 1935, they've got AA

11  meetings 24 hours a day, seven days a week, all over the

12  world.  So it's very easy, all you have to do is walk in

13  and say, my name is Henry and I'm an alcoholic, and

14  you're an automatic member wherever your community is.

15  And sponsors are lined up, you know, to kind of take you

16  under their wing and mentor you.  So, I'm going to

17  continue with that.

18      If you go to AA meetings as I do here, you know,

19  I mean, some people go because the Board requires it or

20  recommends it, but I go because I know that I'm an

21  alcoholic.  Which means that I know I'm in trouble if I

22  take just one drink.  I, my body is the type, you know,

23  we're allergic to alcohol, we can't have a social drink,

24  you know.

25      **DEPUTY COMMISSIONER BLONIEN:**  Yeah.

1        **INMATE AMADOR:**  I mean, you know, I've gotten

2    myself into some big trouble, you know.  I haven't

3    wanted to take a drink because of my, you know.

4    Alcoholics Anonymous is living life on life's terms.

5    When something is stressing you out, an alcoholic

6    normally goes and gets a drink.  But being a member of

7    AA, you call your sponsor and you let them know what's

8    going on.

9        See, I think when I mentioned, mentioned my wife,

10   you know, I allowed her to control me because she was

11   three years older than me.  And you know, I tried to

12   take control of that relationship.  I have what they

13   call, I guess, they, control issues, you know.  I wasn't

14   going to, you know, I was the man of my family and this

15   is the way it goes.

16       Course I've had an opportunity to remarry and I

17   have a wife that, you know, I work with.  But Karen and

18   I, you know, we always pulled at each other, you know.

19   If I tried to build the marriage up, she tried to tear

20   it down.  And I didn't know how to respond to that, you

21   know.  So alcohol was an easy way for me to just, you

22   know, relieve that stress.

23       And now, today, like I said, we deal with life on

24   life's terms.  Whatever you throw at me, like even this

25   meeting, I wasn't ready for this meeting, let alone for

1  it to start early.  And I thought that it might even be

2  cancelled.  I realize that I have to be ready no matter

3  what.  Like in the morning, sometimes we're locked down,

4  but I still have to get up as though we're going to go

5  to work.  I have to be ready for whatever life comes,

6  brings into me, whatever comes into my life.  The people

7  that come into your life that, you know, that bring

8  stresses in your life.

9      And this place is a lot more stressful because, I

10  mean, you have everything here.  You've got all kinds of

11  violence in here.  It's just like a maze, you can try

12  to, you know, be in a different place and (inaudible),

13  you know.  I mean you got a lot of peer pressure here.

14  So, yeah, it's different in here, it's a lot different

15  than on the streets.  Because, like I said, with the

16  violence in here, and the peer pressure, people wanting

17  you to join certain groups or.  I manage to stay out of

18  gangs or whatever.  They know I'm from the Southern

19  (inaudible), you know.  I've fought all my time being in

20  here, you know, to have that status taken off of me, you

21  know, gang status.  What's it called, the Southerners,

22  or something like that, you know, so.  I'm living life

23  on life's terms.

24      So I plan to continue to go to AA.  And there,

25  like I said, there's no problem.  I know the Board says,

1   well, where's your sponsor and all that.  Sponsor's are
2   out there.  That's part of the 11th step.  You have to
3   carry this message to other alcoholics, you know.  So
4   they're there, there's no problem with getting a sponsor
5   wherever, wherever you're in a community.  Or in the
6   world.

7       **DEPUTY COMMISSIONER BLONIEN:**  So do you need to
8   go to Alcoholics Anonymous?

9       **INMATE AMADOR:**  Yes, I need to, yes.  Because it
10  reminds me, you know.  That's where I lived, before I
11  lived in this world.  Something went wrong, I just took
12  a drink and everything went wrong in my life.  I just
13  increased it.  Now when things go wrong, as they will,
14  you know, I have a whole group of people, you know, to,
15  just to talk things out.  Because I'm like my son, you
16  know, I was more of an introvert back then, you know.  I
17  handled my own problems.

18      The Commissioner asked me, did I call the police.
19  No, I handled it myself, you know.  Because I thought
20  that, you know, I mean, it's not like it is today.
21  Course I haven't been out there.  But I know today
22  there's all types of outreach groups and ways to deal
23  with domestic violence and child abuse and the things
24  that weren't, they were available back then but people
25  back then kind of kept these things in.

64

1    **DEPUTY COMMISSIONER BLONIEN:** Here's the, I guess

2    my, and my question (inaudible). You're stressful, you

3    drink when you're stressed. When you read the police

4    reports and interviews of the, your first wife's family,

5    it would seem that you are majorly minimizing the

6    beatings of your wife, your drinking. That you couldn't

7    hold a job because you were drinking so much. The

8    beatings they describe were, you know, she was a

9    paraplegic.

10   **INMATE AMADOR:** Right.

11   **DEPUTY COMMISSIONER BLONIEN:** Very small woman in

12   a wheelchair and she's black and blue. And it seems

13   that you lay the responsibility on your, you beating her

14   on her because she triggered you.

15   **INMATE AMADOR:** Well if I could make a correction

16   in that. You know, I told the Commissioner that I did

17   beat my wife and I passed out. I don't know the extent

18   of what I did.

19   **DEPUTY COMMISSIONER BLONIEN:** But that was only

20   one time. I mean there's four or five.

21   **INMATE AMADOR:** The second time.

22   **DEPUTY COMMISSIONER BLONIEN:** There's allegations

23   that you caused a miscarriage.

24   **INMATE AMADOR:** I understand that, that's the

25   information that was kept in the confidential that they

1  never took out until recently.  And I tried to bring it
2  up last time and the Commissioner, the last Commissioner
3  told me, we're not here to talk about that.  Even though
4  the District Attorney sent up the letter saying, we want
5  to talk about this.

6      **DEPUTY COMMISSIONER BLONIEN:**  I just asked you.

7      **INMATE AMADOR:**  Okay.  Well, in 1973 that's,
8  well, it didn't happen quite, she didn't have a
9  miscarriage, she had an abortion over something we
10 fought about.  Because there was constant lies in the
11 relationship.

12     My wife's attorney claims that I raped my wife.
13 And yet nobody else, nobody else, her two best friends
14 and nobody knows about the rape.  He also claims that he
15 told her to hide in the neighbor's house because he knew
16 that I was going to break in the house to get the
17 neighbor to claim that she knows nothing about that.  So
18 I understand the allegations.  Those are the things that
19 I've been having trouble with.

20     **DEPUTY COMMISSIONER BLONIEN:**  Those are some of
21 the allegations.

22     **INMATE AMADOR:**  Yes.

23     **DEPUTY COMMISSIONER BLONIEN:**  But other ones, you
24 know, concern the numbers of beatings and the visual
25 signs of the beatings that your wife's family and

1   friends observed.  My point is that the beatings seem

2   frequent and severe.  And when we talk to you it sounds

3   like it happened one or two times and you passed out,

4   you don't really remember.  And then when the

5   Commissioner asked you about the actual killing, you

6   said, you know, you passed out.  But you read the

7   autopsy.

8           **INMATE AMADOR:**  I did not say that.

9           **DEPUTY COMMISSIONER BLONIEN:**  No?

10          **INMATE AMADOR:**  Not during the killing, no.  I

11  didn't say that.

12          **DEPUTY COMMISSIONER BLONIEN:**  After the killing?

13          **INMATE AMADOR:**  That was during the 1976 beating.

14          **DEPUTY COMMISSIONER BLONIEN:**  Okay.  You read the

15  autopsy report, it was brutal.

16          **INMATE AMADOR:**  Yes, it was.

17          **DEPUTY COMMISSIONER BLONIEN:**  Multiple.

18          **INMATE AMADOR:**  Yes.

19          **DEPUTY COMMISSIONER BLONIEN:**  Wounds.  And you

20  think, you know, this little, she was very little and a

21  paraplegic and you were a strong young man that was

22  drinking and had no control.

23          **INMATE AMADOR:**  Right.

24          **DEPUTY COMMISSIONER BLONIEN:**  And blamed her.

25  And through all this therapy and things that you've gone

1    through in the institution, how you've come to terms

2    with the fact that you've sort of diminished your

3    culpability in your statements.

4        **INMATE AMADOR:**  Well, see, that's not true, and I

5    talk about it.  And that's why I wrote it all out and I

6    wanted to have it incorporated.  Because I'm here

7    telling the Panel what I responded to, to the

8    provocation, whether it was her or anybody else.  Okay.

9    I'm not blaming her for my actions.  Okay.  As far as

10   the allegations, there's no information that

11   substantiates those.  There's no police arrests.  The

12   police department is the one that's saying it, but

13   they're taking it from what the family says.

14       **DEPUTY COMMISSIONER BLONIEN:**  Yeah, and that's

15   where I'm getting that from.

16       **INMATE AMADOR:**  Yeah, I know.

17       **DEPUTY COMMISSIONER BLONIEN:**  The sworn

18   statements that the family.

19       **INMATE AMADOR:**  But there's, there's no, you

20   know, you read the family, like one of the family

21   members says that she was running from me and hiding at

22   a friend's house.  But when you read the whole report,

23   nobody else knows about this, even the person that she

24   was supposedly hiding in her home.  Because that was the

25   person that brought her home the same night that she was

1  murdered.   Why would she bring her home if she knew that
2  she was running from me?

3      **DEPUTY COMMISSIONER BLONIEN:**  Your brother said
4  that, at the trial, that your wife was a calculating
5  woman who drove the defendant to his behavior.  Is that
6  true?

7      **INMATE AMADOR:**  Well, she was calculating, but
8  like I said, I'm going to take responsibility for my
9  actions.

10     **DEPUTY COMMISSIONER BLONIEN:**  And that means that
11 it was your fault?

12     **INMATE AMADOR:**  Yeah, it was my fault, yeah.

13     **DEPUTY COMMISSIONER BLONIEN:**  And looking at the
14 psych report.  I go back to the questions that the last
15 Panel asked and incorporated.  That specifically, they
16 wanted to address your violence potential in the free
17 community and significance of alcohol and drugs as it
18 relates to the commitment offense.  And an estimation of
19 your ability to refrain from those.  The extent of which
20 you've explored the commitment offense and come to terms
21 with the causative factors.  And Commissioner Welch
22 said, and I quote him,

23              "Because I have some real concerns about
24          whether or not you've explored that and you've
25          come to terms with the causative factors.  You

1          tried to refer to a stack of documents in the

2          last hearing in terms of whether or not you've

3          explored the causative factors.  But what we want

4          from you is whether or not, as an individual,

5          have you internally explored and come to terms.

6          And that's what you have to do, internally you

7          have to do.  And whether or not there is need for

8          further therapy."

9          So in looking at the two psych reports that you

10    have from '04, the one dated 04/05/04 by Dr. Gleason.

11          **ATTORNEY TARDIFF:**  Can I ask you a question.  How

12    come he got two psych reports?  Was there a reason why

13    the second psych report was done?

14          **INMATE AMADOR:**  Yes, there is.  I thought you

15    were going to ask me but you never asked me.  Because --

16          **DEPUTY COMMISSIONER BLONIEN:**  You know, just let

17    me say something.  This is your hearing and the

18    information that we're going to consider here today has

19    an important effect on your life.  And if, don't wait

20    for me to ask you a question because, in a timely

21    manner, if you have information that's relevant, tell

22    us.

23          **INMATE AMADOR:**  Well, I was going to get to that,

24    but I was going to let you.

25          **DEPUTY COMMISSIONER BLONIEN:**  Okay.

1          **INMATE AMADOR:** But anyway, on that first report,
2    he said he had his greatest concern was my return to
3    alcohol.

4          **DEPUTY COMMISSIONER BLONIEN:** Right.

5          **INMATE AMADOR:** And I asked him, where did those
6    concerns come from. And I want, I'm appealing that
7    report.

8          **DEPUTY COMMISSIONER BLONIEN:** You 602'd the psych
9    report.

10         **INMATE AMADOR:** I 602'd it. And they granted me.
11   And they said we'll do a new report. So they chose
12   another psych. And that's how I got it.

13         **DEPUTY COMMISSIONER BLONIEN:** Okay. So this
14   second psych, Dr. Gleason, under Axis I, noted no
15   contributory clinical disorder. Under Axis II, no
16   contributory personality disorder. And gave you a
17   Global Assessment of Functioning score of 83. And notes
18   that,

19              "In consideration of several factors,
20         while his lack of criminal history before
21         starting a fight with his wife, also including a
22         complete lack of CDC 115s since 1989, this inmate
23         has a much lower than average propensity for
24         violence within this prison II Level setting.
25         Within the community, when released to the

*Capitol Electronic Reporting*

1               community, this inmate has no higher prediction

2               for violence than any other citizen within the

3               community."

4         And he based this decision on several dynamic

5    factors which are shown in research to have effect.

6    That,

7               "Besides the history of this one offense

8               with his wife, the inmate has no other history of

9               violence. He's had no violence since 1989, no

10              disciplinary issues. He has the support of a

11              family which is indicative of good social

12              readjustment. He's continued the support of AA,

13              which he will continue to attend once he's

14              released.

15              "And that the only significant risk factor

16              or precursor to violence for this inmate would be

17              should this inmate choose to return to the use of

18              alcohol. Since this inmate has not used alcohol

19              since he was incarcerated, this is unlikely. But

20              in the off-chance that alcohol is within the

21              community where he lives, occasional attendance

22              at AA may be a good idea."

23        Well do you know of any community in this whole

24    world where alcohol is not available?

25        **INMATE AMADOR:** No.

1    **DEPUTY COMMISSIONER BLONIEN:**  I don't know why he

2    said that.  That's crazy.

3    **INMATE AMADOR:**  Well, let me make one correction

4    there, too.  He said in 1989 it was, that was a 115, but

5    that wasn't a violent one.

6    **DEPUTY COMMISSIONER BLONIEN:**  It was a sexual

7    115.

8    **INMATE AMADOR:**  Yeah, okay.

9    **DEPUTY COMMISSIONER BLONIEN:**  In the visiting

10   room.  Is that, was that with your current wife?

11   **INMATE AMADOR:**  Yes, yes.

12   **DEPUTY COMMISSIONER BLONIEN:**  I didn't ask about

13   that because it was in 1989.

14   **INMATE AMADOR:**  Well, I know, but they wrote

15   that, I just seen that this morning.

16   **DEPUTY COMMISSIONER BLONIEN:**  Yeah, I knew it

17   wasn't violence.  In looking at, you know, your

18   substance abuse history, Dr. Gleason says that the

19   inmate began drinking at 14 and that you've been a

20   member of AA since 1981.  And there are not consistent

21   AA chronos in your file, but there are enough of them to

22   know that you have been pretty much in attendance.

23   **INMATE AMADOR:**  Well, she said she found them.

24   **DEPUTY COMMISSIONER BLONIEN:**  There's several of

25   them in there and you've got two files.  And your

1  knowledge of AA, I know it's very good.  Not many people
2  come in and know it was founded in 1935 and the name of
3  it.

4       **INMATE AMADOR:**  Okay.  Can I say something before
5  you proceed forward?

6       **DEPUTY COMMISSIONER BLONIEN:**  Yeah.

7       **INMATE AMADOR:**  Okay now, you said something to
8  the fact that I minimized what I did to my wife.  I
9  wasn't.

10       **DEPUTY COMMISSIONER BLONIEN:**  I said that I think
11  you blame her.

12       **INMATE AMADOR:**  No.  Okay, that, I thought that's
13  what -- But, and I explained it in here, but I can never
14  get this incorporated in the file.

15       **DEPUTY COMMISSIONER BLONIEN:**  Well, you keep
16  referring to that and what you say in there.  Read the
17  paragraph that you want in.

18       **INMATE AMADOR:**  Well, it's a whole four pages, so
19  (inaudible).

20       **DEPUTY COMMISSIONER BLONIEN:**  But it doesn't all
21  say, I mean, we're talking about your minimalization or
22  blaming her for her murder.

23       **INMATE AMADOR:**  Can I say, you know, it is
24  difficult for me sometimes not to accept responsibility.
25  I know that what I did is a cowardly act, you know.  And

1  it's worse because my wife was a paraplegic.

2        So, you know, people talk to me in a harsh tone

3  about it, you know.  They're basically saying you

4  coward, and it, you know, I start to introvert again.

5  So it's not so much that what I did, it's in the tone I

6  hear, most Commissioners, you know, and I get all

7  tongue-tied and all that.

8        But I understand it was a cowardly act.  And I

9  understood that I reacted to the provocation.  I'm not

10  blaming her and I'm not trying to minimize it because,

11  like I said, in 1976, I passed out.  I know that

12  something happened but she had left, and I can only go

13  by what the report says.  And that's the recollection I

14  have of that.

15        But, and see, the people that come into AA got

16  more than just a drinking problem, we got problems with

17  life.  And solving one of my problems, it's that I'm

18  cowardly, you know.  And I understand that today.  And I

19  write about that in here that, you know just as Karen

20  beat my son because he was small.  I say that in there

21  too, that I beat Karen because she was smaller than me.

22  And I could get away with it, whereas I couldn't with a

23  much larger person.

24        **DEPUTY COMMISSIONER BLONIEN:**  And it was a

25  different time back then, also.  You talked about being

1   a different time.  I mean, women didn't have a lot of

2   support, it was a man's world.

3         **INMATE AMADOR:**  That I didn't say.  I said it was

4   difficult, yes.

5         **DEPUTY COMMISSIONER BLONIEN:**  And it was looked

6   on differently.  And it was a secret that you kept in

7   your house.  And that's another reason why she didn't go

8   to the police all the time.

9         **INMATE AMADOR:**  Yes she did.

10        **DEPUTY COMMISSIONER BLONIEN:**  Because that wasn't

11  acceptable.

12        **INMATE AMADOR:**  She did go to the police.

13        **DEPUTY COMMISSIONER BLONIEN:**  Not every time,

14  once.

15        **INMATE AMADOR:**  Well, but you keep saying every

16  time, those are just allegations.  Those are

17  allegations.

18        **ATTORNEY TARDIFF:**  By her family, which they

19  don't sound like they were real functional, so.

20        **DEPUTY COMMISSIONER BLONIEN:**  Okay, go ahead.

21        **INMATE AMADOR:**  No, I'm finished.

22        **DEPUTY COMMISSIONER BLONIEN:**  And then I go to

23  Dr. Talbott's report, who does go into being a biggest

24  concern of his was relative to your alcohol use.  And

25  that you've done a good job in avoiding violence in the

1    prison community.  And the free community offers the

2    potential for frustration he's not experienced in a long

3    time.  And that you'll need to be backed up by regular

4    attendance at AA.

5        And in talking about the life crime, he notes

6    that your relationship with your first wife was laden

7    with violence.  And that he had struck her more than

8    once under the influence.  And he added that alcohol was

9    involved in most of the situations.  Though he added

10   that it was not to blame, that you were, you took

11   responsibility.

12       And that the last time that you were involved in

13   an argument was in the back of your van, and you had

14   been drinking and the focus of the argument was the

15   custody of their son.  And that the wife believed that

16   your drinking was a potential threat to your son.  So

17   that's how this whole life crime started.

18       And when asked about how he felt, inmate Amador

19   said he felt sorry about robbing her of her life.  He

20   went on to say that he handles his anger differently

21   these days, not resuming to violence as in the past nor

22   using alcohol.  And neither one of them found that you

23   had any mental disorders.  So, let's just try to get it

24   clear.

25       **INMATE AMADOR:**  Okay.

1     **DEPUTY COMMISSIONER BLONIEN:** Tell me about your

2 insight into the crime. Whose fault was it?

3     **INMATE AMADOR:** Mine. Like I said, I didn't have

4 the maturity, no matter what age an alcoholic's at.

5 Because, you know the more I drank, I had no ability to

6 function, you know. I didn't have the proper resources.

7 I was an introvert, I kept things, you know, including

8 my violence towards my wife, kept it all in the family,

9 even her violence towards my son, I kept that in the

10 family.

11     Since I've continued in AA, you know, I've

12 learned that you can go to somebody. You can go to your

13 sponsor, you can go to other members in the group and

14 tell them what's going on. Before I didn't even know

15 what was going on myself, let alone try to tell

16 somebody. And what I was saying earlier, you know, a

17 criminal, which I am, is always going to try and

18 minimize his (inaudible).

19     But I'm not minimizing my responsibility or the

20 damage that I've done. Like I mentioned before, I don't

21 know, as far as the '76 incident (inaudible), because I

22 did pass out after that. I woke up and the sheriffs

23 arrested me, told me that I was under arrest so, and she

24 had left. So I truly don't know what happened in that.

25     And then the night of the, that I murdered my

1  wife, like I said, I had shortly buried her body, so I

2  didn't, I didn't minimize it.  I did that because, like

3  I said, I tried to delay the inevitable, you know.  I

4  knew that eventually, you know, this thing was going to

5  come out.  An alcoholic, most alcoholics are very

6  immature in their thinking and they can cover up things.

7       You know, I had to deal with a lot of

8  insecurities.  The insecurity of my wife too, because

9  not only was Karen a paraplegic, you know, her legs were

10 deformed and they had surgical scars all over them.

11 They were very, very, they tapered and they were real

12 thin.  And Karen would kind of, whatever she was doing

13 about that, she would lash out at me and I would lash

14 back out at her, you know.  So yeah, we fought a lot, we

15 had a lot of issues.  And I didn't know what to do with

16 my issues back then.

17      **DEPUTY COMMISSIONER BLONIEN:**  Okay.  And just for

18 the record, you've also taken anger management courses

19 since your last hearing through the (inaudible)

20 Employability Program through videos.

21      **INMATE AMADOR:**  Yes.

22      **DEPUTY COMMISSIONER BLONIEN:**  Parole plans.  Your

23 current wife, whose name is?

24      **INMATE AMADOR:**  Naomi.

25      **DEPUTY COMMISSIONER BLONIEN:**  Lives in Ukiah.

1        **INMATE AMADOR:**  Yes.

2        **DEPUTY COMMISSIONER BLONIEN:**  And she has a job

3    up there.

4        **INMATE AMADOR:**  Yes.

5        **DEPUTY COMMISSIONER BLONIEN:**  And is that where

6    you plan to live?

7        **INMATE AMADOR:**  Well, I'm not sure if we'll move

8    back there again.

9        **DEPUTY COMMISSIONER BLONIEN:**  And she's written

10    you a letter.  And how long have you been married to

11    Naomi?

12        **INMATE AMADOR:**  Since '89.

13        **DEPUTY COMMISSIONER BLONIEN:**  Did you know her

14    before you came in?

15        **INMATE AMADOR:**  No, I met her.

16        **DEPUTY COMMISSIONER BLONIEN:**  Through your

17    sponsor.

18        **INMATE AMADOR:**  Through my M2 sponsor, yes.

19        **DEPUTY COMMISSIONER BLONIEN:**  She says that she

20    has an apartment up there and she lives up there with

21    her daughter.  That she has health insurance for the

22    family and you would be covered by health insurance.

23    That she has car insurance and that she can add you to

24    the car insurance.  And that she relies heavily on you

25    and that you have a good relationship.  And that the

1  values that you have as a family would be an asset to

2  the community and that she would like the opportunity to

3  live as a family.

4  And then you have a letter from your son, Henry,

5  who says that when you get out he will be there for you

6  and help you in any way possible. Where does he live?

7  **INMATE AMADOR:** He lives in Arizona.

8  **DEPUTY COMMISSIONER BLONIEN:** Okay. Because

9  there's no address on here. And that he has a job, he's

10 working as a security officer, and that he has goals,

11 job goals. He wants to be a master practitioner of

12 neural linguistic programming and to be a life coach.

13 And I think you said that he's married. Did you say

14 that?

15 **INMATE AMADOR:** Yes.

16 **DEPUTY COMMISSIONER BLONIEN:** And he has always

17 loved you and always counted you as one of his good

18 friends. And you have a letter from Ed Creswell, C-R-E-

19 S-W-E-L-L, who lives in Bakersfield. And he's been your

20 M2 sponsor since 1937. He's been your friend since 1987

21 but he started as your M2 sponsor.

22 **INMATE AMADOR:** That's my second M2 sponsor.

23 **DEPUTY COMMISSIONER BLONIEN:** And that he knows

24 your wife and your daughter. And that you impress him

25 as being capable, self-disciplined and stable. That not

1  only does he think highly of you but he thinks very

2  highly of your wife and her strength.  And that he would

3  be willing to help you financially with your apartment

4  rental and by providing first and last month's rental

5  fee, or he'd work on other areas.  So what kind of work

6  would you look for in Ukiah?

7      **INMATE AMADOR:**  Well, I do heating,

8  refrigeration, I do appliance repair.  I do roofing, and

9  I'm licensed in --

10     **DEPUTY COMMISSIONER BLONIEN:**  Have you ever been

11 to Ukiah?

12     **INMATE AMADOR:**  No, I never have.

13     **DEPUTY COMMISSIONER BLONIEN:**  Do you know how big

14 the town is?

15     **INMATE AMADOR:**  It's kind of small.

16     **DEPUTY COMMISSIONER BLONIEN:**  Has your wife

17 looked in the classifieds to see what kind of

18 opportunities there are available?

19     **INMATE AMADOR:**  Well, you know, that would be

20 premature.  I have enough, I came in as an aircraft

21 machinist, so I have, you know, actually multiple

22 skills, you know.  But in other.

23     **DEPUTY COMMISSIONER BLONIEN:**  Aircrafts have

24 changed since you've been here.  And I will tell you

25 that.

82

1    **INMATE AMADOR:**  Yeah, I know, they use

2    pneumatics, yes.

3    **DEPUTY COMMISSIONER BLONIEN:**  I do know that.

4    **INMATE AMADOR:**  Yeah, pneumatics, all

5    computerized now.  But basically you still have to set

6    them up.  A computer just assists you.  And you have to

7    program, I've done a little bit of programming.  It was

8    a lot differently back then.  They had big old wheels

9    like that, and now they're --

10   **DEPUTY COMMISSIONER BLONIEN:**  And I can tell you,

11   there's no airplane manufacturing plant in Ukiah.  So

12   tell me about Ukiah, what would you do?

13   **INMATE AMADOR:**  Well I would have to work at air

14   conditioning, heating, ventilation.  And of course in

15   appliance repair.  That would be (inaudible).

16   **DEPUTY COMMISSIONER BLONIEN:**  And your wife has a

17   job?

18   **INMATE AMADOR:**  Yes, she does.

19   **DEPUTY COMMISSIONER BLONIEN:**  What does she do?

20   **INMATE AMADOR:**  She's a, I guess those people,

21   when you go to a medical doctor.  What would you call

22   them?

23   **DEPUTY COMMISSIONER BLONIEN:**  She works for a

24   doctor or an insurance company?

25   **INMATE AMADOR:**  She works for a, she works for a

1   hospital.  She does the billing or something like that.

2        **DEPUTY COMMISSIONER BLONIEN:**  And your daughter

3   is in school up there?

4        **INMATE AMADOR:**  She's at the primer school, yes.

5        **DEPUTY COMMISSIONER BLONIEN:**  And what grade is

6   she in?

7        **INMATE AMADOR:**  I believe she's in the fourth or

8   fifth grade, something like that.

9        **DEPUTY COMMISSIONER BLONIEN:**  You don't know?

10        **INMATE AMADOR:**  No, I'll tell you why.  Because

11   my daughter was born in November and she, so she had to

12   start school late.  And then she even got behind one

13   year.  It's kind of tough for her right now.  She's

14   having problems with people asking her where I am.  So

15   she hadn't been doing real well in school, you know.

16        **DEPUTY COMMISSIONER BLONIEN:**  So you have a place

17   to live and you have job skills, you have family

18   support.  You told me there's AA everywhere.  Is there

19   AA in Ukiah?

20        **INMATE AMADOR:**  Yes, yes.

21        **DEPUTY COMMISSIONER BLONIEN:**  Do you know of any

22   place where it is?  Did you --

23        **INMATE AMADOR:**  Well, I have the kit that they

24   gave me, it's got all the addresses of all the housing,

25   you know, for inmates.  And the one I took, that you

1  have in there, it says two appointments.  I got three so
2  I 206'd it.  They're all referrals.

3      **DEPUTY COMMISSIONER BLONIEN:**  From Prison
4  Industry.

5      **INMATE AMADOR:**  Yeah, yeah.  They have the whole
6  (inaudible).  And besides, you know, your parole
7  department assists you like they do any other inmate
8  that's not (inaudible), you know, with all necessary.

9      **DEPUTY COMMISSIONER BLONIEN:**  Now that, I'll tell
10  you, that's mostly rhetoric.  Not much happens.  I mean
11  they write all the letters, but it looks good on paper,
12  but in reality, especially a place like Ukiah, there
13  isn't a Jobs' Plus program.  And the employment
14  development office doesn't have the resources to help
15  place many people.  But someone with your, I'm not
16  worried about your job because I think you have lots of
17  different skills.

18      **INMATE AMADOR:**  And you know what?  When I.
19      **DEPUTY COMMISSIONER BLONIEN:**  But my question
20  was.

21      **INMATE AMADOR:**  When I was out there before, when
22  I was out there before, when I was out of a job, rather
23  than go to the employment office, I usually went to a
24  place they called Manpower.

25      **DEPUTY COMMISSIONER BLONIEN:**  They still have

1 | that.

2 | **INMATE AMADOR:** Yeah. And there's another one,

3 | it's called (inaudible) Employment. And you worked for

4 | minimum wage and you stayed there for 90 days. The

5 | thing of it is, especially if you have transportation,

6 | they hire you right away because you're a temporary

7 | worker. The thing about the employment program is any

8 | employer that hires you knows from the very beginning

9 | that you are an ex-felon. So, those things are right up

10 | front. And of course that's what we learned in that

11 | program, not to lie to your employers and, you know.

12 | **DEPUTY COMMISSIONER BLONIEN:** And you're bonded

13 | through --

14 | **INMATE AMADOR:** I don't know.

15 | **DEPUTY COMMISSIONER BLONIEN:** Yeah, you are.

16 | Through the EDD.

17 | **INMATE AMADOR:** In AA, you know, to every single

18 | sponsor that comes in here. I mean, I've got tons of

19 | communities, you know, where AAs, like I said, that I've

20 | been going to it years and years and years and I've

21 | never seen a community where they don't have it.

22 | **DEPUTY COMMISSIONER BLONIEN:** Okay.

23 | **INMATE AMADOR:** And if I needed to put it, you

24 | know, I could get that in a minute, a minute.

25 | **DEPUTY COMMISSIONER BLONIEN:** We also send out

1   3042 notices, okay, and we didn't get any written

2   responses.  But we do have a representative from the Los

3   Angeles District Attorney's Office.  And at the

4   appropriate time she'll be given the opportunity to ask

5   questions and to make a final statement.

6           **INMATE AMADOR:**  Okay.

7           **DEPUTY COMMISSIONER BLONIEN:**  And with that, I

8   will return it to the Chair.

9           **PRESIDING COMMISSIONER ENG:**  Sir, I have a couple

10  of follow-up questions to ask you.  You've been to some

11  sort of anger, I'm just going to put an umbrella term

12  onto anger management, okay, so what did you really get

13  out of that?  Do you understand what possibly triggers

14  your anger?

15          **INMATE AMADOR:**  Well actually, that's what they

16  talk about.  And they don't call it anger, they call it

17  rage, so you understand what it is, you know.  Maybe the

18  trigger would be a provocation, but the rage is already

19  in you and the way you respond to it.  And that's what I

20  was trying to tell the Deputy Commissioner.

21          **DEPUTY COMMISSIONER BLONIEN:**  Blonien.

22          **INMATE AMADOR:**  Blonien.  That no, I don't blame

23  my wife, you know.  She may have been the trigger, but

24  ultimately, you know, I needed to manage the rage.

25          **PRESIDING COMMISSIONER ENG:**  So what did you find

1  out about you?

2      **INMATE AMADOR:**  That I have rage.

3      **PRESIDING COMMISSIONER ENG:**  I think that's been

4  apparent that you did have rage.  So how do you deal

5  with that in a non-violent manner?

6      **INMATE AMADOR:**  Well, in AA, like I said, you

7  have outlets.  If I have an argument with my wife, you

8  know, I get on the phone and I call my sponsor and I

9  tell him what's going on inside of me, you know.  At the

10  time when I did, when I reacted the way I did, I didn't,

11  I didn't know what was available to me.  I knew that

12  there were programs out there someplace, but I didn't,

13  you know.  I've become intimate with AA.  Whereas

14  before, AA was just, you know, I used to think it was an

15  insurance company or something.

16      But, yeah, by becoming open and intimate with the

17  group, with your sponsor, and letting them know what's

18  going on.  Don't bury that stuff inside of you because

19  that's what it eventually amounts to, is the rage, you

20  know, the out-of-control.  And I think they got a term

21  today, they call it road rage, when somebody cuts me

22  off, you know.  So they teach you about feelings, you

23  know, when you feel that in something coming on, you

24  have a place to go, somebody that you can talk with,

25  somebody else.

1    Because as I said, I was a coward, I can go up to

2  another coward and talk to him, understand how that

3  feels.  Because nobody likes to admit that.  And because

4  I don't feel comfortable here when a Commissioner is

5  talking down to me in a very, and usually it's a male

6  Commissioner but -- Because they're outraged like, one

7  of you asked me what would I do about my daughter, you

8  know.  I would be outraged too.  But you know, like I

9  said, I know that there's resources, you know.  And I've

10  thought about those things.  If somebody ever hurt my

11  daughter or my wife, you know, how much they mean to me,

12  what I would want to do and what my options are.  And

13  retaliation is not an option.

14      **PRESIDING COMMISSIONER ENG:**  Well, one of the

15  concerns that this Panel has, and I'm speaking for both

16  of us, because we, we understand that you've had, that,

17  you know, you're an admitted alcoholic and that you have

18  come to grips with it and are doing a lot about that.

19  And that you have gone to some of these anger management

20  therapies.

21      However, I can speak for myself.  I have great

22  concerns about any relationship you have with a woman.

23  I'm not so much concerned about your, I am not concerned

24  about your behavior here in the institution.  However

25  you're surrounded by men.  Your past history has,

1  doesn't have anything to do with violence against men,

2  it has to do with violence against women.  Okay.

3  And so, from my own perspective, I'm concerned

4  about your potential for, you know, future violence

5  against women.  And the fact that you have remarried,

6  you've got a daughter, you've never lived on the outside

7  with them.  And the only thing we can go by is your, and

8  you may not like this term, but it's the only term I can

9  think of right now, but your domestic violence history.

10  Okay.  You do have a history of domestic violence.

11  You've had physical altercations with your deceased wife

12  on, we can say numerous occasions.  It wasn't just once.

13  So we'll say you.

14  **DEPUTY COMMISSIONER BLONIEN:**  Let me turn the

15  tape.

16  (Thereupon, the tapes were

17  changed off the record.)

18  **DEPUTY COMMISSIONER BLONIEN:**  Okay.  We're back

19  on tape one, side two.

20  **PRESIDING COMMISSIONER ENG:**  Okay.  So with that

21  history, and I heard what you said about you can call a

22  sponsor, but what I haven't been convinced about is

23  whether or not you could identify or somehow prevent

24  yourself from going too far again in the future.  And

25  again, I'm not concerned about the men.  I'm not even

1    concerned, I'm not concerned about so much the drinking,
2    because I believe you have that under control.

3        But my real concern is what has driven you in a
4    relationship with a woman to such a point that you have
5    had physical altercations to the point where it
6    escalated to death, to murder.  What have you set in
7    place or how can you convince this Panel that that would
8    never happen again?  We want to be sure that, if and
9    when you get a date, sir, that you're going to be
10   successful out there.  Okay.

11       **INMATE AMADOR:**  I understand.  First of all, I
12   need to say, I understand that this is domestic violence
13   against a woman.  It just so happens to be that, you
14   know, it was a woman, you know.  I mean, a violent
15   person operates, you know, anger's real easy, it doesn't
16   matter if it's a man or a woman.  But a coward usually
17   looks for somebody weaker or smaller.  And I think we
18   talked about that.

19       Now I didn't understand that I was looking for
20   somebody, or that I lashed out at her because she was
21   smaller.  And of course she was handicapped too.  So,
22   you know, other than that I, you know, I felt anger
23   towards a lot of people in here and I've had things
24   happen to me in here, including people that want to
25   sexually assault you, I'll put it that way, that I

1  really felt some, you know, anger towards them.  And I

2  wanted to retaliate in some way.

3        And this is when I first came into the

4  institution.  Because when I first came here, it wasn't

5  an institution like this, it was a Level IV where you

6  have what they call a Mexican mafia and things like

7  that.  It's a whole different scenario.  And you think I

8  didn't want to lash out when somebody wants to assault

9  me in a sexual way?  I did, I wanted to.  And then you

10  really can't even reveal this to anybody else because

11  there's really no protection other than going in to

12  protective custody if you was to reveal them

13  (inaudible).  So I had many, many occasions, you know,

14  where I wanted to take matters into my own hands.

15        And that time I did, I took matters into my own

16  hands because like I said, I knew she was small.  I

17  didn't know it at the time, but I've come to grips with

18  that.  And I realized why I did what I did, because she

19  couldn't hurt me, but I could hurt her.  She could hurt

20  me with her words and charge up the credit cards and,

21  you know, all that, things like, that that affected me.

22  So she was the person available at the time.  But no, I

23  do not hate women and I don't lash out at women.  This

24  is an isolated incident.

25        **PRESIDING COMMISSIONER ENG:**  But how, I mean, if

1  you can't make a quick phone call and you feel a lot of
2  tension and the rage building up, what are you going to
3  do to control yourself so that you don't respond in a
4  violent manner?  Whether it's for a woman, or child, or
5  whatever, you know.  What have you set up for yourself
6  in place, your safety net to catch you should you not be
7  able to call a sponsor and not get talked off that
8  ledge, so to speak?

9       **INMATE AMADOR:**  First of all, I know what you're
10  saying.  Even though I haven't lived with my current
11  wife, you know she does a lot of things very much like
12  my deceased wife, you know.  And I've told her, you
13  know, I know that when I do come home you're going to
14  probably see me take a lot of walks, you know, to walk
15  away.  Because I know firsthand what I did, see.  So
16  it's not something that I haven't thought about or even
17  discussed with my wife, you know.

18       Because all you, and she's a woman, you know, she
19  treats me a lot better, we work together and all that,
20  but there are sometimes, you know, that I get so
21  aggravated and so angry, you know.  Because after 20
22  years, you know, you'd think she would learn the system.
23  Coming in for visiting sometimes, like she'll bring my
24  daughter in clothing that she can't wear.  And I'm so
25  mad because they make her go out and change and they

1   waste all -- So yeah, you know, I feel angry and

2   aggravated too.  But yeah, see, and it's not even up to

3   her, it's up to me to walk away so that, I don't even

4   think like I, you know, before I didn't even think, I

5   just reacted, you know,  I didn't know what was inside

6   of me.  Today I know because I lived through it.

7            **PRESIDING COMMISSIONER ENG:**  So how do you, every

8   time you walk away, all that rage, all you're going to

9   do is sort of put a lid on it for a while.  Does it, how

10  do you get rid of it so it doesn't build up?

11           **INMATE AMADOR:**  It doesn't, it doesn't get to the

12  point of rage.  That's what I'm saying.  It's already

13  computerized before it, way before it even gets there.

14  Before there wasn't a lid, there was no outlet, or at

15  least that meant anything to me.

16           **PRESIDING COMMISSIONER ENG:**  Any other questions?

17           **DEPUTY COMMISSIONER BLONIEN:**  No.  But I would

18  like, sir, for you to give me your written statement

19  during deliberation.

20           **INMATE AMADOR:**  I thought I gave it to you,

21  thought I gave it to you.

22           **ATTORNEY TARDIFF:**  Yeah, it's right here.

23           **INMATE AMADOR:**  Okay, here.

24           **DEPUTY COMMISSIONER BLONIEN:**  Have the officer

25  give it to me.  I have nothing.

1     **PRESIDING COMMISSIONER ENG:**  Okay.  Then I'm

2  going to ask Ms. Delagarza if you have any questions

3  that you would like posed to Mr. Amador through the

4  Panel.

5     **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Yes, I do,

6  thank you.  The first question I would ask the Panel to

7  ask the inmate is that he claims that the claims of his

8  abuse were exaggerated by the family.  I would ask the

9  Panel to ask the inmate how many times prior to actually

10  killing his wife does the inmate admit to having abused

11  his wife, physically abused her?

12     **PRESIDING COMMISSIONER ENG:**  Okay, sir, you want

13  to.

14     **INMATE AMADOR:**  I think I mentioned it, 1976 and

15  1978.  As far as striking out at her.

16     **PRESIDING COMMISSIONER ENG:**  Physically?

17     **INMATE AMADOR:**  Physically, physically.

18     **PRESIDING COMMISSIONER ENG:**  Hitting her?

19     **INMATE AMADOR:**  Hitting, that's right.

20     **PRESIDING COMMISSIONER ENG:**  Okay.  So you're

21  stating it was two times?

22     **INMATE AMADOR:**  Yes, it was.

23     **PRESIDING COMMISSIONER ENG:**  Any more than that?

24     **INMATE AMADOR:**  Nothing.

25     **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  With respect

1   to the 1976 striking out, according to the reports, he

2   was jealous because he thought his wife was flirting

3   with another person.  Is that accurate?  Is that the

4   reason why he struck her on that occasion?

5        **PRESIDING COMMISSIONER ENG:**  Sir?

6        **INMATE AMADOR:**  Okay.  Again, I only learned of

7   these things by reading the police report.  It was in

8   confidential for 22 years.  Okay.  I didn't know.  Like

9   I said, I passed out.  But I did read the report after

10  they finally gave it to me.  And it says in there,

11  through a witness, a family member, that I had beaten my

12  wife because I was in a jealous rage.  So that's where

13  I'm getting that information at.

14       **PRESIDING COMMISSIONER ENG:**  But do you have any

15  recollection?

16       **INMATE AMADOR:**  Other than --

17       **PRESIDING COMMISSIONER ENG:**  Do you, yourself,

18  admit that yes, I was in a jealous rage?

19       **INMATE AMADOR:**  Yes, yes.

20       **PRESIDING COMMISSIONER ENG:**  Or no, it has

21  nothing to do with it?

22       **INMATE AMADOR:**  I know it does, yeah.

23       **PRESIDING COMMISSIONER ENG:**  Okay.

24       **INMATE AMADOR:**  Yeah.

25       **PRESIDING COMMISSIONER ENG:**  Okay.

1    **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  And the last

2  question I would ask the Panel to ask the inmate is with

3  respect to the life crime, he's indicated on several

4  occasions that his wife provoked him or triggered

5  something that resulted in his killing her.  I would ask

6  the Panel to ask the inmate, what was it that she either

7  did or said that he feels triggered this response from

8  him?

9    **PRESIDING COMMISSIONER ENG:**  Okay, sir.

10    **INMATE AMADOR:**  Okay.  I thought I had already

11  addressed that, but I guess, I guess.

12    **PRESIDING COMMISSIONER ENG:**  Ms. Delagarza may

13  not have been --

14    **INMATE AMADOR:**  Yes.

15    **PRESIDING COMMISSIONER ENG:**  -- present at the

16  time that we did discuss it, so for the, that would, go

17  ahead and repeat it.

18    **INMATE AMADOR:**  Okay.  And I think the

19  Commissioner's reading it right now.  It was a difficult

20  period of time with all the demands that my wife put on

21  me and the fact that she blamed me for her mother's

22  suicide.  It was just a lot of pressure, it was just

23  always there, it never seemed to let up.

24    **PRESIDING COMMISSIONER ENG:**  But I believe what

25  you were asking, Ms. Delagarza, that, on that fateful

97

1  night in the van.

2      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Exactly,

3  what was the trigger?

4      **PRESIDING COMMISSIONER ENG:**  What was the trigger

5  that caused you to grab the hammer and start to strike

6  her?

7      **INMATE AMADOR:**  When she threatened that she was

8  going to take my son away from me.

9      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Okay.  And

10  this is the last question, and again, I'm not clear, I

11  wasn't here for the full hearing.  Does the inmate

12  indicate that because of the abuse of alcohol that he

13  was going through, that sometimes when he would go into

14  these rages he would black out?  Is that what he said?

15  I wasn't clear and so I just wanted to have an

16  understanding as to that aspect.

17      **PRESIDING COMMISSIONER ENG:**  Do you understand

18  the question?

19      **INMATE AMADOR:**  Yes, I understand.

20      **PRESIDING COMMISSIONER ENG:**  Okay.

21      **INMATE AMADOR:**  But I never used the word

22  blackout, I might've said passed out.

23      **PRESIDING COMMISSIONER ENG:**  Right.

24      **INMATE AMADOR:**  You know, I knew that I struck my

25  wife, you know, but I did pass out or go lay down, or

1  whatever, I don't know what.  So, like I said, it's not

2  so much even the alcohol.  The alcohol was probably why

3  I passed out because it was late or I was tired, all

4  that, but.

5       We came back to the house, you know, to discuss

6  it in there, and I confronted her about this person.  It

7  wasn't that I thought she was flirting, she was

8  flirting.  And of course the witness, I get it from the

9  witness account, states that my wife had told her that.

10  That's the reason why I had beaten her up that night,

11  because I got jealous of another man.  So yeah, I do

12  recall that.  That's exactly why, you know, I lashed out

13  at my wife.  Because of the jealousy.

14       **PRESIDING COMMISSIONER ENG:**  The second time, did

15  you black out also?  Or pass out?

16       **INMATE AMADOR:**  I, you know what, I only know

17  what the report.

18       **PRESIDING COMMISSIONER ENG:**  Or was it just that

19  one?

20       **INMATE AMADOR:**  Yeah, because that was almost 30

21  years ago.  So I'm relying, again, on the reports that

22  were always withheld from me.  In there it said that my

23  wife had gone to the hospital and had stitches.  And one

24  of the witness accounts said that she had told him that

25  she had been unfaithful.  I can't remember what, I know

1   she'd (inaudible) that much.

2          **PRESIDING COMMISSIONER ENG:**  Well let me ask you

3   this.  Was it typical for you to pass out?

4          **INMATE AMADOR:**  I don't believe it, no.  I didn't

5   remember at the time passing out, I mean it just

6   happened to be that, you know.

7          **PRESIDING COMMISSIONER ENG:**  Okay.  Any other

8   questions?

9          **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  No, thank

10  you.

11         **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel do

12  you have any questions to ask of your client?

13         **ATTORNEY TARDIFF:**  No.

14         **PRESIDING COMMISSIONER ENG:**  Okay.  So we'll go

15  into final statements.  Ms. Delagarza.

16         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Thank you.

17  The District Attorney's Office of Los Angeles County

18  opposes the granting of a parole date for this inmate.

19  And the primary reason is the life crime.  It was a, it

20  was beyond a horrible killing by this inmate of an

21  individual who was, according to the reports, four feet

22  tall and a paraplegic in a wheelchair.  According to the

23  autopsy reports, the beating was so severe that the

24  brain was out, parts of the scalp were off the head.

25  And it was just a horrible, horrible beating by this

1  | inmate of this woman who was totally defenseless.

2  | Listening to the inmate today, the part that I

3  | was able to hear, it appears that he continues to

4  | minimize his role in this and continues to insist that

5  | his wife was the one who provoked the incident, and that

6  | she was a manipulator.  And basically indicates that,

7  | almost as if she had it coming because it was a buildup

8  | of rage on his part for over a long period of time

9  | because of her actions.  And he has, he takes

10 | responsibility only for that for which he has to.

11 | He says, in terms of the spousal abuse, he calls

12 | them only allegations because there were no filings,

13 | there were no convictions.  And then he claims that it

14 | was only his wife's family that talked about the fact

15 | that there was domestic violence going on.  However,

16 | that's not true.  His brother-in-law, that being the

17 | husband of his sister, told the police when he called

18 | them after having found the remains of the victim in his

19 | back yard, and I'm reading from the report, and it's the

20 | July 26th, 1980 interview with Michael Terry Jensen, he

21 | stated that in the past, there had been problems with

22 | their marriage.  That Henry had beaten Karen not once or

23 | twice, this is on several occasions.  And that on one

24 | occasion, approximately three years ago, the Lakewood

25 | Sheriffs had arrested him for beating Karen.

1       In going through the reports, there are also

2  reports by neighbors of Karen who claim that the inmate

3  had broken into the victim's house on prior occasions.

4  So this isn't just an incident where the victim's

5  family, after the fact, claims that the inmate was

6  involved in domestic violence.  These were reports by

7  people who were relatives of the inmate, friends of the

8  family and neighbors who had witnessed certain aspects.

9  And again, it seems that the inmate will only admit to

10  that which there is actual reports made on it.

11       When asked about it, and again, if you go through

12  these reports, he tries to rationalize everything.  If

13  you go through the, I think it's the Board report, in

14  talking about the crime, he says that, in trying to

15  defense himself, defend himself against spousal abuse,

16  he says, women who are abused by their own husbands do

17  not divorce their abusers and then remarry them two

18  years later.  Moreover, they certainly do not invite

19  them to stay overnight after they have been raped.  Well

20  that's patently false.  Having worked in the domestic

21  violence unit for many years, we've had victims who were

22  beaten and beaten and beaten and beaten by their

23  husbands and continued to go back to the abuser.

24       So he tries to rationalize, he tries to minimize,

25  and nowhere in the part that I heard, was there ever any

1  actual empathy toward the victim.  And in listening to

2  him, his main concern is always trying to avoid having

3  to go to prison, trying to avoid having to pay the

4  penalty.  He talked about how his concerns were over

5  staying out of prison for as long as he could and having

6  his son.  And again, the fact that he took the remains

7  of this woman that he had beaten to death and buried her

8  in the backyard and had her family concerned for that

9  period of time until the body was recovered, never has

10  this inmate indicated any kind of sympathy or sorrow or

11  apology to the family for what he put them through

12  during that time period.

13      Again, it appears, at this point, that the inmate

14  still has not sufficient insight into what led him to

15  commit this very vicious, violent crime.  I share the

16  Commissioner's concerns about the wife.  It was striking

17  to me that he talked about how his new wife makes him

18  angry over these petty things, and it seems as if

19  there's still this build-up of anger over him, over

20  these very minor things to the point that he mentions

21  them at this time.  And the fact that he claims that his

22  new wife reminds him of his old wife.  All of these are

23  things that present a major concern to his being

24  released at a time when he still does not appear to have

25  the requisite insight.  And does not appear to be

1 | somebody that, should he be released at this point,
2 | would not be a threat to the community, and specifically
3 | to the women in his life.  Thank you.
4 |     **PRESIDING COMMISSIONER ENG:**  Thank you.  Counsel.
5 |     **ATTORNEY TARDIFF:**  Okay.  First of all, I just
6 | read, the police report doesn't have, there's only two
7 | statements by two different, the parties, Frank Reyes,
8 | the victim's nephew and David Amador, Mr. Amador's
9 | brother.  And that's it.  I don't see any other, I have
10 | no documents in here about these witnesses reporting,
11 | the neighbors.  For all I know they could've gotten it
12 | from the wife.  I mean, I'm not trying to diminish his
13 | activity, but we need to rely on evidence that is
14 | substantiated rather than hearsay.
15 |     We have no idea, you know, there obviously was
16 | trouble.  These things written by her family, and I'm
17 | not trying to say that, you know, she deserved to be
18 | killed, but we have no idea of what, we all know what
19 | families can be like at their worst.  Okay.  I don't
20 | think any of it, I think none of that evidence is
21 | reliable and should not be used against Mr. Amador at
22 | these hearings.  They are unsubstantiated.  I see
23 | nothing from any neighbors.  I don't know if the
24 | neighbors actually saw him physically break into the
25 | house, or if this is something that they were told.  So,

1    I really think that that's highly prejudicial and is.

2          Court cases clearly state that you need to prove,

3    these documents need to be produced that will

4    substantiate that the neighbors actually made these

5    statements, under oath, that they saw him break into the

6    house.   They physically saw him with their own eyes.   We

7    don't have that.   This is all just, again, hearsay and

8    we don't know where they get this information.   And I'm

9    putting that on the record that that type of stuff

10   should not be used at this kind of hearing.

11         The issue is, of course, the life crime.   I think

12   that we all know that he's programmed well, he's

13   obtained vocations, he's gotten self-help.   He's

14   continued to further himself educationally in the PIA.

15   He has a stressful job but he gets excellent work

16   reports, he's a lead man.   All of that, I don't think

17   that there's an issue in terms of what he's done since

18   he's been incarcerated.

19         The issue is the life crime.   And it was

20   horrible, okay, let's just, obviously nobody can say

21   that it wasn't.   But I found an interesting psych eval

22   that goes into many of the issues that have been raised.

23   And the issue is his responses to the answers and what

24   it looks like.   And it's definitely -- It's the '99

25   psych eval, it's on page three and it's under review of

```
 1   the, let me go through the other psych evals, because he
 2   just doesn't have one or two favorable psychs, he has
 3   eight psych evals that all say that he has an
 4   understanding of the commitment offense.  And that's
 5   quite a few.  It says,
 6               "A very important part of this report is
 7           the fact that this inmate understands and has
 8           gained sufficient insight into his crime on a
 9           level where the decision-making abilities that he
10           possesses would not allow something like this to
11           happen again.
12               "However, where this inmate is still
13           lacking is the ability to articulate those
14           decision-making abilities so that others
15           understand.  Others being people such as the
16           Board of Prison Terms, that when he is discussing
17           his wife's faults that led him to frustration
18           which led to this crime, he is not actually
19           blaming her, but talking simply about the
20           circumstances.
21               "This inmate does understand that this
22           crime has nothing to do with his wife.  It had
23           everything to do with hate, rage and his
24           inability to handle those emotions in a way which
25           would not lead to the murder of another human
```

1      being."

2      And I do think that when you question him further

3 he does say, and he was, and that's exactly what

4 happened in the hearing today. He is explaining the

5 circumstances in terms of his response. It doesn't mean

6 he doesn't, and then at the same time, though, if you

7 delve further, he's absolutely responsible for what he

8 did. And he's clearly stated that numerous times in

9 today's hearing.

10      And then, in terms of the current wife, it says,

11 this inmate also understands and has gained the insight

12 that although he only sees his current wife once a week,

13 that all couples are going to have family problems and

14 the ability to solve them in a non-violent way will be

15 up to him to learn. I think that that's the crux of the

16 thing and, of this issue here today.

17      And I went back and since 1990, and you have two

18 evaluations then, '91, '92, '95, '97, '99, '04, they've

19 all been supportive of release. Also, I went through

20 the Board reports and when they were making assessments

21 of dangerousness, since 1989 he's received low, '89,

22 '91, '92, '95, '99, '01 and '04. Correctional

23 counselors have stated that he would pose a low degree

24 of threat. I think the evidence is overwhelming that he

25 does not pose an unreasonable risk of danger at this

1    time.

2         And briefly, the current psych report, '04,

3    pretty much is gone over but what has not, he inmate's

4    prognosis for community living is good, particularly

5    with the support of his family.  He's demonstrated much

6    insight into his commitment offense, which he stated he

7    has gained from working in therapy.  He no longer, you

8    know, any past diagnosis is no longer present.  He

9    expressed genuine deep-felt remorse for what happened

10   during the commitment offense.

11        And then it goes into these, understands in quite

12   an insightful manner that he and his wife, although they

13   had never had a smooth relationship, going through all

14   of those factors, it's been discussed.

15        And this is what most likely happened during the

16   commitment offense.  That the heightened time of the

17   emotional volatile situation, and then based on his, and

18   this was read into the record, I believe, already, the

19   reason he, his level of dangerousness is no higher than

20   any other citizen within the community.  And that's

21   based on the fact that he has no violence in his past,

22   other than with the victim.  But there's no other

23   indication of that.  I think I had some notes on that.

24        He's had no violence since 1989, no disciplinary

25   issues in the prison system.  He has the support of his

1   family. I think he has an excellent understanding of

2   his alcoholism as has been noted. And he also has an

3   understanding of AA out in the community. More than any

4   inmate pretty much that I've ever represented, which has

5   been hundreds. He knows, they are, they're everywhere.

6   And pretty much you can find a meeting just about any,

7   any hour of the day. And like he said, there are

8   sponsors that will line up to take you in. So he knows

9   that. Says he will continue to attend these upon his

10   release. I don't think there's any doubt that he will,

11   he's certainly very much into the program.

12        Then the, and then they had this other '04, which

13   I'm not sure what the deal, again, I don't, I guess, I

14   don't know if the second overrode, but in either event,

15   that one was not a negative one either. It says minimal

16   potential for violence in the prison system. And then

17   it says the biggest concern, and that went into the use

18   of alcohol. That's always a concern, the return to

19   substance abuse of anybody who's had an alcohol or a

20   drug problem. And that's why it's a lifelong issue,

21   because it doesn't go away. It doesn't go away for

22   anybody out, that's never been incarcerated, it's always

23   going to be an issue. So I just think it's just an

24   acknowledgment of a fact.

25        In '99 he received a favorable psych. States,

1          "I believe his prognosis for community

2          living is good, particularly with the support of

3          his family.  He demonstrated much insight into

4          his crime.  He has participated in many different

5          types and kinds of self-help and group therapy

6          modulations.  GAF score of 83.  His prognosis for

7          being able to maintain his current state in the

8          community is good."

9          And this was the report that I read where his,

10    what he's lacking is his ability to convey.  And again,

11    that's on page three of the '99 report.

12         This, and it goes on to state, this inmate also

13    understands that, and has gained the insight, that

14    although he only, I read that, his wife,

15          "He also discussed issues and questions

16          surrounding raising his daughter.  So I also saw

17          evidence that this inmate has gained the insight

18          about how he parents his child will affect how

19          she develops relationships.  This inmate has

20          gained insight and the Board can be assured that

21          he does understand.

22          "Should the Board have further direction,

23          it would be simply to continue on the lifelong

24          process of further insight in his ability to

25          articulate to other people how he has learned

1        what he has learned, which in this inmate's case,

2        seems to be quite substantial."

3        And that's on page four of that same report.  If

4   released to the community this inmate should not be

5   viewed as having a significantly higher than average

6   propensity for violence than the average citizens.

7        The next psych eval was in '97,

8            "This writer is in agreement with past

9            psychological evaluations.  In particular with

10           Dr. Ohrling's Category X evaluation dated

11           7/25/90.  Dr. Ohrling concluded that inmate

12           Amador does understand the causes of his

13           commitment offense.  He also understands that he

14           believes his level of dangerousness is below

15           average for incarcerated felons."

16       And finally, he concluded that he has a good deal

17  of self control.  The next evaluation was in '95.  Says,

18  the incident offense appears to be, to have been an

19  affected crime.  This man has not functioned as a

20  predator nor has he had an antisocial lifestyle.  And he

21  is not likely to come within the purviews of the

22  criminal justice system following his release.

23       In '92, they basically, they didn't go into, but

24  they said that, his potential for violence is assessed

25  at less than average for the inmate population.  Ninety-

1   one, during observation in prison, Mr. Amador has
2   improved markedly psychiatrically.  In a less controlled
3   setting, such as a return to the community, he is very
4   likely to extend present levels of adjustment and
5   improvement.

6       And then we have the Cat X, which is an extensive
7   program that no longer is available, but at that time,
8   they sent many lifers to, that really went into, a whole
9   council of psychologists would get together.  As to, and
10  it states, this is the 1090, page four, Diagnostic Unit
11  Evaluation,

12          "As to the specific issues to be addressed
13          per BPT request, one, this is an individual who
14          probably poses a lower than average level of risk
15          to the general community.  His past hostility
16          developed as a consequence of interpersonal
17          relationships and did not lead to a generalized
18          antisocial orientation."

19      And it goes into his alcoholism and he's made a
20  serious commitment to the principles of AA.

21          "Three, he's made significant strides in
22          self-improvement.  Unquestionably a more self-
23          reliant and emotionally well-balanced individual
24          than he was at the time of the crime.  This may
25          be a case where resolution of underlying causes

| | |
|---|---|
| 1 | comes independent of a great depth of insight and |
| 2 | little would likely be gained through more |
| 3 | intensive efforts in this regard." |
| 4 | And then the testing report concluded that, |
| 5 | "Mr. Amador is neither consciously nor |
| 6 | subconsciously angry or hostile. He has a good |
| 7 | level of self-control. His level of |
| 8 | dangerousness is below average for incarcerated |
| 9 | felons. And he understands the causes of the |
| 10 | commitment offense quite well." |

11    I don't know how many times we're going to ask

12 somebody to evaluate whether or not he understands the

13 commitment offense. Seems as if we've pretty much

14 beaten it to death.

15    So that's the past eight evaluations since, and

16 that's going on 17 years. And then once again, since

17 '89, he received a low degree of threat from his

18 counselors. Ninety-nine, the counselor specifically

19 said he demonstrates self-control and maturity. His

20 continued participation in positive programming and his

21 outstanding work reports is the reason that that

22 evaluator did that.

23    I just don't know, you know, the deal is this,

24 that the reason that the Board continues to ask inmates

25 to do this self-help is so that they do get to a point

1  where they can be released out to society.  I believe

2  that by all accounts there's no information to indicate

3  that he doesn't understand the commitment offense, which

4  I believe is the issue.  I think what you can see from

5  that one report in particular, is, you know, his ability

6  to convey what he knows and what he feels.  But I do

7  think that he did, was able to articulate that a little

8  bit better at today's hearing.

9      Again, this information from the family, I'm

10  adamantly opposed to that being used by the Panel.  I

11  don't think it's reliable.  These neighbors' accounts, I

12  have no neighbors' accounts.  Yes, it was a horrible

13  crime, it was terrible.  And he talked about how he took

14  advantage of somebody who was, basically he was the

15  predator and she was not able to defend herself.  He

16  talked about all of that.

17      His parole plans are viable, he has good work

18  skills.  And I think that at this point, I don't know

19  what further incarceration would do other than to

20  continue to punish him.  You know, we're not just

21  talking about one or two psych evals that state that

22  he's not a danger, we're going way back, and none of

23  them.  And I think that that's pretty unusual.  And I

24  certainly cannot argue with these even, this amount of

25  evaluators, you can always throw out a couple of them

1  and say, well that psychologist always says this about

2  inmates.  But in this case, you can't say that.  I mean,

3  we've got, I know Dr. Ohrling, that was the one that

4  wrote the '90, he's been around a long time at CMC.

5  I've read numerous reports by him and he's a very

6  reliable psychologist.  I think that at this point he

7  is, in fact, suitable for parole.  Regardless of what

8  any of us think or feel.  We need to go by what is, the

9  evidence has presented before you.  Thank you.

10        **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Amador,

11  this is your chance, is you choose to, to make a final

12  statement regarding your parole suitability to the

13  Panel.

14        **INMATE AMADOR:**  Okay.  Just briefly.  There is a

15  letter in there where I do apologize to my deceased wife

16  and her family members.  And it's even in the report

17  there.

18        **DEPUTY COMMISSIONER BLONIEN:**  I saw it.

19        **INMATE AMADOR:**  That should be incorporated.  As

20  I said, you know, and I'm thanking the Panel Chair today

21  because you're not down on me like another man would be.

22  Because, like I said, it's horrible being a coward, you

23  know, because I'm an outcast, you know.  I don't blame

24  my wife for any of this, you know.  They're my

25  frustrations.  I didn't know what to do with those

1   frustrations at the time of the crime.  That's the only

2   way I knew, was how to lash out.  I didn't know how to

3   reach out, so I lashed out.

4        And you know, I put this family through a lot,

5   you know.  I realize they had their differences, I mean

6   their, without offending the family, you know.  We were

7   all, we all come from an alcoholic background.  They

8   wanted to practically live with us but, as I said, that

9   has nothing to do with Karen.  It has, you know, all

10  about me and my ability to be able to respond

11  appropriately in any relationship, not just with women

12  or men.

13       The only thing I can say is this is an isolated

14  incident, you know, by nature.  I know I've been called

15  an abuser and I'm not trying to minimize that, but I

16  think the Counselor heard it all.  I'm not a predator.

17  Maybe that's why I feel like somebody's saying to me

18  like, you're a predator and you went after this weak

19  woman, you know, without knowing it.  Yes, I did take

20  advantage of the fact that she was smaller and that she,

21  she was defenseless and that's the only way, without

22  blaming her for my actions, you know.

23       The Commissioner asked me how would I deal, you

24  know, with a person today such as my current wife, you

25  know.  We all have problems in our relationships, with

1  my father, with my wife, with my son.  And I don't agree
2  with everything they do.  And sure, I haven't lived with
3  them other than for family visits where we have been
4  isolated and alone.  I've had a little bit of experience
5  in that.

6        You know I've learned a lot in 20 years of
7  marriage, you know, how to respect a woman, you know.  I
8  didn't respect my first wife because she didn't respect
9  me.  So this wasn't a male-female thing.  This was a
10 relationship thing.  It could've happened to a male,
11 one-on-one, a friendship at work or something like that.
12 People kill their co-workers or whatever in
13 disagreements.  And they do some of the same things I
14 did, they try to get rid of the evidence and stuff like
15 that.

16       And I don't know what else the Panel wants as far
17 as explaining my actions.  I can't reiterate enough.  I
18 don't blame my wife for my actions, you know.  But I
19 have learned, through AA and other therapy groups to, as
20 the Commissioner said, put a lid on it, you know.  In
21 other words, I can acknowledge it, I see it.  In a
22 drunken stupor you can't see anything.  But 27 years of
23 (inaudible) in prison, there's no evidence of any,
24 course any alcoholic can always return to anything, you
25 know.  A smoker can, I've seen smokers go back and smoke

1  after ten years of quitting.  That can happen and I

2  realize it.

3       You know there's, like I said, my parents died at

4  50, I don't know how much longer I've got.  But I have

5  enough, you know, I value what I have left.  I might

6  have ten, I might have 20, I might have 30 years, you

7  know.  Well, if I haven't learned anything in 27 years,

8  you know, or been able to contain my emotions and my

9  rage and all that, then I deserve to be here.  But as

10 the Counselor pointed out, none of them gives any

11 evidence that I don't know how to control my actions, or

12 that I would pose a threat in the community.

13      So, for the record I do want, once again, to my

14 wife and her family, you know, I feel terrible about

15 this.  But it's hard, particularly because you can't

16 change what you've already done.  But before, I took

17 matters into my own hands and I just basically

18 disregarded anything that anybody thought, you know.  I

19 didn't reach out to the agencies that I should've

20 reached out to.  But that's not going to happen again.

21 Can I prove it?  No.  The only way I can prove that is

22 to actually have an opportunity to function in the

23 community.

24      And I think, like I said, this is an isolated

25 incident, other than I'm 55 years old, never had any

1  accounts with anybody, so it's not, not against a woman,
2  you know. I mean, I love my current wife. I wish I
3  could've loved my first wife, you know, I thought we
4  were in love, you know. And I've heard people say you
5  kill the one you love and I realized that's impossible,
6  because you don't kill the one you love, you kill the
7  one you hate. And what I was trying to explain is
8  that's the point I was driven to, where I actually hated
9  this woman, even though I'm supposed to love her and
10 take care of her, as the Commissioner said, you know.

11      But we weren't together and my time for taking
12 care of her was over, and I was taking care of my son.
13 And I was such an emotional wreck that that was the only
14 alternative for me at the time, at least that's the way
15 I seen it.

16      But in AA, they talk about a new pair of glasses,
17 a new way of seeing things, you know. And that's what
18 I've been able to see in the 27 years that I've been
19 incarcerated. And that's the only way I can function in
20 here. But I'm sure as you well know, that, you know,
21 all kinds of things happen in here. People are always
22 getting, going in the hole and getting in trouble and
23 all that, so, I mean, that needs to count for something.
24 Not just, you know, I hate to think that that's in vain.
25 That I had, you know, that that doesn't demonstrate that

*Capitol Electronic Reporting*

1    I've learned something.  And that that something is

2    enough, you know, to give me another opportunity, you

3    know, to go back to the community and establish a new

4    life, show that I can function as all the Board reports

5    say that I can.  That is all I have.

6        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you for

7    your comments.  We'll now recess for deliberations.  The

8    time is 12:12.

9                    **R E C E S S**

10                     --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **CALIFORNIA BOARD OF PRISON TERMS** |
| 2 | **D E C I S I O N** |
| 3 | **DEPUTY COMMISSIONER BLONIEN:** We are on record. |
| 4 | **PRESIDING COMMISSIONER ENG:** Okay. The time is |
| 5 | 12:38 and all parties that were in the room prior to our |
| 6 | recess for deliberations have since returned. |
| 7 | In the matter of Henry Amador, CDC number C- |
| 8 | 28545, the Panel has reviewed all of the information |
| 9 | received from the public and relied on the following |
| 10 | circumstances in concluding that the prisoner is not |
| 11 | suitable for parole and would pose an unreasonable risk |
| 12 | of danger to society or a threat to public safety if |
| 13 | released from prison. |
| 14 | This Panel finds that the commitment offense was |
| 15 | carried out in a very, very cruel, very callous manner |
| 16 | in that the victim, the estranged wife of Mr. Amador, |
| 17 | was a paraplegic in a wheelchair and was of a very small |
| 18 | stature, and was not able in any way, shape or form to |
| 19 | really defend herself. |
| 20 | And we find that the victim was abused, somewhat |
| 21 | defiled and mutilated during the offense in that the |
| 22 | inmate took a hammer and basically beat this woman to |
| 23 | death. Cause of death was a massive brain, was massive |
| 24 | brain damage due to multiple blunt force injury. It was |
| 25 | **HENRY AMADOR     C-28545     DECISION PAGE 1     2/6/07** |

1    so extensive that basically part of her skull was
2    missing, her brain was missing. And then the inmate
3    ended up burying the victim in the backyard of his
4    brother-in-law and sister's home.

5          It was carried out in a manner that demonstrates
6    a very callous disregard for human suffering. Again,
7    this was an unarmed victim and this inmate chose to pick
8    up a hammer and basically bash her head in with it in
9    the van. And there was some amount of trust built
10   between the two because you were husband and wife, even
11   though you had been separated.

12         Motive for the crime. This Panel finds, we feel,
13   is inexplicable in that the inmate's explanation to the
14   Panel today, he stated that his rage was triggered by
15   the victim stating to him that she wanted custody of
16   their son. Yet the inmate also stated that he had
17   custody of the son, that, we believe that the courts had
18   awarded him because his estranged wife couldn't drive.
19   So we don't understand how that could have been any
20   threat to the inmate in any way to justify the motive
21   for, to kill her, to go into such a rage to the extent
22   that he committed this murder.

23         These conclusions are drawn from the Statement of
24   Facts wherein the prisoner, again, had been staying with
25   **HENRY AMADOR    C-28545    DECISION PAGE 2    2/6/07**

*Capitol Electronic Reporting*

1  his brother-in-law and sister's home for a period of

2  time, and that the defendant's estranged wife, the

3  victim, had been missing since the previous Wednesday.

4  And the brother-in-law noticed that Mr. Amador had been

5  acting strange around the house and decided to plant a

6  garden.  Mr. Jensen, his brother-in-law, felt that the

7  defendant might have killed his wife and had buried her

8  body in the backyard.  And when he checked out the

9  situation, he found the body.  And again, the autopsy

10  was performed on July 23rd, 1980, and it revealed that

11  the cause of death was massive brain damage due to

12  multiple blunt force injury, that the scalp was not

13  present and that an extremely large portion of the skull

14  was missing and the brain was no longer present.

15       Regarding a previous record, this inmate does not

16  have any prior convictions.  However, we do notate that

17  he does have a history of unstable and tumultuous

18  relationships with others.  Specifically with the

19  victim, Karen Amador, his estranged wife.  And this is

20  evidenced by his prior arrest for domestic violence.

21       Regarding institutional behavior, the Panel finds

22  that the inmate's conduct while incarcerated includes

23  two 128A counseling chronos, the last one being in

24  November of 1995 for being out-of-bounds.  And then only

25  **HENRY AMADOR    C-28545    DECISION PAGE 3    2/6/07**

1   one 115 dating back to May of 1989 and it stated, for
2   sucking on a visitor's breast.

3       Regarding 3042 responses, we do note that the
4   representative from the District Attorney's Office of
5   Los Angeles County has stated their opposition to parole
6   at this time.  The Panel makes the following findings.
7   That the inmate should continue to engage in documented
8   self-help in order to face, discuss, understand and cope
9   with stress and anger in a non-destructive and non-
10  violent manner.  Until progress is made, the Panel finds
11  that the prisoner continues to be unpredictable and a
12  threat to others.

13      And sir, there's all different types of self-help
14  available out there.  Not just AA or not just group
15  things.  There are books, there are video tapes, there's
16  audio tapes, all kinds, articles.  That even if you'd
17  rather listen to something, you could write a brief
18  statement about what it is that, you know, that what you
19  read or watched, what does it mean and how do you use
20  that to live your life.  How do you incorporate what
21  you've learned to, to keep you on the right road towards
22  success.

23      Because we stated numerous times during the
24  hearing, our concern for you being able to deal with
25  **HENRY AMADOR    C-28545    DECISION PAGE 4    2/6/07**

*Capitol Electronic Reporting*

1   your pent, any pent-up anger or stress in you in a non-
2   violent manner. Also that you do not, you know, what's
3   the safety net that you set up for yourself on the
4   outside so that there's minimal risk of you ever falling
5   back on taking the actions that you did with Karen
6   Amador. So anything and everything that you can do to
7   ensure yourself a success is always in your best
8   interest.

9        However, we find that the inmate should be
10  commended for, you know, your very good and long work
11  record here at the institution. And that, remember
12  Commissioner Blonien had stated something about you
13  being involved in PIA for well over ten years and you've
14  had good work reports. And also, your extensive
15  participation in AA since 1981. And that the, sir, the
16  insight about your alcohol was in your truthfulness
17  about it to this Panel. We recognize that and we
18  appreciate that. It's sort of a breath of fresh air to
19  see that in an inmate.

20       However, these positive aspects of his behavior
21  do not outweigh the factors of unsuitability. Sir,
22  we're giving you a one-year denial at this point. And
23  we recommend that you remain disciplinary-free, that if
24  available, that you upgrade all you can, vocationally
25  **HENRY AMADOR    C-28545    DECISION PAGE 5    2/6/07**

1  and educationally.  It's always to your benefit.  The
2  more you can upgrade vocationally, the more
3  marketability you're going to have on the outside.  It's
4  just, it broadens your horizons a bit.

5       And also that, that if available, you do
6  participate again in any and all types of self-help.
7  It's important for you and it's also important for a
8  Panel to see that you have well thought-out plans for
9  your future.  And that you have set up a safety net
10 should something happen.  God forbid you end up in the
11 same circumstances.  But if you end up in something
12 similar that could cause some rage and a lot of tension,
13 and you've got it pent up inside of you, what have you
14 set up on the outside to prevent you from taking that
15 drastic extra step and resorting to violence?  This is
16 what you really need to address.  And you need to
17 convince future members of the Panel that you've got
18 that under control.  You need to be able to prove it to
19 them.

20      And we're asking that you cooperate with
21 clinicians in another evaluation.  We got very, very
22 specific about what we're asking for in a subsequent
23 psychological evaluation.  That this Panel didn't find
24 that any of the previous psychologicals that it were
25 **HENRY AMADOR     C-28545      DECISION PAGE 6      2/6/07**

126

 1  addressed.  And it shouldn't be any secret to you

 2  because we raised it during the hearing.  And it does

 3  have to do with potential violence in any relationship

 4  with the opposite sex.  Any interpersonal relationship

 5  that you would have.  And that, you know, what

 6  assurances are there, what have you set up for yourself

 7  to ensure that you wouldn't resort to violent solutions.

 8  So we ask that you do cooperate.

 9        Twelve months goes by very, very quickly.  So I'm

10  going to ask that you be sure, if you happen to get a

11  notice for a Subsequent Hearing and you haven't seen the

12  schedule for your psych evaluation, put your hand up and

13  make sure or do whatever you can to get that postponed

14  so that you do have a good psych addendum prior to

15  coming to the next Panel.

16        So, that basically concludes my reading of the

17  decision.  I'm going to ask Commissioner Blonien if she

18  has anything to add.

19      **DEPUTY COMMISSIONER BLONIEN:**  Mr. Amador, I think

20  I caught your frog, I thought when you spoke today

21  extemporaneously, that you spoke from the heart.  And I

22  think when, one of the psychologists got it right in

23  that you do have more insight than you can, than you've

24  been able to articulate.  But you really need to work on

25  **HENRY AMADOR    C-28545    DECISION PAGE 7    2/6/07**

1   that, you certainly don't have to be a postmaster or

2   extremely articulate to the Board. But when you reach

3   into your heart and say what you really think, I think

4   you were distracted by trying to read what you had, that

5   you're your best advocate. And you're certainly not a

6   rookie on the Board circuit here. You've had nine, ten

7   hearings. And the questions don't change too much. So

8   you're level of preparation, and when you get a notice

9   that there's a hearing, it's for that week and they can

10  call you, like we're going to be calling up someone from

11  Friday. It can happen anytime during the week. So you

12  have to be prepared with glasses and take a deep breath

13  and really think about what's coming from your heart

14  now. You do have a whole new family out there waiting.

15          **INMATE AMADOR:** Yes.

16          **DEPUTY COMMISSIONER BLONIEN:** And I know it's

17  worth the work.

18          **INMATE AMADOR:** Yes, it is.

19          **DEPUTY COMMISSIONER BLONIEN:** I wish you good

20  luck.

21          **INMATE AMADOR:** Okay, thank you very much.

22          **PRESIDING COMMISSIONER ENG:** Good luck, sir. The

23  time is 12:49.

24                          --oOo--

25  **HENRY AMADOR    C-28545    DECISION PAGE 8    2/6/07**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21  **PAROLE DENIED ONE YEAR**

22  **THIS DECISION WILL BE FINAL ON:** _JUN 0 6 2007_

23  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24  **DATE, THE DECISION IS MODIFIED.**

25  **HENRY AMADOR   C-28545   DECISION PAGE 9    2/14/07**

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, DEBRA S. BRADFUTE, as the Official

Transcriber, certify that the attached proceedings:

In the matter of the Life     )     CDC Number:   C-28545
Term Parole Consideration     )
Hearing of:                   )
                              )
HENRY AMADOR                  )
_____)

CORRECTIONAL TRAINING FACILITY

SOLANO, CALIFORNIA

FEBRUARY 6, 2007

9:51 A.M.

were held as herein appears.  Further, this transcript

is a true, complete and accurate record, to the best of

my ability of the recorded material provided for

transcription.

Debra S. Bradfute
Debra S. Bradfute
March 13, 2007
Capitol Electronic Reporting

# EXHIBIT
# 3

```
 1

 2

 3

 4

 5

 6

 7

 8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 9                 FOR THE COUNTY OF LOS ANGELES

10   DEPARTMENT SOUTH "F"           HON. ERNEST L. KELLY, JUDGE

11

12   THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                            )
13                            Plaintiff,    )
                                            )
14               vs.                        )    NO. A-021884
                                            )
15   HENRY AMADOR,                          )    STATE PRISON;
                                            )    ADVISEMENT OF
16                            Defendant.    )    RIGHT TO APPEAL
                                            )
17

18   LONG BEACH, CALIFORNIA; MONDAY, MARCH 30, 1981; 9:50 A.M.

19                            -oOo-

20           Upon the above date, the defendant being present

21   in court and represented by counsel, John P. Torelli, Deputy

22   Public Defender of Los Angeles County, the People being

23   represented by Richard D. Howard, Deputy District Attorney

24   of Los Angeles County, the following proceedings were held:

25           (Carol A. Wolf, Official Reporter, CSR #1108.)

26

27       THE COURT:  All right.  We have Henry Amador with

28   counsel, Mr. Torelli.  The matter is on calendar for hearing
```

-1-

1    on probation and sentence.

2            Defendant was found guilty by the Court of murder

3    in the second degree, the killing of his wife.

4            Mr. Howard is present representing the People.

5            I've read and considered the probation report

6    and the attachments, letters, et cetera.

7            Do you wish to be heard, Mr. Torelli?

8        MR. TORELLI:  Yes, Your Honor.

9            I would ask the Court to consider on a motion

10   for a new trial a reduction of the offense to voluntary

11   manslaughter.

12           I think the evidence established during the course

13   of the trial that the defendant and his spouse had a long-

14   term history of marital discord which had resulted in a prior

15   divorce, a prior remarriage.  There had been numerous

16   hostilities over the heir of that marriage or the child of

17.  the marriage, Henry, Jr.

18           There had been some antagonism on Mrs. Amador's

19   part and some heavy drinking on Mr. Amador's part, definitely

20   within the last year, and possibly for a much longer period

21   of time, and I think under all the evidence that was

22   established at the trial the Court could properly reduce

23   this to an offense of voluntary manslaughter in light of

24   the amount of alcohol consumed and the fact that this took

25   place during the course of an argument.

26       THE COURT:  Well, I considered all that when I was

27   trying the case, and it was a flip between murder in the

28   first degree and murder in the second degree.

1        It was a very, very brutal beating.  The woman's

2  head was practically pulverized by the use of a heavy hammer.

3        And there as some evidence of premeditation,

4  but I thought that, listening to the evidence and the

5  mechanics of how the crime went down, apparently they started

6  off that evening friendly, and it developed into just an

7  out-and-out anger-induced but not enough to bring it to

8  voluntary.

9        Any legal cause?

10    MR. TORELLI:  There is no legal cause, Your Honor.

11    THE COURT:  Waive formal arraignment?

12    MR. TORELLI:  Yes, Your Honor.

13        We would ask the Court to consider the possibility

14  of a diagnostic study in this case.  The defendant has a

15  very minor record, negligible.

16    THE COURT:  What do you feel, Mr. Howard?

17    MR. HOWARD:  Your Honor, we would oppose that.

18        In this case I can't see any alternative but

19  to send this man to the state prison.

20        After all, he's killed a young lady who was

21  helpless in a wheelchair, who had no way to defend herself,

22  and he viciously beat her to death with a hammer.

23        I don't see any possibility to do anything but

24  to send him to the state prison.

25    THE COURT:  I use the diagnostic study quite frequently,

26  but I'm satisfied from what I heard here that it would be

27  just a waste of the Court's time and the Department of

28  Corrections' time.

1          Probation will be denied.  Defendant will be

2    sentenced to state prison for 15 years to life, the term

3    prescribed by law.

4          He has 252 days in custody, 126 days' good

5    time/work time.

6          Defendant is ordered to be transported by the

7    sheriff of this county to the Department of Corrections,

8    Chino, to serve his sentence as indicated.

9          All right.  Now, Mr. Amador --

10    MR. TORELLI:  He has, Your Honor, appeal rights the

11    Court should advise him of.

12    THE COURT:  Yes.  I'm going to.

13          It is my duty to advise you of your right to

14    appeal to the Appellate Courts from the judgement of this

15    Court in imposing sentence.

16          If you want to file an appeal, there's a 60-day

17    time limit within which you must act by filing a written

18    Notice of Appeal.  This 60 days starts to run from today.

19          Your Notice of Appeal must be filed in this court

20    and not in the Court of Appeal.  Your notice must clearly

21    specify that you are appealing, just what it is that you

22    are appealing from, whether you are appealing from the whole

23    judgment or just part of it, and your Notice of Appeal must

24    be signed by you or your attorney.

25          If you appeal, you have the right, at no cost

26    to you, to a transcript and record of the trial court

27    proceedings as provided for by the California Rules of Court.

28          If you appeal and you don't have the money to

1    hire an attorney, the Appellate Court will appoint an attorney
2    to represent you on appeal.
3         It is your obligation to keep the Appellate Court
4    advised of your current mailing address.  Then they will
5    be in touch with you to see whether you have a right to a
6    free attorney after you have filed a Notice of Appeal.
7         Do you understand these rights as I've stated
8    them to you?
9         THE DEFENDANT:  Yes, sir.
10        THE COURT:  All right.  You have to file your written
11   Notice of Appeal starting from today within 60 days of this
12   date.  It must be signed by you or your attorney.
13        Do you understand?
14        THE DEFENDANT:  Yes.
15        MR. TORELLI:  I have presented, Your Honor, for the
16   record, a copy of the Notice of Appeal, and we are going
17   to file that today.
18        THE COURT:  All right.  The reporter is ordered to
19   have a transcript of these proceedings prepared, certified,
20   and filed with the clerk of this court.
21        MR. TORELLI:  Your Honor, could the defendant be
22   permitted one or two court-ordered phone calls to contact
23   his son in Arizona?
24        THE COURT:  Certainly.
25        MR. TORELLI:  There's one other thing the defendant
26   wanted me to ask, and I don't know if the Court has the
27   jurisdiction or authority, but defendant's son is residing
28   in Arizona, and if the defendant is going to serve his time,

1   he wanted to know if it was agreeable with the Department

2   of Corrections and agreeable with the Court -- I don't know

3   what the procedure of the Department of Corrections is.

4          THE COURT:  I have no reluctance, if we can make the

5   arrangements, to allow him to serve his time in any other

6   state, Arizona included.  If they can work out the mechanics,

7   I have no objection to it.  I don't know how they do it.

8          MR. TORELLI:  All right.  I'm going to file the Notice

9   of Appeal now with the clerk.

10         THE COURT:  Okay.

11              (Proceedings concluded.)

12                      -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3    DEPARTMENT SOUTH "F"          HON. ERNEST L. KELLY, JUDGE

4

5    THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                           )
6                              Plaintiff,  )
                                           )
7               vs.                        )    NO. A-021884
                                           )
8    HENRY AMADOR,                         )    REPORTER'S CERTIFICATE
                                           )
9                              Defendant.  )
                                           )
    _____)
10

11   STATE OF CALIFORNIA    )
                            )   ss
12   COUNTY OF LOS ANGELES  )

13        I, CAROL A. WOLF, Official Reporter of the Superior

14   Court of the State of California, for the County of Los

15   Angeles, do hereby certify that the foregoing is a true and

16   correct transcript of the proceedings held at the time of

17   pronouncing sentence and notification of appeal rights,

18   pursuant to Rule 250 of the California Rules of Court; that

19   the views and recommendations of the Court, if any, are

20   contained therein, pursuant to Section 1203.01 of the Penal

21   Code.

22        Dated this 17th day of April, 1981.

23

24

25       

26       /s/ Carol A. Wolf      , CSR #1108
                Official Reporter
27

28       RECORDS OFFICE
         FOLSOM STATE PRISON

-7-

# EXHIBIT
# 4

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

PROBATION OFFICERS REPORT

REPORT SEQUENCE NO. 1

THE PEOPLE OF THE STATE OF CALIFORNIA,
Plaintiff

vs.

HENRY AMADOR

Defendant

| DEPT. | ATTY. | JUDGE |
|---|---|---|
| SOUTH "F" | (PD) | KELLY |
| HEARING | C.I.I. NO. | COURT CASE NO. |
| 3-30-81 | A05897813 | A021884 |
| DPO | AREA OFFICE | |
| LAVERY | LONG BEACH | |

ADDRESS (IF IN CUSTODY, EXPECTED ADDRESS WHEN RELEASED)

L.A. COUNTY JAIL
BOOKING #5775688

PROB. NO.
X- 864517

NAME

SAME

CHARGED WITH THE CRIME(S) OF

187 PC (MURDER)

FILED

CONVICTED OF THE CRIME(S) OF

SAME, SECOND DEGREE

MAR 3 0 1981

JOHN J. CORCORAN, COUNTY CLERK

C. Carper

BY C. Carper, DEPUTY

| BY (PLEA, CT. JURY) | DAYS IN JAIL THIS CASE |
|---|---|
| COURT | 252 |

☐ Pre-conviction invest. (131.3 C.C.P.)    ☐ Drug Diversion invest. (1000.1 (a) P.C.)

| COMPANION CASES | DISPOSITIONS |
|---|---|
| NONE | N/A |

PERSONAL HISTORY

| | BIRTHDATE | RACE | FORMAL EDUCATION | AGE LEFT SCHOOL |
|---|---|---|---|---|
| | 9-17-51 | MEX/AMERICAN | HIGH SCHOOL GRADUATE | 16 |

| MARITAL STATUS | HOME INCLUDES | | | NO. OF DEPENDENTS |
|---|---|---|---|---|
| WIDOWER | SELF | | | 0 |

| OCCUPATION | INCOME PER MONTH | WHERE EMPLOYED | |
|---|---|---|---|
| MACHINIST | 0 | UNEMPLOYED | |

| BIRTH | CAME TO STATE | CAME TO COUNTY | BRANCH MILITARY SERVICE | KIND OF DISCHARGE |
|---|---|---|---|---|
| USD | BORN | BORN | NONE | N/A |

SUPPLIED BY

(AS SUPPLIED BY DEFENDANT AND SUBSTANTIATED IN

PART BY INTERESTED PARTIES.)

BORN IN LOS ANGELES, CALIFORNIA, DEFENDANT IS

THE SECOND OF THREE CHILDREN OF THE UNION OF RALPH AND RACHEL

(DIAZ) AMADOR.  THE DEFENDANT'S PARENTS' SEPARATED WHEN HE WAS

APPROXIMATELY FIVE YEARS OF AGE AND HE WAS RAISED BY HIS MOTHER.

HIS FATHER, A CONSTRUCTION WORKER DIED OF A HEART ATTACH IN 1977.

1  AND HIS MOTHER DIED IN 1980.  THE DEFENDANT ATTENDED SCHOOLS

2  LOCALLY QUITTING LYNWOOD HIGH SCHOOL AFTER THE TENTH GRADE SINCE

3  HE DID NOT LIKE SCHOOL AND THEN RETURNED TO NIGHT SCHOOL AND

4

5  ACHIEVED HIS DIPLOMA IN 1975.  AT THE TIME OF HIS ARREST, THE

6  DEFENDANT WAS LIVING WITH HIS SISTER AND BROTHER-IN-LAW FOR

7  APPROXIMATELY THREE MONTHS.

8          IN NOVEMBER OF 1970, THE DEFENDANT MARRIED

9  THE FORMER KAREN LYLES, THE VICTIM, AND HE INDICATED THEY SEPARATED

10  25 TO 30 TIMES FROM ONE WEEK TO A MONTH UNTIL THEY WERE DIVORCED

11  IN 1976.  THE COUPLE REMARRIED IN OCTOBER, 1978, AND SEPARATED

12  PERMANENTLY IN MAY OF 1979.  THE DEFENDANT RELATED THAT SEPARATIONS

13  WERE A RESULT OF ALMOST EVERY MEMBER OF HER FAMILY MOVING IN ONE

14  TIME OR ANOTHER AND DID INDICATE THAT HE STARTED DRINKING HEAVY

15

16  AFTER THEIR SEPARATION IN 1976.

17          DEFENDANT RELATES THAT HE IS IN GOOD HEALTH

18  AND NEVER HAD ANY SERIOUS ILLNESSES NOR INJURIES.  HE DID SEE A

19  PSYCHIATRIST IN FEBRUARY OF 1979 ON ONE OCCASION AS A RESULT

20  OF EMOTIONAL PROBLEMS, BUT HE FELT HE COULD NOT PAY THE $45 PER

21  HOUR AND NEVER WENT BACK.  HE RELATED THAT HE ATTENDED THE

22  GRACE BRETHERAN CHURCH WITH REGULARITY, THAT HE IS NOT THE

23  MEMBER OF ANY SOCIAL OR FRATERNAL ORGANIZATIONS AND HAS NEVER

-2-

1 | SERVED IN THE ARMED FORCES AND HIS MAJOR LEISURE TIME ACTIVITY
2 | SINCE 1976 WAS DRINKING.

3 |                    FROM MAY, 1980, UNTIL HIS ARREST IN THE
4 | PRESENT OFFENSE, THE DEFENDANT WAS EMPLOYED AS A MACHINIST BY
5 | THE METAL PRODUCTS COMPANY OF CERRITOS.  FROM 1976 UNTIL FEBRUARY,
6 | 1979, HE WAS EMPLOYED AS A MACHINIST BY THE MORGAN MILL PRODUCTS
7 | OF SOUTH GATE, EARNING $860 PER *MONTH*, BUT WAS FIRED WHEN HE HAD
8 |
9 | EMOTIONAL PROBLEMS THAT HE COULD NOT COPE WITH AND WORK.  FROM
10 | 1971 UNTIL 1976, HE WAS EMPLOYED AS A MACHINIST BY BOUTELL AIRCRAFT,
11 | LYNWOOD, EARNING $5 PER HOUR, BUT LEFT THERE FOR A BETTER JOB WITH
12 | MORGAN MILL PRODUCTS.  FROM 1968 UNTIL 1971, HE WAS EMPLOYED AS
13 | A COMPOUNDER BY WEST CHEMICALS, VERNON, CALIFORNIA, BUT WAS
14 |
15 | FIRED AS A RESULT OF DOMESTIC PROBLEMS THAT AFFECTED HIS WORK.
16 |                    FINANCIAL SITUATION:
17 |                    AS THE DEFENDANT IS CURRENTLY IN CUSTODY HE
18 | HAS NO SOURCE OF INCOME.  HE RELATES THAT HE HAS VARIOUS UNPAID
19 | CHARGE ACCOUNTS AND HIS 1980 VAN WAS REPOSSESSED.
20 |                    SUBSTANCE USE:
21 |                    DEFENDANT INDICATES HE BEGAN DRINKING WHEN
22 |
23 | HE WAS APPROXIMATELY 13 YEARS OF AGE, AND IN 1976 HE DEVELOPED
   | A DRINKING PROBLEM AND WAS DRINKING DAILY FROM THAT TIME UNTIL HIS

-3-

78C692G - PROB 5A - 11/76

1  ARREST. HE INDICATES HE BEGAN EXPERIMENTING WITH MARIJUANA AT THE

2  AGE OF 24, THAT HE WOULD SMOKE IT APPROXIMATELY ONCE IN SIX MONTHS.

3
   HE INDICATES THAT HE EXPERIMENTED WITH SODIUM SECONAL FOUR OR FIVE
4
5  TIMES AT THE AGE OF 15.

6  PRIOR RECORD:

7                      SOURCES OF INFORMATION:

8                      C.I.I. (3-9-81), L.B.P.D., L.A.S.O., THE

9  DEFENDANT.

10 7-19-80              LBPD - 647(F) PC (INTOXICATION) - RELEASED
                        849B2.
11
   PRESENT OFFENSE:
12
                      THE DEFENDANT WAS ARRESTED BY OFFICERS OF THE
13
   LONG BEACH POLICE DEPARTMENT ON MONDAY JULY 21, 1980, AT 6:50 P.M.,
14
15 AT 3705 SOUTH STREET, LONG BEACH, CALIFORNIA, ON A CHARGE OF

16 VIOLATING SECTION 187 PENAL CODE (MURDER). THE FELONY COMPLAINT

17 CHARGED HIM WITH THE SAME AND HE WAS HELD TO ANSWER AT HIS

18
   PRELIMINARY HEARING IN THE MUNICIPAL COURT OF THE LONG BEACH
19
20 JUDICIAL DISTRICT ON AUGUST 7, 1980. ON MARCH 2, 1981, IN DEPARTMENT

21 SOUTH "F" THE DEFENDANT WAS FOUND GUILTY AFTER A COURT TRIAL OF

22 187 PENAL CODE (MURDER), IN THE SECOND DEGREE AND THE MATTER WAS

23 CONTINUED TO THIS DATE FOR PROBATION AND SENTENCE HEARING.

-4-

1          AS THIS MATTER WAS HEARD IN TRIAL, THE COURT

2  IS WELL AWARE OF THE SPECIFICS OF THIS OFFENSE.  THE FOLLOWING IS

3  A BRIEF RESUME GATHERED FROM A REVIEW OF THE TRANSCRIPT OF THE

4  PRELIMINARY HEARING AND INFORMATION CONTAINED IN THE DISTRICT

5  ATTORNEY'S FILE:

      FACTS

6          ON MONDAY, JULY 21, 1980, OFFICERS RESPONDED

7  TO 1506 EAST 63RD STREET, LONG BEACH, CALIFORNIA, AFTER A CALL OF

8  A DEAD BODY.  OFFICERS WERE INFORMED BY MICHAEL JENSEN, THAT HIS

9  BROTHER-IN-LAW, THE DEFENDANT, HAD BEEN STAYING WITH HIM AND HIS

10,11  WIFE FOR A PERIOD OF TIME, THAT THE DEFENDANT'S ESTRANGED WIFE,

12  THE VICTIM, KAREN AMADOR, HAD BEEN MISSING SINCE THE PREVIOUS

13  WEDNESDAY, THAT THE DEFENDANT HAD BEEN ACTING STRANGE AROUND THE

14  HOUSE AND DECIDED TO PLANT A GARDEN.  HE FELT THAT THE DEFENDANT

15,16  MIGHT HAVE KILLED HIS WIFE AND HAD BURIED HER BODY IN THE

17  BACKYARD AND WHEN HE CHECKED THE SITUATION OUT, HE FOUND THE

18  BODY.  AN AUTOPSY PERFORMED ON JULY 23, 1980, REVEALED THAT

19  CAUSE OF DEATH WAS MASSIVE BRAIN DAMAGE DUE TO MULTIPLE BLUNT

20  FORCE INJURY, THAT THE SCALP WAS NOT PRESENT, AND THAT AN EXTREMELY

21  LARGE PORTION OF THE SKULL WAS MISSING AND THE BRAIN WAS NO LONGER

22  PRESENT.  INVESTIGATION REVEALED THAT THE DEFENDANT WAS SEEN WITH

23  THE VICTIM ON WEDNESDAY, JULY 16, 1980, IN FRONT OF HER RESIDENCE AND

CON'T pg6

1   APPARENTLY KILLED HER IN HIS VAN LATER THAT EVENING AND THEN

2   BURIED THE BODY IN THE JENSEN'S BACK YARD ON SATURDAY, JULY

3   19, 1980.   OFFICERS TOOK THE DEFENDANT INTO CUSTODY APPROXIMATELY

4   AN HOUR LATER WHEN HE WAS WALKING DOWN SOUTH STREET.

5

6   DEFENDANT'S STATEMENT:                                    . END

7                      THE DEFENDANT WAS INTERVIEWED IN THE LOS

8   ANGELES COUNTY JAIL ON MARCH 11, 1981, AND INDICATED THAT HE

9

10  HAD HAD ALOT OF EMOTIONAL PROBLEMS, THAT HIS WIFE HAD BEEN USING

11  HIS SON AS A TOOL TO BLACKMAIL HIM OVER ALOT OF THINGS AND THAT

12  AFTER HE WENT TO TALK TO HER THAT HE "JUST WENT OFF" AND KILLED

13  HER IN HIS VAN WITH A HAMMER. WITH RESPECT TO HIS SUBSEQUENT

14  ACTIONS, HE INDICATED THAT HE DID NOT FEEL THAT HE COULD GET AWAY

15  WITH THE MURDER, BUT HE WAS AFRAID AND THEN PANICKED.  HE INDICATED

16  THAT HE HAD NO INTENTION OF HURTING THE VICTIM WHEN HE WENT TO

17  HER RESIDENCE AND HOPED THAT HE WOULD BE CONVICTED OF MANSLAUGHTER.

18                      THE DEFENDANT DID ADMIT THAT HE HAD A PRIOR

19  ARREST FOR WIFE BEATING, BUT INDICATED THAT THEY RECONCILED AND

20

21  SHE LATER DROPPED THE CHARGES.  HE ADMITTED HITTING HER ON MORE

22  THAN TWO OCCASIONS AND INDICATED THAT SHE WAS QUITE CAPABLE OF

23  ENRAGING HIM EVEN THOUGH SHE WAS IN A WHEELCHAIR.

-6-

WHEN ASKED IF THERE WAS ANY STATEMENT HE WOULD LIKE TO MAKE TO THE COURT, THE DEFENDANT INDICATED THAT WHEN HE IS RELEASED FROM CUSTODY HE WOULD LIKE TO MOVE TO ARIZONA TO BE WITH HIS SON.

INTERESTED PARTIES:

FRANK REYES, THE VICTIM'S NEPHEW, INDICATED THAT HE WAS HER CLOSEST RELATIVE AND WOULD SEE HER FREQUENTLY. HE INDICATED THAT THE VICTIM TOLD HIM OF HIM BEATING HER IN THE PAST, THAT ON OCCASION THE DEFENDANT WOULD TAKE HER WHEELCHAIR AND TELEPHONE FROM HER AND WOULD BE QUITE VICIOUS WITH HER. HE FEELS THE POTENTIAL SENTENCE IS TOO LIGHT AND FEELS THAT THE OFFENSE WAS PREMEDITATED.

DAVID AMADOR, THE DEFENDANT'S BROTHER, INDICATES THAT HE IS CARING FOR THE DEFENDANT'S SON IN ARIZONA AND THAT HE WAS TOTALLY SHOCKED WHEN THIS INCIDENT HAPPENED. HE HOPES THE COURT WILL UNDERSTAND THAT THE DEFENDANT WAS A HARDWORKING FAMILY MAN, THAT HE HAD TO RUN THE HOUSE IN ADDITION TO WORK AND THAT THE VICTIM WAS JEALOUS OF THE DEFENDANT AND HIS SON'S LOVE FOR HIS FATHER. HE STATES THE DEFENDANT WAS INTOXICATED WHEN THE OFFENSE HAPPENED, AND THAT IT WAS NOT PREMEDITATED AND THAT EVEN THOUGH SHE WAS CONFINED TO A WHEELCHAIR SHE WAS CONNIVING, CALCULATING WOMAN WHO

-7-

# EXHIBIT
# 5

Court of Appeal, Second Appellate District
State of California

THE PEOPLE,

        Plaintiff and Respondent,

        v.

HENRY AMADOR,  C -28545

        Defendant and Appellant.

No. 39954

S. C. No. A021884

REMITTITUR

ON APPEAL FROM THE SUPERIOR
COURT IN AND FOR THE
COUNTY OF LOS ANGELES

*The above-entitled cause having been fully argued, submitted and taken under advisement,*

IT IS ORDERED, ADJUDGED AND DECREED *by the Court that* the judgment is affirmed.

FILED

MAY 2 4 1982

JOHN J. CORCORAN, County Clerk

BY W. SEALS, DEPUTY

*I, CLAY ROBBINS, IR. Cl*

3

C-32545

NOT TO BE PUBLISHED IN
THE OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>HENRY AMADOR,<br><br>  Defendant and Appellant. | 2D CRIM. NO. 39954<br>(Super.Ct. No.- A 021884)<br><br> |

APPEAL from a judgment of the Superior Court of Los
Angeles County.  Ernest L. Kelly, Judge.  Affirmed.

Corinne S. Shulman, under appointment by the Court of
Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H.
Philibosian, Chief Assistant Attorney General--Criminal
Division, S. Clark Moore, Assistant Attorney General, Robert F.
Katz and Roy C. Preminger, Deputy Attorneys General, for
Plaintiff and Respondent.

2.

Defendant Henry Amador appeals from the judgment of
conviction by court trial of the second degree murder of his
estranged wife Karen.

On July 16, 1980, defendant killed Karen by repeatedly
hitting her in the head with a hammer. Karen was an
achondroplastic dwarf, confined to a wheel chair because of a
bone disease. Defendant and Karen had married in 1970, divorced
in 1976, remarried in 1979, and separated shortly thereafter.
They had one son who was living with defendant since their
separation.

Karen was last seen alive at about 8 p.m., on July 16,
1980, in her wheel chair, talking with defendant outside her
residence at the corner near defendant's parked van. The
homicide occurred later that evening inside defendant's new van
near the coast. Defendant then buried her in the back yard of
his sister and brother-in-law where he was residing, untied
Karen's dog which had been leashed up near the apartment, and
washed out his van.

Since defendant admitted the homicide, the issue at
trial was the degree of his culpability. The defense theory was
that the killing was an explosive, unplanned, passionate
outburst without premeditation or deliberation, by a chronically
depressed defendant who drank a lot and that defendant was only

4.

permitted to introduce testimony by Karen's neighbor, nephew
and attorney concerning Karen's fear of defendant and
defendant's threats and prior assaultive conduct for the
limited purpose only of showing Karen's fearful state of mind,
in order to show it was "unlikely that the victim would have
gotten voluntarily in that van with defendant and go[ne] off
with him."  The neighbor testified that shortly before her
death, Karen told the neighbor she had divorced defendant
because they had had violent arguments during which defendant
would hit her and she feared he might seriously hurt her some
day; within two weeks of her death, Karen had expressed a fear
of defendant; and on the day of her death, Karen told the
neighbor she had talked to defendant over the phone and refused
to see him.  Karen's nephew testified that in 1976, Karen had
expressed fear of defendant and had last expressed such fear
only two days before her death when she said that she was
staying with a friend because defendant was after her and
threatening her.  Her attorney testified on rebuttal that he
had had several conversations with Karen in June 1980 in which
she expressed her fear of defendant and stated that defendant
had told her that he would never let her go and would kill her
first.

        The court found defendant guilty of second degree
murder, indicating that it was a "classic" second degree murder

5.

in which defendant had acted in a "frenzy" without
premeditation and that the killing was not voluntary
manslaughter because defendant's "frenzy" was not a
"reasonable" reaction but rather was "overkill." This appeal
followed defendant's state prison sentence.

## Admission of Evidence to Show
## Karen's State of Mind Was Proper

Defendant contends that "the court committed
prejudicial error in its admission of irrelevant evidence of
the victim's fear of defendant and defendant's past conduct."
We disagree. The challenged testimony of Karen's neighbor,
nephew and attorney was admitted solely for the limited
purpose of showing Karen's state of mind when she entered the
van. $\frac{2}{}$  Evidence of Karen's statements reporting
defendant's prior threats and conduct and her fear was
admissible, either as circumstantial evidence of the fact that
Karen feared defendant (People v. Green (1980) 27 Cal.3d 1,
23, fn. 9; see Jefferson, Cal. Evid. Benchbook (1972) §§ 1.6,
14.1, pp. 24-26, 168) or under the hearsay exception for

---

$\frac{2}{}$

It is clear that this evidence did not improperly focus on
defendant's state of mind, rather than Karen's. The trial
court, which was the finder of fact, repeatedly stated that
this evidence was being introduced and considered solely for
the limited purpose of showing Karen's state of mind.

6.

evidence of Karen's fearful state of mind offered to prove or
explain her acts or conduct (Evid. Code, § 1250, subd. (a)(2);
see People v. Spencer (1969) 71 Cal.2d 933, 944-946; People v.
Pinn (1971) 17 Cal.App.3d,99, 104-106; Jefferson, Cal. Evid.
Benchbook, supra, § 14.2, pp. 171-177).   Such evidence of
Karen's fear, in turn, was relevant to a disputed issue in the
case, i.e., to the question whether she voluntarily
accompanied defendant in the van, as defendant claimed, or was
forced to enter the van against her will as part of
defendant's plan to kill her as the prosecution claimed.   (See
People v. Green, supra, 27 Cal.3d at p. 23.)  Here, there was
an issue of fact with respect to Karen's conduct immediately
preceding her death (see People v. Spencer, supra, 71 Cal.2d
at pp. 945-946) which was relevant to the degree of
defendant's culpability.

Admission of this evidence was a proper exercise of
the broad discretion vested in the trial court.   (See Evid.
Code, § 352; People v. Jackson (1980) 28 Cal.3d 264, 302.)
The "possible proper benefit to the prosecution" was not "far
outweighed by its prejudicial effect.". (People v. Hamilton
(1961) 55 Cal.2d 881, 894, overruled on other grounds in
People v. Wilson (1969) 1 Cal.3d 431, 442.)  The prosecution
was entitled to try to prove that defendant was guilty of the
charged offense of first degree premeditated murder, rather

7.

than second degree murder or voluntary manslaughter.   Evidence
of the victim's statements, directly or indirectly indicating
her fear, provided a basis for reasonable inferences
contradictory of defendant's version of the relevant events
and supportive of the prosecution theory of a premeditated
murder accomplished by forcibly abducting Karen, driving to a
secluded place and then killing her.   Under the circumstances
of the case, particularly in view of other evidence of her
unlocked door, her dog tied outside and her empty stomach, the
proffered state of mind evidence had substantial probative
value since it would be reasonable to infer that since she
feared defendant she would not willingly accompany him.

In any event, even if we assume this evidence should
have been excluded, defendant was not prejudiced by its
admission. (People v. Watson (1956) 46 Cal.2d 818, 836.)
Evidence of the victim's fear did the defense no harm
whatsoever for defendant, in fact, was convicted of second
degree murder rather than first degree murder as charged.$\underline{3/}$

---

$\cdot \underline{3/}$

The challenged evidence, of course, had no impact upon the
court's rejecting   the defense voluntary manslaughter
theory.   The court in essence agreed with the defense that the
killing occurred in the heat of passion but found that
defendant's frenzy was not a reasonable reaction to
provocation.   Indeed, as the court pointed out in denying the
motion for new trial, the court believed that defendant and
Karen "started off that evening friendly."

8.

As defendant himself points out in his brief, "[t]he evidence
of the victim's state of mind failed in [its] purpose . . .
for it is clear that the court never accepted the prosecution
theory of a kidnapping and believed only that the killing
occurred in an unplanned frenzy."

        The judgment is affirmed.


                              POTTER, J.

We concur:


        KLEIN, P.J.


        LUI, J.

# EXHIBIT
# 6

# I N D E X

| | | |
|---|---|---|
| VICTIM: | AMADOR, Karen Christina | REPORT NO. 803 6961 |
| ACCUSED: | AMADOR, Henry | BOOKING NO. 795 163 |
| REFERENCE: | 187 PC - MURDER<br>7/16/80, 2030-7/21/80, 1700 | |

--------------------------------------------------------------------------------

| | | |
|---|---|---|
| POLICE REPORT: | Missing Report - Victim, AMADOR, Karen | Page 01 |
| POLICE REPORT: | 187 PC - Victim AMADOR, Karen | 02 - 03 |
| POLICE REPORT: | Dead Body - Victim AMADOR, Karen | 04 - 05 |
| FOLLOW-UP: | Post Mortem Examination | 06 |
| EVIDENCE REPORT: | Items from crime scene | 07 |
| FOLLOW-UP: | Crime scene diagram | 08 |
| POLICE REPORT: | Suspect vehicle impound | 09 |
| FOLLOW-UP: | INTERVIEW:  SALAZAR, Yvonne | 10 - 15 |
| FOLLOW-UP: | INTERVIEW:  REYES, Frank | 16 - 22 |
| FOLLOW-UP: | INTERVIEW:  REYES, Cyndy | 23 - 26 |
| FOLLOW-UP: | INTERVIEW:  JENSEN, Theresa | 27 - 29 |
| FOLLOW-UP: | INTERVIEW:  JENSEN, Michael | 30 - 34 |
| FOLLOW-UP: | INTERVIEW: (Second) JENSEN, Michael | 35 |
| FOLLOW-UP: | INTERVIEW:  REYES, Tanya | 36 |
| FOLLOW-UP: | INTERVIEW:  REYES, Raymond | 37 |
| ARREST REPORT: | AMADOR, Henry | 38 - 40 |
| POLICE REPORT: | BA Examination - Deft, AMADOR, Henry | 41 |
| FOLLOW-UP: | Narcotic examination - Deft, AMADOR, Henry | 42 |

LONG BEACH POLICE DEPARTMENT
## INVESTIGATIVE CRIME REPORT

| | CRIME REPORT NO |
|---|---|
| | 803-6961 |

PAGE __1__ OF __1__ CONTINUATION OF (OFFENSE) 187 PC - MURDER

LAST, FIRST, MIDDLE) OR FIRM NAME IF BUSINESS

OR, KAREN

DATE

23 July, 1980

BOOKING NUMBER    ACCUSED

BOOKING NUMBER

AMADOR, HENRY - 795-163

INDICATE ADDITIONAL IN MARGIN AT LEFT:
VICTIM — V        WITNESS — W        RELATIVE — X        SUSPECT — S        ACCUSED — A

INTERVIEW:

On 7/22/80, at approximately 1137 hrs, F/O, Det. L. R. WREN, interviewed the above witness in Room 346b of the Long Beach Public Safety Building.

Witness stated that she recalls that towards the end of 1976, Karen had called and asked her if she could live with them for a while due to marital difficulties. Witness stated that she recalls Karen telling her that Henry had beaten her up and that she was now afraid of him and wanted a divorce.

Witness stated that she was further told by Karen that Henry had accompanied Karen to a party and had been jealous of another man that was at the party. Witness stated that when Karen showed up to begin living with them, she was shocked at how badly beaten up Karen was. Witness stated that she recalls that Karen's eyes were almost swollen shut and were black and blue. Witness stated that most of Karen's body was black and blue. Witness stated that she remembers that Karen had to blow her nose for several days after her arrival and that it was always bloody.

Witness stated that she recalls that after Christmas of 1976, Karen decided to move back with Henry so that she could see her son and because she didn't want to impose on the family anymore. Witness stated that she recalls that eventually Karen got divorced, after going back to Henry, and then re-married Henry.

CONFIDENTIAL

Detective L. R. WREN #3116
Homicide Detail
By: M. Alvarez, 7/24/80

CRIME REPORT NUMBER

PD-2310 008 8 (8/79)        PSIS HIT        REPORT BY.

**36**

# EXHIBIT
# 7

# WAITING ON
# DOCUMENTS

## THE FOLLOWING DOCUMENT WAS ORDER ON  1-23-07

DATE

_____    BOARD REPORT

_____    ADDENDUM

X    PSYCH. REPORT

_____    HEARING RIGHTS

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
APRIL 1984 ISL CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MARCH 14, 1984

1.  This is the first psychological evaluation for the Board of
    Prison Terms, and is based on a 30 minute interview with
    inmate, a review of Central File, and psychiatric and
    medical records.  The inmate is a 32-year-old, Mexican-
    American man, first termer committed to the CDC on 4/81 for
    Murder 2nd.  His parents are both deceased: his father dying
    in 1975, and his mother in 1977.  The inmate appears to have
    been the product of a rather chaotic family background which
    provided little involvement with his father, a self-involved
    mother and a poor relationship with his step-father and many
    of his mother's successive boyfriends.  He is the oldest of
    five siblings of which the younger two were step-sister.  It
    appears as if the children cared for each other in the ab-
    sence of martial involvement.  The inmate appears to have
    cared for others for a long time and tends to be a dutiful,
    hard working individual who identified at an early age with
    his father, who stressed confidence and diligence.  His need
    for care was channelled into a typical obsessive-compulsive
    pattern of dedication and prefectionism, emotional over
    intellectualization as a defense against underlying depression
    and sense of loss.  He was married at the age of 18 in 1970
    and worked as a skilled machinist.  His wife was partially
    disabled and partially unable but also partially disinclined
    towards deep involvement with their first child, a boy.
    Mr. Amador compensated with an exaggerated commitment to care
    for his son.  After divorce he was apparently unable to com-
    pletely separate from his wife or resolve his loss, as they
    were remarried in 1979.  There is a long history of their
    volatile and mutually destructive relationship, marked by
    Mr. Amador's violence toward his wife which culminated in the
    instant offense.  He also became a severe alcoholic apparent-
    ly from the combined stress of single parenting and his own
    unmet needs and inability to resolve the loss of the relation-
    ship with his wife.  This need for release through alcohol
    was heightened by Mr. Amador's emotional overcontrol, and
    excessively intellectualized and contricted character.  He
    was so attached to his son that when his wife apparently
    threatened this involvement he demanded custody of the child
    just prior to her murder.

2.  Since coming to the CDC Mr. Amador has been an exemplary and
    model prisoner.  This is well documented in his Central File,

reflecting an excellent work record, involvement with religious and self-help groups and overall conforming adjustment. He continues to be involved and concerned with his son, and visited with him regularly.  He contacts people with similar religious interests in a number of different states.

3.   On interview the inmate was logical and coherent and speaks in a precise and measured fashion.  He showed no evidence of psychosis, disordered thinking or marked psychiatric symptomatology.  Although he is quite organized and careful in his verbalizations, his degree of intelligence at times bordered on obfuscation and it was difficult to understand how his responses related to the proceeding question or train of thought.  His inability to answer directly or come to the point is not uncharacteristic of obcessive types but was quite marked in Mr. Amador.  His affect was typically controlled, constricted, and shallow  although at all times he was cooperative if not ingratiating.  Intelligence appears to be in the average to above average range.  No symptoms of organic brain damage were noted or reported.  Inmate reports no history of head trauma or other neurological difficulties.

Memory in all its aspects appeared intact and the inmate was oriented and appropriate.  The inmate appears to have an impoverished self-concept that underlies his continuing struggle to be competent, dutiful, and in control.  His characteristic relating style is one of being meticulous, precise, verbal  ideational.  His ability for insight appears to be poor and he would tend to be a poor candidate for therapy.  His social judgment and sensibility is over develop= ed and he is acutely sensitive to the requirements of good manners and social mores.  There was no current evidence of suicidal ideation or marked depression (Mr. Amador did attempt suicide on two different occasions just after his 1976 divorce from his wife).  The inmate has no prior history of psychiatric hospitalization but did seek psychiatric help on one occasion during his first marital separation.

On interview the inmate revealed a fair amount of self-understanding and comprehension of what led to the instant offense. He admits that he has spent a life time caring for other people and minimizing his own needs.  At the present time under the reduced stress of institutionalization, he admits that he is beginning to learn how to be good to himself.  Unfortunately, he still continues to be overintellectual and to depend on religiously based and over simplified approaches to his own emotional growth.  He appears to be hypermotivated to affect changes in his life situation.  He has a large

number of social contact with family and friends outside
the institution and appears hard working and realistic in
his plans for the future.

4.  DIAGNOSIS:    I.   303.93   alcohol dependence, in remission.
                       313.35   isolated explosive disorder.

                 II.   301.40   compulsive personality disorder with
                                 characteristics of perfectionism,
                                 restricted emotionality stubborn-
                                 ness and excessive devotion to duty.

5.  CONCLUSION:  The inmate's psychopathology was indirectly
    related to his criminal behavior which was directly related
    to stress and alcoholism.  During incarceration the inmate
    has improved.  His violence potential is estimated to be
    less than the average inmate.  His prognosis in the community
    or a less controlled setting is good and he would be expected
    to hold present gains.  He shows a great deal of remorse and
    well-developed conscience and is well prepared for the future.

RANALD BRUCE, Ph.D.
Staff Psychologist

AMADOR        C-28545        CTF-CENTRAL        3-26-84        da

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

Amador, Henry, C-28545, Psychiatric Consultaiton, BPT, Unit II,
8/11/87

HISTORY:

The patient is a 35-year-old, White, widower.  This is his first
prison term as of 1981, when he received a life sentence for Murder
in the second degree of his ex-wife.  He could be released some-
time in the early 1990's, but he is not sure.  He states that he
had been drinking at the time that his wife and he had been divorced
and they were fighting about custody of his son.  His wife was very
cruel and manipulating toward him and he got drunk and hit her
with a hammer, which caused her death.  He feels remorse about this.
He realizes that he could have handled the situation better.

PAST HISTORY:

The patient's father is deceased and he was seen rarely by the
patient.  He had a step-father who treated him in a reasonable
manner.  His mother is deceased and he states that she was pretty
good to him.  He has six brothers and three sisters and he is the
only one in prison.  He completed high school and has worked as a
machinist.  He has a Protestant religious background.  He is depressed
some of the time, but he sleeps and eats good.  He has suicidal
thoughts in the past and some intention, but not now.  In 1980, he
was drinking alot and turned the gas on once to try and destroy
himself, but this was unsuccessful.  He has had an appendectomy, but
denies any other serious medical illness.  He denies V.D. history.
He only saw a psychiatrist once outside.  He married his deceased
wife, Karen Lyles in 1970 and they were divorced in 1976.  She was
in a wheel chair, because she suffered from Osteogenisis imperfecta.
They had a son, who was the cause of the post-divorce contention.
He denies homosexual activity and had his first coitus when he was
sixteen years of age.  He has only been arrested on another occasion
for drinking.  He has no military history and started using alcohol
when he was fourteen years of age.  He does consider himself an
alcoholic, and has been to A.A.  He smokes about a half of a pack
of cigarettes per day.  He has tried Marijuana and Seconol in the
past, but only infrequently.

MENTAL STATUS:

The patient's attention and stream of talk are satisfactory.  He
is not depressed and no hallucinations or delusions are elicited.

At one time, he had an odd dream about his mother being a mortician.
I would estimate his I.Q. in the average range. His three wishes are
1) To be with my son, Henry. 2) To get married again. 3) Travel.
I would estimate that his memory function is satisfactory for recent
and remote events and he is oriented as to time, place or person.
His insight, judgement and comprehension seem adequate. He sees
himself as "normally a quiet guy, I listen more than I speak." He
asked me no significant questions.

SUMMARY AND DISCUSSION:

We have here a man who is not psychotic and who is responsible for
his actions.

This is the first BPT evaluation done for him.

This is the only time that I have personally seen this man for
evaluation.

There is no significant psychopathology here.

There is insufficient evidence to formulate any psychiatric diag-
nosis on this man.

My conclusions about this man are that this was a crime of passion
and that during his time in prison, he has improved in terms of
behavior. In a less controlled situation, he would probably be
stable. I am of the opinion that his violence potential would
probably be less than average and that my suggestion is that he can
be removed from the calendar, since I do not feel that psychiatric
opinion will significantly influence decision to release him.


CHARLES D. WILLIS, M.D.
Diplomate American Board of
Psychiatry and Neurology


Amador, Henry, C-28545          CCI Tehachapi          8/11/87

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

AMADOR, Henry, C-28545, Psychiatric Evaluation for Unit II,
BPT, 6-28-89.

Mr. Amador is serving a sentence of 15 years to life for
second degree murder. This is apparently his second BPT
report. In preparation for this report, I reviewed part
of Mr. Amador's C-File and Medical File and carried out
a psychiatric interview.

Mr. Amador is presently scheduled to marry on July 12, 1989
to a woman that he met through relatives three years ago.
He is working in the appliance repair shop and feels that he
is likely to be able to continue work at small appliance
after he is released on parole and has hopes that at some
point that he may be able to own his own business.

Mr. Amador has been attending A.A. with regularity. He had
no "115" disciplinaries until a few weeks ago when he received
one for sexual misconduct with his fiancee in the visitor's
room. He states that the tower guard misperceived his behavior.

Mental status examination reveals a hispanic male of average
size appearing about five years younger than his stated age.
He was cooperative for the interview. His speech was lucid,
coherent and focused on content. His mood was calm. His
orientation was intact with respect to time, place, person and
circumstances. His memory appeared to be intact and his intel-
ligence level above average. Thought processes: Mr. Amador
showed no evidence of psychosis. He was neither delusional nor
hallucinated. He appeared to be quite introspective. He was
able to relate to me the murder of his ex-wife, his fear at the
time and particularly his fear of what would happen to his son.
He remains in touch with his now 18 year old son who has been
raised by his brother and attempts to discuss the murder with
his son. Mr. Amador believes that at the time of the killing,
he was not only draining himself by working two jobs and trying
to take care of his son and pay for a babysitter but he was also
drinking heavily and believes that had he not been drinking
heavily, he would have handled himself better. He states that
when his wife told him she planned to try to get custody of
their son after he was already feeling financially drained by
her, he lost control in a fit of passion and killed her. He
states that he has experienced significant remorse but has had
to wall off much of his feelings in this regard in order to
survive without severe depression in a prison setting. He
states that his fiancee's family fears him as a wife killer
whereas he has learned well the importance of discussing problems
and leaving open doors for relationships. He appears to recog-
nize the importance of remaining abstinent from drugs.

My diagnostic impressions:    AXIS I:    ALCOHOL DEPENDENCE BY
                                          HISTORY.
                               AXIS II:   NO DIAGNOSIS.

Mr. Amador's crime appears to be a crime of passion that took
place while he was under the influence of alcohol.  His poten-
tial for violence appears to be significantly less than other
persons in his situation.  He is well prepared to  earn a
living and has reestablished himself with a new love relation-
ship and his potential for living successfully and free of
illegal activities outside the prison seems excellent.  He
appears to appreciate both the need to remain chemically free
and his continuing need for A.A. to help him achieve that goal.


*M. Tavoularis*

M. TAVOULARIS, M.D.
Psychiatrist



AMADOR     C-28545     CCI-Tehachapi:sb    Unit II    6-29-89

## DIAGNOSTIC UNIT EVALUATION

### I. OFFICIAL RECORD / BASIS OF REFERRAL:

Henry Amador is a 38-year-old Hispanic first-termer who was received into CDC on 4-3-81 from Los Angeles County on a 15-year-to-life sentence for murder second-degree. A minimum eligible parole date of 7-22-90 was established in the case. The subject made his initial appearance before the Board of Prison Terms on 7-25-89, at which time parole was denied for one year and a request was made for a Category "X" evaluation at CMC. The inmate was received at CMC on 1-17-90 and agreed to a postponement of his pending Board appearance to the 10/90 Calendar to allow him sufficient time to complete the program. He entered the program on 5-22-90 with a scheduled completion date of 7-19-90. Specific issues to be addressed per Board of Prison Terms request are as follows:

1. The prisoner's violence potential in the free community.

2. The significance of alcohol/drugs as they relate to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released.

3. The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes.

4. The prisoner's need for therapy programs while incarcerated.

### II. CRIMINAL HISTORY / BACKGROUND FACTORS:

Henry Amador is one of three children born to Ralph and Rachel Amador, who were divorced during the inmate's early childhood. His father moved to Arizona where he remarried and had several children by his second wife. Amador was raised by his mother, with the family subsiding on Welfare benefits. Amador indicates that his mother was disabled for most of her life due to diabetes and its complications. She was also a chronic alcoholic, which complicated the problem and contributed to her erratic and sometimes abusive behavior. She was involved in numerous sexual relationships of a short-term nature, and Amador had no stable father figure. Despite her own lack of discipline, Mrs. Amador insisted on rigid adherence to rules by her children, who were placed in a Catholic school. There was a lack of any emotional exchanges in the family, and overall communication was extremely poor. Amador recalls that he was a very reclusive child who had few social contacts, due in part to the fact that he was required to work from a very early age in order to help provide for himself and his siblings. Despite these problems, Amador saw his childhood as essentially "normal" and he did not experience significant periods of depression or engage in antisocial behavior. He was only an average student in school due to a lack of motivation or encouragement, and he eventually was expelled by the tenth grade due to lack of attendance. At about this time in his life, he became acquainted with Christina Lyles, who was three years older than he. They began dating, primarily due to the fact that they had mutual friends who were also dating. He had little initial interest or attraction for Christina, whom he describes as "attractive" despite the fact that she suffered from a genetic bone disease which inhibited her growth beyond four feet and caused her to walk on crutches. Despite a lack of emotional attachment, the relationship continued, since neither individual had other social contacts and they did enjoy doing things together. He eventually moved in with her and enjoyed the fact that she was seeing that meals were prepared for him and providing him with the "royal treatment" which he had never experienced previously in his life. He later learned that she in fact did not know how to cook or maintain a household but secretly had received help in this, initially from her sister. He began working full-time by the age of 17, and he and Christina became married one year later. This was despite the warnings from his mother that he was too young and might be accepting an unreasonable burden in caring for Christina. Christina assured him that her physical condition was not degenerating and that she could have children. In fact, she rapidly deteriorated once she had their only child, due to the fact that this birth depleted her already deficient level of calcium in her system. This rendered her a paraplegic. She remained emotionally attached to her own family at the expense of her relationship with Amador,

DIAGNOSTIC UNIT EVALUATION
Page 2

and she seemed to resent the attachment he had for their son. Both he and his wife began to drink more and more heavily, which exaggerated their troubles and mutual dissatisfaction. They were separated frequently and eventually obtained a divorce in 1976. Amador became extremely depressed over this due to his perception that his life had been a total failure. He contacted a psychiatrist on one occasion and did make a suicide gesture. Rather than completing the break-up with his wife, the dissolution of the marriage simply created more conflicts, due to arguments over financial support and the custody of their son. There were numerous attempts at reconciliation and they in fact became remarried in 1978. This lasted only a short time, and they once again became divorced. They continued to date and have sex periodically, however, due primarily to the fact that neither had alternative relationships. Nevertheless, their arguments continued to the point that he did strike her on occasion. He saw himself as being provoked to this violence, and despite her physical incapacitation, he considered her to be psychologically abusive. The dysfunctional relationship eventually culminated in the life crime.

## III. BEHAVIORAL OBSERVATIONS IN GROUP AND INDIVIDUAL INTERVIEWS:

During his participation in the Diagnostic Unit process, Amador was seen in approximately 18 hours of group and individual interview sessions. He was an active participant in the group discussions, particularly with regard to such issues as alcohol abuse and the effects of poor self-esteem on one's behavior. He openly discussed the life crime which was described with a minimum of affect.

## IV. COMMITMENT OFFENSE:

Officers of the Los Angeles Police Department were contacted on July 21, 1980 by an individual who identified himself as the brother-in-law of Henry Amador. Amador had been residing at his sister and brother-in-law's residence and reportedly had been acting strangely over the previous several days. He had recently planted a garden in the back of the home, and an investigation of the site uncovered the body of his estranged wife, Christina Amador. The cause of death was determined to be massive brain damage due to multiple blunt force injuries. A portion of the skull and the entire brain were missing. Investigation revealed that Amador had been in the company of his former wife on July 16, 1980, and had apparently killed her in the rear of his van later that evening. The murder weapon was believed to be a hammer. Witnesses indicated that the victim had indicated that Amador had previously threatened to kill her and had previously beaten her. Witnesses on the behalf of Amador indicated that the victim was a "conniving, calculating woman who drove (Amador) to his behavior."

In discussing the commitment offense at the present time, Amador denied ever threatening to kill the victim, although he admitted that he had struck her on occasion during their frequent fights. On the date of the offense, he had asked her to accompany him to dinner and she agreed. Both were drinking heavily during the evening, and an argument eventually developed after he took her for a ride in his newly-acquired van. The argument was over bills and the custody of their son. She was demanding more money, pointing to the fact that he had just purchased a new van and could obviously afford to pay her more. A hammer was available in the van, and he spontaneously reached for it, then began striking her. He admits that he lost all control of himself during the incident and felt "devastated" after it occurred. He decided to bury the body and spend as much time with his son as he possibly could. He continued to drink heavily over the ensuing three days and fell into a heavy depression. He was extremely fearful of going to prison and worried about losing his son. He saw himself as being a total failure.

In assessing the underlying causes of the crime, Amador points primarily to his inability to communicate his growing depression over his sense of failure in his life and the build-up of hostility toward the individual whom he saw as the primary factor in his failure, that being the victim. He denies that there was any conscious deliberation in the murder, although he admitted a sense of release of tension once it

AMADOR, Henry        C-28545        CMC-East        10/90 Cal.        co
                  CATEGORY "X" DIAGNOSTIC UNIT

DIAGNOSTIC UNIT EVALUATION
Page 3

had occurred. He cannot adequately explain why he could find no means of totally severing the relationship short of murder. He was questioned regarding his lack of expression of remorse or guilt over such a brutal attack on a defenseless individual. He continued to portray the victim as anything but helpless, however, and indicated that he had chosen to deal with the present and the future rather than dwell on what happened in the past. He has made immeasurable gains in his self-esteem through his vocational achievements. His social skills have also increased immensely through his involvements in the Alcoholics Anonymous Program and in his church groups. He has also dealt with the issues of anger control and effective communication in his therapy program at CCI. He has continued his relationship with his son, although they have never discussed the crime at any length. He realizes that his use of alcohol greatly impaired his judgment before, during and after the crime and he is dedicated to total abstinence in the future. He stated that he never considered himself to be a "party drinker" and consumed alcohol simply as a means of avoiding depression. He now realizes that the alcohol, in actuality, contributed to the depression.

## V. INSTITUTIONAL BEHAVIOR:

During initial processing through the Southern Reception Center, Amador tested academically at the eighth grade level with an overall I.Q. of 93. He expressed an interest in vocational upgrading, although he has no specific programs in mind. He was initially placed at Folsom due to the nature of the commitment offense and time to be served. He received above-average work reports in his assignment in the metal fabrication plant at that institution, and he was eventually transferred to CTF in October of 1982 due to his overall good behavior. At CTF, he completed in excess of 1,500 hours of training in small engine repair, receiving overall A grades. He transferred to CCI-II in July of 1987 as his classification score continued to drop, and he expressed an interest in the Vocational Appliance Repair Program available at that institution. He completed 75 percent of that training program prior to his transfer to CMC in January of 1990. He plans to complete it upon his return to CCI. He also began college courses through the junior college extension program at that institution and will continue this in the future. He has been an active participant in the Alcoholics Anonymous Group at CCI and has also attended group therapy provided by a staff psychologist. He has no history of violence in the institutional setting, and, in fact, has received only one serious-level CDC-115, for overly-amorous conduct with his fiancee during a visit in May of 1989. There is confidential information on file in which a confidential informant identified him as being involved in pressuring activities at CTF during 1985. No action was taken in that matter, and Amador adamantly denies any such activities. He has no identified enemies within the inmate population.

## VI. CATEGORY "X" LIVING UNIT ASSESSMENT:

Housing staff in the Category "X" Living Unit indicate that Amador has maintained a very low profile while within the unit and has a good relationship with both staff and fellow inmates. He maintains his personal hygiene and living quarters up to adequate standards. He spends his spare time in his cell reading his religious and self-improvement material.

## VII. PLANS FOR RELEASE / OUTSIDE SUPPORT:

During the course of his imprisonment, Amador developed a relationship with a Miss Naomi Brown through a mutual friend, for whom she had served as a housekeeper. They began to correspond and she visited him regularly over the course of three years. In July of 1989, they became married. She is a highly religious person who has an independent spirit and positive outlook. She neither uses drugs nor consumes alcoholic beverages. She has never been married, and she has no children. She continues to work as a housekeeper in Hollister, California, where Amador would like to parole. He feels that returning to the Los Angeles area would be counterproductive, since he believes that various community members in that area remember the commitment offense. He has a job possibility in a

PSYCHOLOGICAL TESTING REPORT
Page 2

S participated in no military service. Occupationally, he worked as a machinist for several years.

S met his wife when he was 16 years old and she was 19. He stated that there was nothing attractive about her; he stayed with her because he believed that he was "useful to her." At the time, she had a bone disease which caused her bones to be brittle from birth. S stated that he lived with her because he was naive and that, "It wasn't a bad place to be." At age 18, they decided to get married and had what S called "not a good marriage." S stated that the pampering his wife received all of her life caused problems for them in their marriage. They had one child a year after they were married; complications from the pregnancy caused his wife to be in a wheelchair the remainder of her life. She became more manipulative, and this caused a conflict between the two. S reported 25 to 30 separations, lasting from three days to three weeks, throughout the course of their marriage. They divorced in 1976, remarried in 1978 and separated in 1979.

## JUVENILE / CRIMINAL HISTORY:

S has no juvenile record. As an adult, he was arrested for public intoxication and for wife battery (the charges were later dropped).

## ATTITUDE TOWARD THE OFFENSE:

According to the file, on 7-16-80, under the influence of alcohol, S repeatedly bludgeoned the head of his former wife with a hammer. Three days later, S buried the body in the backyard of his sister's house.

According to Amador, after the first divorce he began to drink heavily and was feeling "stressed" over raising their child as a single parent. He was feeling a great financial burden. His wife threatened to regain the custody of their son. When asked about his thoughts and feelings at the time of the crime, S stated that he had a sense of fear, and that in the county jail five days later he felt a sense of relief because he had released much hate toward her. "There was no reason to hate her anymore...all the turmoil was over." S mentioned that much hostility and bitterness which was turned inward came out at the time of the crime. When asked about his thoughts and feelings concerning the crime now, he stated that he went through periods of guilt and then he "learned to be good to myself." As he remembers the crime, he keeps thinking that he could have taken care of things in a better way. S mentioned that he learned from a psychiatrist at Soledad that he gave too much, expecting that something would come back in return. When that didn't happen, he felt hostility toward others. Also in therapy, S said he learned that he was used as a target for the release of his former wife's frustrations.

## HEALTH AND DRUGS:

S viewed himself as having "pretty good" health with no complaints. He reported no neurological complications and one prescribed medication for sinus difficulties.

Concerning alcohol and drugs, S stated that he started drinking alcohol at age 14 but confined his drinking to social engagements. At age 28, in 1976 at about the time of his divorce, he began drinking "a quart of whiskey every day." S rationalized that this was because he was "depressed." Also, S indicated that he experimented with marijuana and barbiturates at various times in his life. When asked about this depression, S stated that it occurred because of his failure as a husband and a father. He said he was quite lonely, attempting to raise a son, and had "no time to socialize." He mentioned working 12 hours a day, his son clinging to him for some support and encouragement and any spare time that S had, in a stressful and depressing environment. This, he said, increased his consumption of alcohol.

AMADOR, Henry          C-28545          CMC-East          10/90 Cal.          co
                        CATEGORY "X" DIAGNOSTIC UNIT

PSYCHOLOGICAL TESTING REPORT
Page 3

PROGRAMMING:

S received only one CDC-115 in 5/89 when he participated in sexual misconduct with his fiancee in the visitor's area. S described this as giving his wife a hickey.

S has participated in several vocational training programs, including refrigeration and microwave repair, sheet metal, major appliance repair, and small engine repair. S has received several laudatory chronos for exceptional work. S stated that he has been offered job by a friend who owns a small engine shop. Also he indicated that he has combined the learning of refrigeration and microwaves with that of sheet metal so that he will be able to find employment in the area of central air conditioning.

Concerning therapy, S received eight weeks of group therapy at CCI in 1989 with a psychologist. A chrono includes positive remarks concerning his participation and involvement. S claimed that he participated in two eight-week therapy programs; however, only one is documented. In 1/90, he was placed on the waiting list for five therapy groups at CMC. S participated in Alcoholics Anonymous for two years early in his incarceration and then again for the last three years. He has received outstanding reports and has served as a group facilitator and the group secretary.

PREVIOUS PSYCH EVALUATIONS:

During his incarceration, his first psychiatric evaluation from 1984 described him as a compulsive personality with characteristics of perfectionism, restricted emotionality, stubbornness, and excessive devotion to duty. That evaluation also mentioned his alcohol dependence and an isolated explosive disorder. An evaluation from 1987 mentioned that there was no significant psychopathology in that his violence potential was less than average. His latest evaluation from 1989 mentions the alcohol dependence, by history, but gives him no personality diagnosis. This evaluation stated, "The potential for living successfully and free of illegal activities outside of prison seems excellent."

MENTAL STATUS EXAMINATION:

S was prompt for all scheduled interviews and demonstrated a courteous and cooperative attitude. He was alert and orientated in all spheres. His speech was clear, relevant and goal-directed. He demonstrated no signs of a major thought disorder. His mood was blunted and restricted with the exception of momentary increase in affect when he discussed a recent two-day family visit with his wife. S displayed a low level of activity, sitting rigidly at attention throughout all interviews. Rarely did he change his position. Immediate and remote memories appear to be within normal limits; however, he had some difficulty remembering early childhood incidents attributing his first memory to age five or six.

S became very thoughtful and purposeful when asked about his strengths. He reported, "I am a decisive person and not easily influenced by others." Also, he mentioned that he could avoid peer pressure and that he was able to communicate with people on a personal level. He listed as a weakness his not being able to accept things the way that they are. He mentioned that a friend would describe him as "a man of integrity." S mentioned that what he does not like to accept are difficult moral issues in society and the manner in which the justice system operates.

Concerning the future, S wants to have his own business and become a family man. S mentioned that he has an increased awareness of how situations affect him. However, he mentioned that he believes that he is still critical and pre-judgmental and he needs to learn to set goals that are not too high.

AMADOR, Henry        C-28545        CMC-East        10/90 Cal.        co
                     CATEGORY "X" DIAGNOSTIC UNIT

PSYCHOLOGICAL TESTING REPORT
Page 4

## PSYCHOLOGICAL TEST VALIDITY:

All of the tests are considered to be valid. Apparently, S read the items carefully and answered in a reasonable fashion. The results tend to accurately describe his current level of functioning.

## PSYCHOLOGICAL TEST RESULTS:

### MMPI (Profile Code: 508-94 36 27/1:L/F/K:)

This profile is valid and is reflective S's current psychological functioning. S was more honest and revealing on this test than most incarcerated felons, yet there are no indications of any major psychopathology or any firmly embedded personality disorder. None of the scale scores reached the level of clinical significance. S tends to be somewhat conventional and unassertive. He has difficulty recognizing anger and dealing with it appropriately. He tends to be somewhat inquisitive and introspective. He is shy, inhibited, insecure and uncomfortable in most social situations. He has a lack of self-confidence and tends to be somewhat submissive and compliant.

Supplemental Scales: S is very hypersensitive to the criticism of other people. He feels very uncomfortable in social situations. He could be described as a socially introverted individual who mistrusts other people and is quite suspicious of them. Fortunately, S does not have an above-average degree of repression, nor does he suppress or repress hostile feelings to any extent. He is doing much better in this area than most incarcerated felons. However, on the scales that relate to prisoners, he appears to be the type of person who may use drugs to the point of their interfering with his work and family relationships. Also, even though he does not appear to be an habitual criminal, he does tend to have a high score in the parole violation area and looks like someone who may not be able to complete parole. Recent research indicates that people with a high score on the parole violator scale may be considered dangerous.

### MCMI - II

This test profile is valid. S did show some hesitance concerning revealing psychological feelings and problems, but there was no attempt to place himself in a favorable light, nor did he attempt to depreciate himself or to fake bad. There are no indications that S has any severe psychopathology such as a mental illness or thought disorder. In the area of neurotic manifestations, he is doing very well. He does not have much anxiety or depression, and thus is quite comfortable with himself. Additionally, there are no indications of any severe personality pathology.

On the basic clinical personality scales, there is a presence of schizoid features and mild indications of compulsive and antisocial features. S lacks the capacity to experience depth in either pleasure or pain. He tends to be apathetic, distant and asocial. Affectionate needs and emotional feelings are minimal. He functions as a passive observer, detaching himself from the rewards and affections of human relationships. All of this he does to a mild degree.

### CPI

This test is totally valid. The indications are that S may have overemphasized some of his faults. Certainly, he was much more honest on this test than most incarcerated felons. As in the testing interpreted above, S is not an outgoing or sociable person. He tends to be quiet, submissive and unassuming. He is somewhat detached and passive in his attitude. He is uneasy and awkward in new unfamiliar social situations. He is somewhat vacillating and uncertain in his decision-making processe Yet, he has a fairly healthy degree of self-acceptance and personal worth. On measures of intra-personal values, S tends to be less responsible than the average person in society. However, his degre of socialization is only slightly below that of most people in society and much better than most incar-cerated felons. Thus, S has a higher degree of social maturity, integrity, and rectitude than most felon

AMADOR, Henry        C-28545          CMC-East            10/90 Cal.        c
                        CATEGORY "X" DIAGNOSTIC UNIT

DIAGNOSTIC UNIT EVALUATION
Page 4

small engine repair shop in Hollister through a friend. He also has job opportunities in the Bakersfield area in small appliance repair. He does have half-brothers who reside in Los Angeles, although he does not communicate with them. His son is now age 19 years and living on his own in Arizona. Both parents are deceased. He would plan to continue his Alcoholics Anonymous involvements into the community and become actively involved in a church. Both he and his wife are strong Christians, and their relationship will continue to revolve around their mutual worship. He stated that he has no false impressions about living a "perfect Ozzie-and-Harriett life," but nonetheless, he continues to have a goal of developing a family with a secure home and positive career.

## VIII. CONCLUSIONS / SUMMARY / RECOMMENDATIONS:

Henry Amador has now served his minimum 10-year imprisonment toward his life term for what has been described as a "classic" crime of passion. The degree of mutilation involved, the fact that the victim was a defenseless paraplegic, and the seeming lack of deep-felt remorse for the crime are particularly aggravating factors, however, and are not offset by any great depth of insight on the inmate's part as to the underlying causative factors. He appears to have accepted the fact of putting what he acknowledges was an outrageous crime behind him and living for the present. This seems to be a successful strategy, at least for the institutional setting, as he has made optimum use of vocational programs and self-help groups. He has also cultivated what is obviously a passionate relationship with an individual who, by his description, also seems to have a highly prosocial orientation. This is the individual who would be most likely to suffer the consequences of any future outbreaks of hostility from the inmate. She has expressed her confidence that he is no longer dangerous.

As to the specific issues to be addressed per BPT request:

1. This is an individual who probably poses a lower-than-average level of risk to the general community. His past hostility developed as a consequence of interpersonal relationships and did not lead to a generalized antisocial orientation. His stability in the future is directly related to the stability of his relationships which, from this distant perspective, appear to be stable.

2. The excessive use of alcohol contributed to Amador's state of depression and absence of self-control, leading to the commitment offense. He has made a serious commitment to the principles of Alcoholics Anonymous, which he should be encouraged to continue into the free community.

3. The inmate has neither a depth of insight into his behavior in the crime nor a deep-felt sense of remorse for the victim, whom he continues to assess as partially responsible for the crime. He has nonetheless made significant strides in self-improvement through institutional programs and is unquestionably a more self-reliant and emotionally well-balanced individual than he was at the time of the crime. This may be a case where resolution of underlying causes comes independent of a great depth of insight, and thus little would likely be gained through more intensive efforts in this regard.

4. The inmate has derived benefit from his therapeutic involvements in Alcoholics Anonymous and a Lifers Group at CCI, and he should be encouraged to continue in these involvements, with perhaps more focused attention toward the development of enhanced decision-making skills and anger control. These efforts, combined with continued vocational and educational upgrading and religious study, would appear to be sufficiently therapeutic undertakings to alleviate the need for more organized or focused types of treatment.

Ron Metz, CC-III
Category "X" Coordinator

D/R/T:7-20-90

AMADOR, Henry        C-28545         CMC-East              10/90 Cal.          co
                    CATEGORY "X" DIAGNOSTIC UNIT

CATEGORY "X" PROGRAM
PSYCHOLOGICAL TESTING REPORT

REFERRAL QUESTION:

Henry Amador was referred for psychological testing as an integral part of the Category "X" Psycho-diagnostic Program. The 7/89 Board of Prison Terms referred him, requesting that the program explore:

1. The prisoner's violence potential in the free community.

2. The significance of alcohol/drugs as they relate to the commitment offense, and an estimate of his ability to refrain from the use/abuse of same when released.

3. The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes.

4. The prisoner's need for therapy programs while incarcerated.

TESTS OR PROCEDURES USED:

The Minnesota Multiphasic Personality Inventory was administered on 5-23-90. The Millon Clinical Multiaxial Inventory-II was administered on 6-6-90. The California Psychological Inventory was administered on 6-6-90. The Wechsler Adult Intelligence Scales-Revised were administered 7/90. S was interviewed twice by psychology trainee Jonathan Ririe. He was interviewed on 7-24-90. Jonathan Ririe contributed to this report in the form of a rough draft of the history and mental status examination.

INTRODUCTION:

Henry Amador is a 38-year-old, Hispanic first-termer received on 4-3-81 for the offense of murder second-degree.

HISTORY:

S was the second of three children born to his natural parents. At age five, his parents divorced and he continued to live with his mother. S had three sisters, two stepsisters, and one younger brother. He described the relationship with his brother as very competitive. At age 14 when his mother moved away, S began to live with his aunt in order that he could stay at the same high school. At age 16, he met and moved in with his future wife, who was also his victim. He stated that his father was a construction worker and that his mother was a housewife. He described his home atmosphere as "a normal single parent home." However, there was some financial stress, and his mother was a "very nervous person." S described his relationship with his father as one of very sparse contact, since he saw his father only a couple of days every two years. In reality, S never really got to know him. He described his relationship with his mother as "a loving relationship." She made S attend church; however, he also stated that she "had quite a social life and she drank a lot."

As S was growing up, he was withdrawn from most social interactions, preferring to remain at home and be selective about the friends that he chose. He said, "I didn't want more friends, I sought out truer friends." S claimed that, since he grew up without a male role model who might have taught him how to socialize, he became very shy. He mentioned that his mother did not teach him how to socialize, and therefore, he "hung around the house a lot."

In the eleventh grade, after an extended period of truancy, S was expelled from high school. Later, in 1975, S received his GED certificate from the California Adult School.

AMADOR, Henry          C-28545          CMC-East          10/90 Cal.          co
CATEGORY "X" DIAGNOSTIC UNIT

PSYCHOLOGICAL TESTING REPORT
Page 5

He tends to be more conscientious and conforming. He tends to achieve in a setting where conformance is a positive behavior, since he is persistent and industrious. However, he is not very flexible, since he tends to be deliberate and cautious and somewhat rigid in his thinking and his decision-making processes.

## WAIS-R
Intelligence testing administered during 7/90 indicates that S has a low-average I.Q. There are no signs of any neuropsychological deficits.

## DIAGNOSTIC IMPRESSION:

Axis I:   303.93 - Alcohol dependence, in institutional remission.
          312.39 - Impulse control disorder, not otherwise specified, isolated explosion.
Axis II:  V71.09 - No personality disorder, with schizoid and compulsive features.

## CONCLUSIONS:

In answer to the questions posed by the Parole Board:

1. S is neither consciously nor subconsciously angry or hostile. He has a good level of self-control. His personality functioning is fairly normal. His current level of dangerousness is below-average for incarcerated felons.

2. Although S was certainly an abuser of alcohol in his youth, he has profited from attendance in Alcoholics Anonymous and seems committed to the philosophy of Alcoholics Anonymous.

3. S understands the causes for the commitment offense quite well. He realizes that he accumulated anger over a long period of time and that he had a very tumultuous relationship with a very demanding invalid wife who became his victim.

4. S has no psychopathology serious enough to warrant mandatory psychotherapy.

R. A. Orling, Ph.D.
Senior Psychologist
License No. PSY-5394

Noted:
James B. Hollingsworth, M.D.
Assistant Warden, Psychiatric Services

D/R:7-25-90
T:   7-27-90

AMADOR, Henry        C-28545          CMC-East          10/90 Cal.
                     CATEGORY "X" DIAGNOSTIC UNIT

LIFE PRISONER EVALUATION
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 1990 CALENDAR

I.   <u>COMMITMENT FACTORS</u>:        (See Diagnostic Unit Evaluation.)

II.   <u>PRE-CONVICTION FACTORS</u>:   (See Diagnostic Unit Evaluation.)

III.   <u>POST-CONVICTION FACTORS</u>:  (See Diagnostic Unit Evaluation.)

IV.   <u>FUTURE PLANS</u>:             (See Diagnostic Unit Evaluation.)

V.   <u>SUMMARY</u>:                   (See Diagnostic Unit Evaluation.)

Ron Metz, CC-III
Category "X" Coordinator

AMADOR, Henry        C-28545        CMC-East        10/90 Cal.        co
CATEGORY "X" DIAGNOSTIC UNIT

CATEGOR    X" PSYCHOLOGICAL COUNCi    EVALUATION

## I. PSYCHOLOGICAL COUNCIL COMMENTS:

Henry Amador appeared before the Category "X" Psychological Council on July 31, 1990. He had been provided with a preliminary copy of the Diagnostic Unit Evaluation and was allowed the opportunity to comment upon that report. He indicated that, contrary to the report, he never considered his mother to be abusive. He also was concerned that his wife's dwarfism was erroneously attributed to her calcium deficiency, which he indicated were separate disorders. The Council explored at length his relationship with his wife and the insights he claims into the crime. He attributed his inability to break away from the relationship to the sense of moral obligation he had for the victim.   He portrayed himself as essentially a martyr who was bound by duty to care for his wife and his son and to fend off the oppressive interventions of her family members. His sense of morality did not control his drinking habits or his admitted physical abuse against the victim on two previous occasions, and he acknowledges that these were symptoms of his own moral weaknesses. Throughout the discussion, he held tightly to his claims of drinking a quart of whiskey per day, despite being able to work and care for his child and occasionally for his wife. He accepted the fact that the alcohol consumption probably clouded his judgment, although he commented at one point that, "I drank to keep my sanity." His perception remains that he was essentially the abused party in the relationship, although he stressed that he takes "full responsibility" for the murder. When various Council members attempted to explore some of his statements and perceptions in-depth, he refused to provide direct responses, relying instead on controlled intellectualization and references to Biblical teachings which he attempted to provide in detail. He at one point in the conversation compared the "persecutions" he has suffered to those of St. Paul. He discussed his perception that the judicial system is too lax with what he sees are major intrusions into the morality of the culture via increased nudity, use of obscenities in the press, and abortion. He would make no comment in terms of the system's treatment of murderers.

## II. PSYCHOLOGICAL COUNCIL CONCLUSIONS:

Based upon the observations in today's session and a review of the reports prepared on Mr. Amador, it is reasonable to conclude that this commitment offense likely occurred at a point in time when his lingering schizoid and compulsive personality traits were much greater factors in his day-to-day behavior. These were no doubt exaggerated due to his consumption of alcohol at the time. It must be said that his rigid world view, suspicions as to the moral lacking of others, and inflated self-confidence are irritating traits which may cause him conflicts in some social situations. He nonetheless is probably not dangerous when not under the influence. His personality traits are not to be considered pathological at the present time, and he has certainly compensated for any past sense of social inadequacy. He feels no need for therapy as he externalizes his problems and sees his only weakness as an inability to live up to his own, religiously inspired virtuousness. To the degree that he is able to establish relationships in the free community which are compatible with this world view, which he has apparently been able to accomplish, he does not represent a threat.

## III. DIAGNOSTIC IMPRESSIONS:

Axis I:    303.93 - Alcohol dependence, in institutional remission.
           312.39 - Impulse control disorder, not otherwise specified, isolated explosion.
Axis II:   V71.09 - No personality disorder, with schizoid and compulsive features.

R. A. Orling, Ph.D.
Senior Psychologist
License No. PSY-5394

Steven C. Walker, Ph.D.
Staff Psychologist

Ron Metz, CC-III
Category "X" Coordinator

Denise Morse, CC-II     Noted:
Diagnostic Unit Specialist     James B. Hollingsworth, M.D.
                               Asst. Warden, Psych. Services

Also Present: David Silbaugh, Gary Hitchcock, and Jonathan Ririe, Psychology Interns

AMADOR, Henry     C-28545     CMC-East     10/90 Cal.     co
                  CATEGORY "X" DIAGNOSTIC UNIT

Board of Prison Terms                                              **State of California**
LIFE PRISONER: POST CONVICTION PROGRESS REPORT

___ Document Hearing
___ Parole Consideration Hearing
___ Progress Hearing

**Instructions:**
To CDC Staff: Document each 12-month period from the date the life term starts to present.

To BPT Staff: For each 12-month increment apply the guidelines under which the parole date was originally
established -- i.e., 0-2 months for PBR and 0-4 months for BPT. See BPT Sections 2290-2292,
2410 and 2439.

| Dates/ Postconviction Credit | REASONS |
|---|---|
| 7-25-89 to Present | Remained at CCI-II under Medium-A custody in the General Population until transfer to CMC for Category "X" and return on 1-17-90. Continued assignment in Vocational Appliance Repair Program with overall A grades. Described as "employable as full-line major appliance technician" per 128-E chrono of 10-6-89. Completed three units of college math course per 128-L chrono of 12-22-89. Continued involvement in self-help therapy group per 128-C of 10-2-89. TABE results of 1-23-90 reveal overall grade-point level of 8.1. Placed on waiting list for available therapy groups at CMC on 1-30-90. Submitted urinalysis test which proved negative for controlled substances on 6-11-90. Placed in Vocational Sheet Metal assignment at CMC with positive performance noted per 128-E chrono of 6-28-90. Entered Category "X" Program on 5-22-90 with scheduled completion date of 7-24-90. Received CDC-115 on 5-29-89 for overly amorous conduct with fiancee. |

Signature:                                                          Date:
                                                                   8/2/90

Ron Metz, CC-II, Category "X" Coordinator

| Name: | CDC No.: | Institution: | BPT Calendar: |
|---|---|---|---|
| MADOR, Henry | C-28545 | CMC-East | 10/90 Cal. |

PT1004(Rev.7/86)

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

AMADOR, Henry, C-28545, Psychiatric Evaluation for Unit II, BPT, 6-7-91.

INTRODUCTION:

A. This is the fifth psychiatric report for the Board of Prison Terms on Inmate Amador, one of which consists of a lengthy CATEGORY-X Report from CMC dated October, 1990. His original report at Soledad was 1984.

B. This writer has known Mr. Amador in the context of approximately two years of self-help groups and he is currently enrolled in the advanced group. His participation was briefly suspended due to his CAT-X transfer to CMC in 1990.

CURRENT PROGRAMS AND MENTAL STATUS:

A. Mr. Amador is currently attending A.A. regularly. He has been taking a variety of college courses, and is one of the principal assistants to the free staff in small appliance vocations. I have been able to find evidence of two disciplinaries, one a minor dorm-living infraction, and one, in 1989, involving what evidently was "petting" with a girlfriend in the visiting yard.

B. On interview, the inmate is well oriented, articulate, and shows above average intelligence. He is soft-spoken, generally, and somewhat serious in demeanor; on the other hand mood is not flat, and there is some range of emotion, including humor. I find no sleep or appetite problems suggestive of any psychiatric disorder; there is no evidence or history of thought disorder. There is history of alcohol abuse, prior to current conviction, and this was duly noted in and around the time of the murder of his wife. No substances other than alcohol have evidently been abused. I find Mr. Amador in possession of excellent judgment and of significant insight into his offense and life generally. He has been highly responsive to insight-oriented psychotherapy, both individually and in group.

Mr. Amador consented to taking the MMPI-2, October 1, 1990, following his return from CMC (primarily to permit the present writer to see how the results compared to those from CMC--using MMPI original). The profiles were very similar. MMPI-2 however had the added advantage of new scales, one of which seemed to summarize what the present writer judged remained an important emotional issue with the inmate: namely, Cynicism, and a tendency to be uncomfortable around other people. I do agree that the inmate appears reserved in large groups, but he is not anxious or withdrawn in a support group. With respect to cynicism, it seems clear that given a seriously co-dependent

history and the serious disillusionment with marriage, Mr. Amador would indeed have some true sense of malaise with respect to the prospects of his future. On the other hand he seems exceptionally realistic about his current marriage and its (inevitable) ups and downs, and invests far less fantasy (as it were) in what marriage is able to do, or provide. He is much more clearly centered in terms of self-esteem, although there is some evidence that esteem can fluctuate and that his conscience remains somewhat severe when he judges himself.

C.   Diagnostic impressions:
      AXIS I:   ALCOHOL DEPENDENCE, BY HISTORY, IN
              REMISSION 303.90
              BY HISTORY:  IMPULSE CONTROL DISORDER
              NOS (ISOLATED) 312.39
      AXIS II: NO DIAGNOSIS V71.09

## PSYCHIATRIC CONCLUSIONS:

A.   General conclusion:  The diagnosed psychopathology was indirectly related to the instant offense.
B.   During observation in prison, Mr. Amador has improved markedly psychiatrically.
C.   In a less controlled setting, such as return to the community, he is very likely to extend present levels of adjustment and improvement.

## SUGGESTED ACTIONS:

If this inmate is paroled or released, consideration should be given to the following:
A.   Continued community involvement in Alcoholics Anonymous.
B.   Random drug/alcohol screens for six months.
C.   No other specific conditions.

J. HASKETT, Ph.D.
Staff Psychologist

AMADOR    C-28545    CCI-Tehachapi:sb    Unit II    6-11-91

*PSYCHIATRIC EVALUATION*
*CCI TEHACHAPI*

*AMADOR, Henry, C-28545, BPT, CCI Unit II, 6-27-92.*

### IDENTIFYING INFORMATION:

*This is a 40 year old Mexican-American man who is serving a sentence of 15 years to Life for Second Degree Murder, the offense in July, 1980, the inmate sentenced in April, 1981. This appears to be the sixth psychiatric report to the Board of Prison Terms.*

### MATERIALS USED IN PREPARATION:

*In preparation for this report, I reviewed the inmate's C-File, his medical jacket, and carried out a psychiatric interview.*

### CIRCUMSTANCES OF THE INSTANT OFFENSE:

*The inmate murdered his wife by beating her about the head with a hammer and burying her body in the backyard of relatives with whom he had been living.*

### PAST HISTORY:

*The inmate's past history is well documented elsewhere and I will not go into great detail. I refer the Board to the write-up of the CAT-X evaluation in 1990, as it is the most extensive summary in his file.*

### INTERIM HISTORY:

*The inmate has maintained his steady work pattern from the streets into the prison. A Machinist on the streets, he is presently teaching Small Appliance Repair here at the prison. He remarried three years ago to a woman he met through correspondence and who had been acquainted with some of his relatives, and their relationship is intact. His son born to his first marriage is now 21 years of age and living with the inmate's brother in Arizona. The inmate anticipates a visit with that son for the first time in several years.*

*The inmate's disciplinary record has been singularly clear of any violent behaviors and the only 115 on record occurred in May, 1989, when he was found to be exhibiting inappropriate sexual conduct with his then fiance in the visiting room.*

### PSYCHIATRIC HISTORY:

*In addition to participating in a CAT-X Program at CMC in 1990, the inmate maintains himself in group therapy with Dr. Haskett, here at the Prison, and remains active in A.A. (he says he developed a serious drinking problem during the 1970's).*

*MENTAL STATUS EXAMINATION:*

*Mental status examination reveals a well-developed man who appears
a few years younger than his given age. He has several missing teeth.
He was neatly dressed and groomed. He showed no signs of major mental
illness in that he was not delusional nor hallucinated, nor did he
show signs of major affective disorder. He appeared very serious
and somewhat muted in his affective response. He talked of his first
marriage, he and his wife marrying as teen-agers, with over involvement
with relatives. He said that his wife was disabled with Osteogenesis
Imperfecta, that their marriage was highly conflicted, they had
separated, divorced, and had remarried prior to the instant offense.
During their separations and divorce, he had obtained custody of their
son, and this was a big source of contention at the time of their
final argument, with him losing control and beating her severely,
which lead to her death. He said at that time he was not able to
verbalize or talk through problems, and tended to handle his
aggressions in a physical way. He described the improvement over
the past several years and his observations of his ability to work
with his present wife to resolve conflict through discussion.   He
expressed concern about what he felt was primitivity and even
misdiagnosis as part of the CAT-X Program, not specifically referring
to himself, though eluding to some discomfort with the confrontational
style of the moderators in that program. He acknowledged that he
is well prepared to make a living on the outside, relishes the
challenge to earn a living and support his family. Yet says that
he is prepared to live within the prison forever if need be.*

*DIAGNOSIS:*

*My diagnostic impression:*

```
AXIS I:     ALCOHOL DEPENDENCE, IN REMISSION.
AXIS II:    NO PERSONALITY DISORDER NOTED.
AXIS III:   NONE.
AXIS IV:    ONE (EVALUATION ONLY).
AXIS V:     NINETY.
```

*The inmate's instant offense was not directly related to the diagnosis.
It appeared to have been the result of loss of control of rage.   His
impulse control is excellent as evidenced by the lack of serious
disciplinaries within the prison structure. His potential for violence
is assessed at less than average for this inmate population.   The*

*AMADOR, Henry    C-28545      CCI-Tehachapi:lh     CCI-II      6/27/92*

*inmate made a living for himself and his family prior to incarceration,
and has upgraded himself educationally and vocationally since that
time. He has a supportive family, has established himself in ongoing
therapy and 12 Step program, and is not likely to come within the
purview of the legal system after his eventual release from prison.
He should be encouraged to maintain 12 Step activity after his eventual
parole.*

*MARJORIE TAVOULARIS, M.D.*
*Senior Psychiatrist*

*AMADOR, Henry    C-28545    CCI-Tehachapi:lh    CCI-II    6/27/92*

*PSYCHIATRIC ASSESSMENT*
*CCI - TEHACHAPI*

*AMADOR, Henry, C-28545, BPT, CCI-II, 1/8/95*

## *IDENTIFYING INFORMATION:*

*This is a 43 year old Mexican-American man (9/17/51), who is serving a sentence of 15 years to Life for Second Degree Murder; the offense in 1980, and the inmate sentenced in 1981. This appears to be the seventh psychiatric report to the Board of Prison Terms.*

## *MATERIALS USED FOR REPORT:*

*In preparation for this report, I reviewed the inmate's C-File and medical jacket, and carried out a psychiatric interview on the afternoon of Sunday, January 8, 1995.*

## *CIRCUMSTANCES OF THE INSTANT OFFENSE:*

*The inmate killed his wife with a hammer and buried her body in his relative's yard. The victim had been confined to a wheelchair with a bone disease.*

## *PAST· HISTORY:*

*The inmate's past history is well documented and I will not go into detail here, except to indicate that he had experimented with drugs at an early age but made a decision by fourteen to not use drugs. Nevertheless, he did use alcohol from time to time in a fashion of excessive drinking in order to tranquilize himself. He was a steady worker for the most part, and had been married to the victim twice after an intervening divorce. He has a son now age twenty-four from that marriage.*

## *PRISON HISTORY:*

*The inmate has been working for about six years in Vocational Appliance Repair. He completed the vocational training and works as a teaching assistant there. He has not had a serious disciplinary on his record for nearly six years. He went through a CAT-X program in 1990, and participated in Dr. Haskett's self-help group as well as individual psychotherapy here at this prison. He remarried several years ago and has an infant daughter born two months ago.*

## *MENTAL STATUS EXAMINATION:*

*This is a well-developed man, appearing his given age. He showed no signs of major mental illness. He tended to be somewhat guarded in his manner. He expressed concern that his CAT-X report was not completely favorable, and felt that the MMPI did not sufficiently reflect his improvement in maturation.*

COPY TO INMATE
VIA CC-1 *neuman*

He was particularly concerned that he said the CAT-X report
suggested he would not complete his parole, whereas in reality
he has a record of sticking with things that he begins, such
as his employment here in the prison, and his marriage.
Likewise, he was concerned that some place in his file there
is a suggestion that he was still experimenting with drugs in
his twenties, whereas he did not touch any drug other than
alcohol from the age of fourteen.  He stressed the value of
A.A.  He said he has been active in A.A. for a number of years,
and has worked the 12 steps of recovery.  He has in his mind
to live with his wife and child, and work as an appliance
repairman following his release from prison.

### DIAGNOSTIC IMPRESSIONS:

AXIS I:     NO DIAGNOSIS.
AXIS II:    NO DIAGNOSIS.
AXIS III:   NONE KNOWN.
AXIS IV:    ONE (EVALUATION ONLY).
AXIS V:     EIGHTY TO NINETY.

The instant offense appears to have been an affective crime;
this man has not functioned as a predator nor has he had an
antisocial lifestyle.  He is sufficiently trained to earn a
living.  He has social support, and is not likely to come within
the purview of the criminal justice system following his release.
Nevertheless, in view of his past history of heavy drinking
and the less than ideal CAT-X report, it is recommended that
parole stipulation include A.A. attendance and POC follow-up.

*M. Tavoularis / Williams, M.D.*

MARJORIE TAVOULARIS, M.D.
Senior Psychiatrist

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
APRIL 1997 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JANUARY 3, 1997

Inmate Amador was interviewed for this psychological evaluation
for the Board of Prison Terms on 01/03/97.  It is unknown what
number this psychological evaluation is.  This report is the
product of a personal interview, conducted on 01/03/97, as well
as a review of his Central file and his unit health record.  This
interview was a single contact with this inmate for the sole
purpose of preparing this report.

Inmate Amador was convicted of the 1980 murder of his ex-wife.
He described some of the circumstances surrounding this crime,
which involved losing his job, having financial difficulties, and
problems with his wife, including her wanting custody of their
son.  He acknowledged drinking heavily during this time, and in
particular, the night of the commitment offense.  Asked how he
has changed since becoming incarcerated, he stated that he is
more mature, has upgraded himself educationally, has attended
Alcoholics Anonymous and acknowledges that he had a significant
drinking problem, and he stated he thinks before he reacts.  He
stated that he did hate his wife during the time of the
commitment offense, but does not any longer.  He also stated that
he hates what he did to her.

This inmate has not received any CDC-115s since 1989.

Regarding drugs and alcohol, he has participated in Alcoholics
Anonymous in the past and plans to engage in Alcoholics Anonymous
here at this institution soon.  He stated that he has worked
through the 12 steps.  He has participated in a number of self-
help groups and in individual therapy at CCI.  Educationally, he
stated he is half-way to achieving an A.A. degree.  Vocationally,
he has completed appliance repair and small engine repair in the
past.  If paroled, he plans on working either in appliance repair
or in small engine repair.  He stated he has a number of job
opportunities, one coming from his M-2 sponsor.

MENTAL STATUS EXAMINATION:  Inmate Amador is a 45-year-old male
of average build who appeared his stated age.  He was
appropriately dressed and groomed.  He was calm, cooperative,
coherent and alert.  His speech was somewhat slow.  His affect
was somewhat bland.  There was no evidence of a thought or mood

AMADOR      C-28545      CTF-NORTH      01/08/97      gj

AMADOR
C-28545
Page Two


disorder.  He demonstrated some insight into his crime, which he
stated he has gained from working in therapy and in groups.  His
flow of thought was normal.

DIAGNOSTIC IMPRESSIONS:

AXIS I:     1)  Alcohol dependence, in remission.
            2)  Impulse control disorder NOS.
AXIS II:    No personality disorder.
AXIS III:   No contributory physical disorder.

CONCLUSIONS AND RECOMMENDATIONS:

1)   This inmate is competent and responsible for his behavior.
He has the capacity to abide by institutional standards and he
has generally done so during his incarceration.

2)   Regarding substance abuse, he acknowledges that he has had
problems in the past.  Alcoholics Anonymous attendance as well as
monitoring should be mandatory conditions of parole.

3)  This man does not have a significant psychiatric disorder
which requires mental health services.

4)   The writer is in agreement with past psychological
evaluations, in particular with Dr. Orling's Category "X"
evaluation dated 07/25/90.  Dr. Orling concluded that inmate
Amador does understand the causes of his commitment offense.  He
also stated that he believed his level of dangerousness is below
average for incarcerated felons, and finally, he concluded that
he has a good deal of self-control.

STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


AMADOR        C-28545        CTF-NORTH        01/08/97        gj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
MAY 1999

CORRECTIONAL TRAINING FACILITY
FEBRUARY 5, 1999

Inmate Amador was interviewed for the Board of Prison Terms on inmate on 2/5/99.
This appears to be the ninth psychological evaluation. This report is the product of a per-
sonal interview conducted on 2/5/99 as well as a review of his Central File and medical
records. This single contact was for the express purpose of preparing this report.

### SECTION I:    IDENTIFYING INFORMATION

Inmate Amador is a 47 year old, married, Hispanic male. He stated his religion as
Protestant. No unusual physical characteristics were noted. He denied the use of aliases
or nick names.

### SECTION II:    DEVELOPMENTAL HISTORY

Inmate Amador denied any history of birth defects, abnormalities of develop-
mental milestones, cruelty to animals, arson or significant childhood medical history. He
also denied any history of physical abuse or sexual abuse as a victim or perpetrator.

### SECTION III:    EDUCATION

This inmate completed high school in 1975 and after incarceration acquired thirty
college units before college classes were discontinued in institutions.

### SECTION IV:    FAMILY HISTORY

Both parents of inmate Amador are deceased. He still stays in contact with a bro-
ther and a sister. Historically, the relationships with his family were described as close
and currently, although everybody are adults and have their own families, their relation-
ships are still good. He stays in touch by phone and occasionally writing.

### SECTION V:    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION

This inmate is heterosexual. He denied any high risk sexual behavior and he
reported no sexually aggressive behavior.

AMADOR        C-28545        CTF-NORTH        2/5/99        CJW

AMADOR, HENRY
CDC NUMBER: C-28545
PAGE TWO

## SECTION VI:  MARITAL HISTORY

Inmate Amador was married first, on and off for twelve years, which led to this offense, the murder of his wife. He again married and has been married for the last nine years. From this marriage he has a four year old daughter.

## SECTION VII:  MILITARY HISTORY

He denied any military service.

## SECTION VIII: EMPLOYMENT/INCOME HISTORY

This inmate spent eight years with various companies as an aircraft industry machinist. He is a skilled employee. Since incarceration he has completed vocations in small engines, appliance repair and sheet metal. Chronos are in his Central file which document both participation and good work habits.

## SECTION IX:  SUBSTANCE AND ABUSE HISTORY

The inmate admits to a problem with alcohol since 14 years of age. He has been a member of Alcoholics Anonymous since 1981. Previous Board hearing transcripts note the lack of chronos from Alcoholics Anonymous. However, this writer was able to find chronos and documentation of attendance back to 1981.

## SECTION X:  PSYCHIATRIC AND MEDICAL HISTORY

Inmate Amador reported himself having no history hospitalizations, serious accidents, head injuries, seizures, any other neurological conditions or events. He has had no significant medical problems and he does not currently take any medications. Further, however, within his family, both parents died of heart problems and within the last year, his only brother and sister have had heart attacks. This inmate himself also had two suicide attempts at the end of the previous marriage which resulted in this offense. He has a history of heart problems within his family which should be addressed.

## SECTION XI:  PLANS IF GRANTED RELEASE

Inmate Amador plans to parole to Los Angeles County. At first opportunity he wishes to transfer parole to San Benito County to live with his wife and daughter. He has offers for jobs and long term employment in his Central file. He will find employment in either an appliance store or as an appliance technician. I believe his prognosis for community living is good particularly with the support of his family.

**AMADOR**      **C-28545**      **CTF-NORTH**      **2/5/99**      **CJW**

AMADOR, HENRY
CDC NUMBER: C-28545
PAGE THREE

## SECTION XII:   CURRENT MENTAL STATUS/ TREATMENT NEEDS

Inmate Amador is a 47 year old male, of average build, who appeared older than his stated age. He was cooperative, calm, coherent and alert. He was appropriately dressed and groomed. His speech was somewhat deliberate and his affect was appropriate. His intellectual functioning was estimated to be within the average range. He demonstrated much insight into his crime, which he stated he has gained from working in therapy, throughout his history of incarceration. Chronos in his Central file date back to therapy groups he has attended since coming into the prison system. He has participated in many different types and kinds of self-help and group therapy modalities.

Current diagnostic impressions (DSM IV):

| | |
|---|---|
| AXIS I: | Alcohol abuse, in remission. |
| AXIS II: | Impulse control disorder, improving. |
| | No personality disorder. |
| AXIS III: | No contributory physical disorder. |
| AXIS V: | GAF = 83. |

His prognosis is good for being able to maintain his current mental state in the community upon parole.

## SECTION XIII:   REVIEW OF LIFE CRIME

Inmate Amador described the details of his commitment offense. As he has in the past he expressed remorse for what happened. When discussing insight into the crime, quite a lengthy discussion ensued, wherein the inmate discussed the particular circumstances surrounding what happened before the actual murder. A very important part of this report is the fact that this inmate understands and has gained sufficient insight into his crime on a level where the decision making abilities that he possesses would not allow something like this to happen again. However, where this inmate is still lacking, is the ability to articulate those decision making abilities so that others understand, others being people, such as the Board of Prison Terms, that when he is discussing his wife's faults that led him to the frustration which led to this crime, he is not actually blaming her but talking simply about the circumstances. This inmate does understand that this crime had nothing to do with his wife, it had everything to do with hate, rage and his inability to handle those emotions in a way which would not lead to the murder of another human being. This inmate also understands and has gained the insight that although he only sees his current wife once a week, that all couples are going to have family problems, and the ability to solve them in a non-violent way, will be up to him to learn. He has been working on that in an active fashion. He also discussed issues and questions surrounding

AMADOR, HENRY
CDC NUMBER: C-28545
PAGE FOUR

raising his daughter, so I also saw evidence that this inmate has gained the insight about how he parents his child will effect how she develops relationships and handles or does not handle problems in those relationships later on. This inmate has gained insight and the Board can be assured that he does understand. Should the Board have further direction it would be simply to continue on the life long process of further insight and his ability to articulate to other people how he has learned, what he has learned, which in this inmate's case, seems to be quite substantial.

SECTION XIV: ASSESSMENT OF DANGEROUSNESS

A.      In consideration of several factors including his complete lack of CDC 115s since 1989, any criminal history besides this quite serious offense, this inmate has a lower than average propensity for violence within a controlled prison setting.

B.      If released to the community this inmate should not be viewed as having a significantly higher than average propensity for violence than the average citizen. In his last psychological evaluation Dr. Steven Terrini noted that he believes Inmate Amador has gained a good deal of self-control.

C.      The only significant risk factor or precursor to violence would be the return to the use of alcohol. As such, this inmate should be mandated to attend Alcoholics Anonymous as well as be available for alcohol and drug screening on a mandatory basis as part of his parole.

SECTION XV: CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

1.      This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards and he has done so for the length of his incarceration period.

2.      He acknowledged that he has had problems in the past with alcohol. Alcoholics Anonymous attendance as well as monitoring should be a mandatory condition of parole.

AMADOR, HENRY
CDC NUMBER: C-28545
PAGE FIVE

3.   This inmate does not have a significant psychiatric disorder which requires
     mental health services.


**M. E. CARSWELL, Ph.D.**
**Staff Psychologist**
**Correctional Training Facility, Soledad**


**STEVEN J. TERRINI, Ph.D.**
**Staff Psychologist**
**Correctional Training Facility, Soledad**

MEC:cjw

D:    2/5/99
T:    2/5/99

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
(REVISED AUGUST 1998)
JULY 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
APRIL 4, 2001

Inmate Henry Amadaor, CDC# C-28545, was seen for a mental
health evaluation for the Board of Prison Terms by M.
Carswell, Ph.D., Clinical Psychologist at CTF, on 02/05/99
for the May 1999 Lifer Calendar.

According to the agreement that CDC psychologists made with
the Board of Prison Terms, once a mental health evaluation
is completed in the new format, revised in August 1998, a
new evaluation is not necessary each time the inmate appears
before the Board of Prison Terms.

Therefore, a mental health evaluation was not conducted at
this time.

R S Coate

R. S. COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

RSC/gmj

D:  04/04/01
T:  04/04/01



COPY - TO INMATE ON
2-27-04

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### FEBRUARY 2004 LIFER CALENDAR

## CORRECTIONAL TRAINING FACILITY, SOLEDAD
### JANUARY 20, 2004

This is a psychological evaluation for the Board of Prison Terms for inmate Henry Amador, CDC# C-28545. This report is the product of one interview with the inmate, conducted on 01/20/04, as well as a review of his Central file and unit health record.

## PSYCHOSOCIAL ASSESSMENT

### I.    IDENTIFYING INFORMATION:

Inmate Amador is a 52-year-old, Hispanic male, born 09/17/51. He stated that he is a Protestant by faith. He stated he uses no aliases or nicknames, and has no obvious unusual physical characteristics.

### II.    DEVELOPMENTAL HISTORY:

Inmate Amador denied any unusual or aberrant feature of his prenatal or perinatal development. He further stated that he had never been abused, either physically or sexually, and denied having perpetrated such behavior himself. He went on to say that he had never engaged in animal abuse or committed arson.

### III.    EDUCATIONAL HISTORY:

Inmate Amador received his high school diploma in 1975, and has subsequently acquired 30 units of college credit.

### IV.    FAMILY HISTORY:

Inmate Amador said no member of his family other than himself has had significant legal problems. He stated that his parents are both deceased--his mother at age 78, and his father at age 76. The inmate has a brother and a sister (to whom he has felt close, and who is now in a coma). He stated that his family has a history of heart problems, and he himself has had bypass surgery. His current wife, with whom he remains in contact, lives in Hollister; he killed his first wife. His family members have been approved for visits.

### V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

When asked about his sexual preference, inmate Amador stated that he is definitely heterosexual. He states that he has always treated females with respect, and denied any sexually related, high-risk behaviors.

**AMADOR**        **C-28545**        **CTF-NORTH**        01/20/04        gmj

AMADOR, HENRY
CDC NUMBER: C-28545
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

## VI.    MARITAL HISTORY:

Inmate Amador has been married more than once--as noted above, he killed his
first wife. He has a daughter by his first marriage.

## VII.   MILITARY HISTORY:

Inmate Amador denied any military history.

## VIII.  EMPLOYMENT/INCOME HISTORY:

Inmate Amador said that he worked for several years as a machinist in the aircraft
and chemical industries before he came to prison.

Since his incarceration, inmate Amador has subsequently taken training in heating
ventilation, air conditioning, appliance repair, and sheet metal. He has also
obtained training and certification in vocational printing.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Amador admitted to a history of substance abuse beginning at an early
age. He also stated that he has attended Alcoholics Anonymous since the early
'80s, and intends to do so if he is released to the free community.

## X.     PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Amador had two suicide attempts after his first marriage broke up. He
denied any other psychiatric history. As noted earlier, he had a bypass operation
in 2002, and no other major medical issues were noted.

## XI.    PLANS IF GRANTED RELEASE:

If granted parole, inmate Amador indicated that he would likely go to Los
Angeles County, where he will live with his niece and sister. His wife will also
move to LA with her daughter to be with him. He has an offer from an ex-felon
placement business to assist him with finding a job on the basis of experience and
training. He also has a sponsor to help him with his first and last month's rent.
His sister and wife will also help. If he is able to go to Hollister, California, to be
with his wife, he also has offers of job placements in that area.

## CLINICAL ASSESSMENT

## XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Amador was clean and well groomed during the interview. His speech
was fluent, and he maintained good eye contact. He appeared to be goal-oriented,

AMADOR        C-28545        CTF-NORTH        01/20/04        gmj

AMADOR, HENRY
CDC NUMBER: C-28545
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

and displayed neither a thought disorder nor a mood disorder. His intelligence is likely to be in the average range, and he seems to have reasonably good insight into the issues that brought him into prison.

### CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:        Alcohol Abuse.
AXIS II:       Deferred.
AXIS III:      No Contributory Physical Disorder.

## XIII.  REVIEW OF LIFE CRIME:

Inmate Amador stated that the person he killed was his first wife. He said that his relationship with his first wife was laden with violence. He had struck her more than once (under the influence), and added that alcohol was involved in most of their "situations," though he added that it was not to blame; he was. The last time they were involved in an argument was in the back of his van (he had been drinking), and the focus of their argument was the custody of their son. His wife believed his drinking was a potential threat to their son. He eventually smacked her with a hammer, and buried her in the back yard of his sister's, and took her (his wife's) belongings.

When asked about how he felt, inmate Amador said that he felt sorrow about robbing her of her life. He went on to say that he handles his anger differently these days, not resuming to violence as in the past, nor using alcohol.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

By his record in prison, inmate Amador appears to be a relatively minor risk for danger within the prison system—he has received one CDC-115 and two CDC-128s. In sum, he would appear to offer a minimal potential for violence in the prison system.

The biggest concern this psychologist has relative to his potential release to the free community is his old habit of using alcohol. While it is acknowledged that he has done a good job of avoiding violence in the prison community, the free community offers a potential for frustration he has not experienced in a long time. The ready availability of alcohol offers a great temptation to former alcoholics under these circumstances. Thus, he will need to be backed up by regular attendance at Alcoholics Anonymous, plus random checks to assess his sobriety. If he can manage to handle the demands of frequent and regular attendance at such meetings, he will stand a good chance of maintaining his nonviolent approach to solving the frustrating situations of everyday life.

AMADOR        C-28545        CTF-NORTH        01/20/04        gmj

AMADOR, HENRY
CDC NUMBER: C-28545
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

Inmate Amador has no mood disorder that puts him at risk for uncontrolled
behavior. His greatest issue is whether or not he will be able to avoid violence in
his interactions with the world. He currently seems to have the tools to do so.

R. Talbott, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

RT/gmj

D: 01/20/04
T: 01/28/04

COPY TO INMATE ON
APR 2 8 2004

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## (REVISED AUGUST 1998)
## PAROLE CONSIDERATION HEARING
## FEBRUARY 2004 LIFER CALENDAR

## CORRECTIONAL TRAINING FACILITY, SOLEDAD
## APRIL 5, 2004

This is a psychological evaluation for the Board of Prison Terms on inmate Henry Amador, CDC# C-28545, who has been incarcerated for 24 years on a 15-year to life sentence for Second Degree Murder. This report is the product of a personal interview, conducted on 04/05/04, as well as a review of his Central file and unit health record. This interview was a single contact with this individual for the sole purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

### I.    IDENTIFYING INFORMATION:

Inmate Amador is a 52-year-old, married, Hispanic male. His stated religious affiliation is Protestant. There were no unusual physical characteristics noted, and he denied the use of any nicknames or aliases.

### II.    DEVELOPMENTAL HISTORY:

Inmate Amador denied any history of birth defects or abnormalities of developmental milestones.

He denied a history of cruelty to animals, a history of enuresis, or acts of arson. He also denied any significant childhood medical history, or a childhood history of physical or sexual abuse as either a perpetrator or a victim.

### III.    EDUCATIONAL HISTORY:

Inmate Amador completed high school at Lynnwood High School in Lynwood, California, in 1975. After incarceration, he acquired 30 college units before college classes were discontinued in education. The inmate recalls taking a TABE test in Chino in 1980, with a score of 8.1. The inmate is not currently in educational programming.

### IV.    FAMILY HISTORY:

Inmate Amador's parents are deceased. One died in 1976, and the other in 1978. The inmate still stays in contact with a brother and a sister. Historically, the relationships with his family were described as close, and currently, although all

AMADOR, HENRY
CDC NUMBER: C-28545
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

are adults and have their own families, their relationships are still very good. The inmate states that he stays in touch with his family by phone, and occasionally writes.

## V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Amador stated that he is a heterosexual male. He denied any history of high risk sexual behavior or sexual aggression.

## VI.    MARITAL HISTORY:

Inmate Amador was first married off and on for 12 years, which led to his commitment offense, which was the murder of his first wife.

Inmate Amador married again since he was incarcerated, and has been married for the last 17 years. From this marriage, the inmate has a nine-year-old daughter. Recently, this daughter and his son from his previous marriage have talked on the phone, and are excited about meeting.

## VII.    MILITARY HISTORY:

The inmate denied any history of military service.

## VIII.    EMPLOYMENT/INCOME HISTORY:

Inmate Amador spent eight years at various companies as an aircraft industry machinist. He is a skilled employee.

Since his incarceration, this inmate has completed vocational training in small engines, appliance repair, and sheet metal. Chronos are in his Central file, which document both participation and good work habits.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Amador discussed starting to drink alcohol at the age of 14. The inmate admits that he was under the influence at the time of the commitment offense, and he also discussed having been a member of Alcoholics Anonymous since 1981. Previous board hearing transcripts note the lack of chronos from AA. However, this writer was able to find documentation of attendance back until 1981.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Amador denied any history of medical or psychiatric hospitalizations, or any history of suicidal behavior or attempts. He denied a history of serious accidents or head injuries, or a history of seizures or other neurological conditions or events.

AMADOR, HENRY
CDC NUMBER: C-28545
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

However, two years ago, he had chest pain, and there was a resulting blockage in his heart. The inmate was treated, and will be taking heart medication for the rest of his life. Further, within his family, both parents died of heart attacks, and in the last few years, his only brother and sister have had heart attacks.

This inmate, in his medical history, had two suicide attempts at the end of the previous marriage, which resulted in his commitment offense.

**XI.    PLANS IF GRANTED RELEASE:**

Inmate Amador plans to parole to Los Angeles County, and then at the first opportunity, he hopes to transfer parole to San Benito County to live with his wife and child. He has offers for jobs and long term employment in his Central file. He will find employment in either an appliance store, or as an appliance tech. The inmate's prognosis for community living is good, particularly with the support of his family.

## CLINICAL ASSESSMENT

**XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Amador is a 52-year-old, Hispanic male of average build, who appeared his stated age. He was appropriately dressed and groomed. He was cooperative, calm, coherent and alert throughout the interview. His speech was somewhat deliberate, and his affect was appropriate. His intellectual functioning was estimated to be within the average range.

Inmate Amador demonstrates much insight into his commitment offense, which he stated he has gained from working in therapy, and throughout his history of incarceration. Chronos in his central file date back to therapy groups he has attended since coming into the prison system. He has participated in many types of self-help and group therapy modalities.

The Diagnostic Statistician Manual, Fourth Edition, is the criteria book used by the psychological community in order to assign diagnoses for the purpose of clarity in psychological problems and issues. In this setting, one often sees diagnoses simply being carried from one report and one professional to another without re-establishing guidelines and criteria for which those diagnoses were made. The DSM-IV mandates that certain symptoms be present before diagnoses are assigned, and that those symptoms continue to be a current issue in order to currently reassign these diagnoses year after year. In this case, this inmate no longer qualifies for any diagnosis written about or specified in the DSM-IV.

AMADOR, HENRY
CDC NUMBER: C-28545
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

## CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

| | |
|---|---|
| **AXIS I:** | No Contributory Clinical Disorder. |
| **AXIS II:** | No Contributory Personality Disorder. |
| **AXIS III:** | Heart problem. |
| **AXIS IV:** | Long-term incarceration. |
| **AXIS V:** | Current GAF = 83. |

The inmate's prognosis for being able to maintain his current mental state in the community upon parole is positive.

## XIII. REVIEW OF LIFE CRIME:

Inmate Amador described the details of his commitment offense. As in previous evaluations, the inmate expresses genuine and deep-felt remorse for what happened during the commitment offense.

When discussing insight into the commitment offense, the inmate understands in quite an insightful manner that he and his wife, although they had never had a smooth relationship, during the time of the commitment offense, they were going through a particularly difficult time, since they were involved in a custody dispute. As the board and other professionals in this area note, this is a quite heightened time of emotional and volatile situations which can occur, and this is what most likely occurred during the commitment offense.

Inmate Amador goes on to express remorse about the fact that his wife was never able to see her son grow up, and that he was never able to have a normal family life. For these things, the inmate takes responsibility.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.    In consideration of several factors, including his lack of criminal history before starting to fight with his wife, also including the complete lack of CDC-115s since 1989, this inmate has a much lower than average propensity for violence within this level II prison setting.

B.    Within the community, when released to the community, this inmate has no higher of a prediction for violence than any other citizen within the community. This statement is based on several dynamic factors which are shown in the research to have an effect on the actual prediction of violence. Besides the history of this one offense with his wife, the inmate has no other history of violence. He has had no violence since 1989, no disciplinary issues in the prison system. He has the support of a family, which is very indicative of good social readjustment. He has continued support of AA, which he will continue to attend once he is released. The

AMADOR, HENRY
CDC NUMBER: C-28545
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

inmate has no mental illness. All of these are factors which are shown to be indicative of whether or not a person will be violent in the future.

C.   The only significant risk factor or precursor to violence for this inmate would be should this inmate choose to return to the use of alcohol. Since this inmate has not used alcohol since he was incarcerated, this is unlikely, but in the off chance that alcohol is within the community where he lives, occasional attendance at AA may be a good idea.

XV.   **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

A.   This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has done so during his incarceration period.

B.   This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

C.   Considering the fact that this inmate was under the influence at the time of the commitment offense, he should continue to attend Alcoholics Anonymous as a mandatory condition of parole. He should also have periodic testing for substance abuse.

**M. E. Gleason, Ph.D., FSICPP**
**Staff Psychologist**
**Board Certified Diplomate, Forensic Psychology**
**Correctional Training Facility, Soledad**

**B. Zika, Ph.D.**
**Senior Supervising Psychologist**
**Correctional Training Facility, Soledad**

MEG/gmj

D: 04/05/04
T: 04/07/04

D:\Word Files\BPT - 2004\AMADOR, HENRY  C-28545  02-04  GLEASON.doc

**AMADOR**      **C-28545**      **CTF-NORTH**      **04/05/04**      **gmj**